No. 26-30016

# In the United States Court of Appeals for the Fifth Circuit

NETCHOICE,
*Plaintiff–Appellee,*

v.

LIZ MURRILL, in her official capacity as Attorney General of Louisiana;
MIKE DUPREE, in his official capacity as Director of the Public Protection
Division, Louisiana Department of Justice,
*Defendants–Appellants.*

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:25-cv-231

## BRIEF OF DEFENDANTS-APPELLANTS

ELIZABETH B. MURRILL
Attorney General of Louisiana

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 421-4088
FairclothZ@ag.Louisiana.gov

J. BENJAMIN AGUIÑAGA
Solicitor General

ZACHARY FAIRCLOTH
Principal Deputy Solicitor General

*Counsel for Defendants-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

Under Fifth Circuit Rule 28.2.1, a certificate of interested persons

is not required because Defendants-Appellants are governmental parties.

/s/ Zachary Faircloth
ZACHARY FAIRCLOTH

**STATEMENT REGARDING ORAL ARGUMENT**

Defendants-Appellants respectfully request oral argument. The district court's decision permanently enjoins Louisiana from enforcing the protections its Legislature enacted to shield children from online predators, addictive platform designs, and mental-health harms they cause. This appeal presents significant questions regarding associational standing at summary judgment, the standard for Due Process vagueness challenges in civil cases, and the appropriate level of First Amendment scrutiny for state laws requiring age verification and parental consent on social media platforms after *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461 (2025). Oral argument would assist the Court in resolving these issues, which bear on both the jurisdictional threshold and the constitutionality of Louisiana's efforts to protect minors online.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS..............................................ii

STATEMENT REGARDING ORAL ARGUMENT............................... iii

TABLE OF AUTHORITIES.........................................................................vi

INTRODUCTION .......................................................................................1

JURISDICTIONAL STATEMENT.............................................................4

ISSUES PRESENTED ................................................................................5

STATEMENT OF THE CASE ....................................................................6

    A.    Social Media Poses Serious Risks to Minors. .........................6

    B.    Age Assurance and Parental Involvement Are Familiar Tools for Protecting Minors.....................................8

    C.    Act 456 Adopts Those Traditional Tools for Large Social-Media Platforms.........................................................9

    D.    Proceedings Below.................................................................11

    E.    The District Court's Decision. ..............................................15

SUMMARY OF THE ARGUMENT .........................................................21

STANDARD OF REVIEW........................................................................26

ARGUMENT.............................................................................................26

  I.  THE DISTRICT COURT LACKS SUBJECT MATTER JURISDICTION..................................................................................27

    A.    NetChoice Failed to Prove Any Member or any User of a Member Platform Has Standing. ...................................28

1. The district court erred in finding associational standing based on alleged injuries to unidentified users..................................................30

2. The district court erred in finding associational standing without specific evidence of injury to any identified member. ...................................................31

B. NetChoice Also Failed to Prove That Its Claims and Requested Relief Can Be Resolved Without the Participation of Individual Members. ...................................34

II. THE DISTRICT COURT ERRED ON THE MERITS. ...............................39

A. The Act's Definition of "Social Media Platform" Is Not Unconstitutionally Vague...............................................39

B. The Act Does Not Violate the First Amendment As Applied to NetChoice's Members..........................................42

1. The district court erred in holding the Act's definition of "social media platform" violates the First Amendment as applied to NetChoice's members....................................................................42

2. The district court erred in holding the Act's parental-consent and age-verification requirements violate the First Amendment as applied to NetChoice's members......................................51

3. The district court erred in holding that the Act's minor-privacy provisions violate the First Amendment as applied to NetChoice's members.............62

III. THE EQUITABLE FACTORS FAVOR THE STATE. ................................67

CERTIFICATE OF SERVICE.................................................................70

CERTIFICATE OF COMPLIANCE ........................................................71

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*44 Liquormart, Inc. v. Rhode Island,*
    517 U.S. 484 (1996) ............................................................................ 67

*Abbott v. Perez,*
    585 U.S. 579 (2018) ............................................................................ 68

*Am. Acad. of Implant Dentistry v. Parker,*
    860 F.3d 300 (5th Cir. 2017) .............................................................. 64

*Anderson v. City of Hermosa Beach,*
    621 F.3d 1051 (9th Cir. 2010) ............................................................ 54

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
    627 F.3d 547 (5th Cir. 2010) ................................................. 34, 35, 38

*Brown v. Entertainment Merchants Association,*
    564 U.S. 786 (2011) ................................................................ 18, 57, 59

*Carney v. Adams,*
    592 U.S. 53 (2020) .............................................................................. 27

*Central Hudson Gas & Electric Corp. v. Public Service
    Commission of N.Y.,*
    447 U.S. 557 (1980) ................................................................... *passim*

*Century Sur. Co. v. Colgate Operating, L.L.C.,*
    116 F.4th 345 (5th Cir. 2024) ....................................................... 26, 60

*Christian Lab. Ass'n v. City of Duluth,*
    142 F.4th 1107 (8th Cir. 2025) ........................................................... 29

*City of Austin v. Reagan Nat'l Advert. of Austin,*
    596 U.S. 61 (2022) .............................................................................. 47

*City of Cincinnati v. Discovery Network, Inc.*,
  507 U.S. 410 (1993) ................................................................ 66

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ................................................................ 31

*Coates v. City of Cincinnati*,
  402 U.S. 611 (1971) ................................................................ 40

*Computer & Commc'ns Indus. Ass'n v. Uthmeier*,
  No. 25-11881, 2025 WL 3458571 (11th Cir. Nov. 25, 2025) ....... *passim*

*Crete Carrier Corp. v. EPA*,
  363 F.3d 490 (D.C. Cir. 2004) ................................................ 29

*Ctr. for Biological Diversity v. EPA*,
  937 F.3d 533 (5th Cir. 2019) .................................................. 32

*Deep S. Ctr. for Env't Just. v. EPA*,
  138 F.4th 310 (5th Cir. 2025) ................................... 28, 30, 32

*E.T. v. Paxton*,
  41 F.4th 709 (5th Cir. 2022) .................................................. 28

*Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Pro.
  Eng'rs & Surveyors*,
  916 F.3d 483 (5th Cir. 2019) .......................................... 64, 65

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ................................................................ 39

*Ford Motor Co. v. Tex. Dep't of Transp.*,
  264 F.3d 493 (5th Cir. 2001) .................................................. 41

*Free Speech Coal., Inc. v. Paxton*,
  95 F.4th 263, 280 (5th Cir. 2024), *aff'd on other grounds*,
  606 U.S. 461 (2025) .......................................................... 54, 64

*Free Speech Coalition, Inc. v. Paxton,*
  606 U.S. 461 (2025) ................................................................*passim*

*In re Gee,*
  941 F.3d 153 (5th Cir. 2019) (per curiam) ................................... 32, 34

*Glickman v. Wileman Bros. & Elliott, Inc.,*
  521 U.S. 457 (1997) .................................................................. 43, 46

*Groome Res. Ltd. v. Parish of Jefferson,*
  234 F.3d 192 (5th Cir. 2000) ........................................................... 40

*Hines v. Pardue,*
  117 F.4th 769 (5th Cir. 2024) ......................................................... 52

*Holder v. Humanitarian L. Project,*
  561 U.S. 1 (2010) ........................................................................... 52

*Hunt v. Washington State Apple Advertising Commission,*
  432 U.S. 333 (1977) ...............................................................*passim*

*Justice v. Hosemann,*
  771 F.3d 285 (5th Cir. 2014) ........................................................... 37

*La Union del Pueblo Entero v. Abbott,*
  167 F.4th 743 (5th Cir. 2026) ............................................... 40, 41, 42

*LaCroix v. Town of Fort Myers Beach,*
  38 F.4th 941 (11th Cir. 2022) ......................................................... 46

*Lorillard Tobacco Co. v. Reilly,*
  533 U.S. 525 (2001) ................................................................... 66, 67

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ...............................................................*passim*

*McClelland v. Katy Indep. Sch. Dist.,*
  63 F.4th 996 (5th Cir. 2023) ........................................................... 40

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024) ................................................................ *passim*

*Morgan v. White,*
964 F.3d 649 (7th Cir. 2020) .............................................. 53

*Murthy v. Missouri,*
603 U.S. 43 (2024) ....................................... 27, 31, 32, 39

*Nat'l Press Photographers Ass'n v. McCraw,*
90 F.4th 770 (5th Cir.), *cert. denied sub nom. Nat'l Press
Photographers Ass'n v. Higgins,* 145 S. Ct. 140 (2024) ..................... 55

*NetChoice v. Bonta,*
761 F. Supp. 3d 1202 (N.D. Cal. 2024), *aff'd in part, rev'd
in part and remanded sub nom. NetChoice, LLC v. Bonta
(Bonta II),* 152 F.4th 1002 (9th Cir. 2025) ......................................... 13

*NetChoice, LLC v. Bonta (Bonta I),*
152 F.4th 1002 (9th Cir. 2025) ................................................ *passim*

*NetChoice, LLC v. Bonta (Bonta II),*
No. 25-2366, 2026 WL 694471 (9th Cir. Mar. 12, 2026) .............. 23, 45

*NetChoice, L.L.C. v. Fitch,*
134 F.4th 799 (5th Cir. 2025) ......................................... 28, 30, 35, 67

*NetChoice, L.L.C. v. Fitch,*
No. 25-60348, 2025 WL 2078435 (5th Cir. July 17, 2025) ................. 67

*NetChoice, LLC v. Fitch,*
145 S. Ct. 2658 (2025) ..................................................................... 67

*Packingham v. North Carolina,*
582 U.S. 98 (2017) ......................................................................... 55

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,*
547 U.S. 47 (2006) ......................................................................... 53

*Sable Commc'ns of Cal., Inc. v. FCC,*
   492 U.S. 115 (1989) ...................................................... 49, 58, 66, 68

*Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't*
   *Quality,*
   968 F.3d 419 (5th Cir. 2020) ...................................................... 29, 34

*Sierra Club v. EPA,*
   292 F.3d 895 (D.C. Cir. 2002) ........................................................... 29

*Sorrell v. IMS Health Inc.,*
   564 U.S. 552 (2011) ........................................................................... 43

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016) ........................................................................... 28

*Students for Fair Admissions, Inc. v. President & Fellows of*
   *Harvard Coll.,*
   346 F. Supp. 3d 174 (D. Mass. 2018) ............................................... 27

*Students for Fair Admissions, Inc. v. President & Fellows of*
   *Harvard Coll. (SFFA),*
   600 U.S. 181 (2023) ................................................................ 27, 28, 34

*Tex. Democratic Party v. Abbott,*
   961 F.3d 389 (5th Cir. 2020) ........................................................... 40

*TikTok Inc. v. Garland,*
   604 U.S. 56 (2025) .......................................................... 48, 50, 58, 61

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ........................................................................... 32

*Trump v. CASA, Inc.,*
   606 U.S. 831 (2025) .................................................................... 31, 68

*Turner Broad. Sys., Inc. v. FCC,*
   520 U.S. 180 (1997) .................................................................... 48, 49

*Univ. of Penn. v. EEOC,*
  493 U.S. 182 (1990) ............................................................... 43

*US Inventor Inc. v. Vidal,*
  No. 21-40601, 2022 WL 4595001 (5th Cir. Sept. 30, 2022) ................ 32

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
  455 U.S. 489 (1982) ............................................................... 41

*Virginia v. Am. Booksellers Ass'n,*
  484 U.S. 383 (1988) ............................................................... 30

*Virginia v. Hicks,*
  539 U.S. 113 (2003) .......................................................... 53, 63

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) .......................................................... 48, 51

*Williams-Yulee v. Fla. Bar,*
  575 U.S. 433 (2015) ............................................................... 50

*Zauderer v. Off. of Disciplinary Counsel of Supreme Ct. of Ohio,*
  471 U.S. 626 (1985) ............................................................... 64

**Statutes**

15 U.S.C. §§ 6501-6506 ............................................................ 66

28 U.S.C. § 1291 ...................................................................... 4

28 U.S.C. § 1292(a)(1) ............................................................... 4

28 U.S.C. §§ 1331 and 1343 ......................................................... 4

Fla. Stat. § 501.1736(1)(e) ......................................................... 47

La. R.S. 14:32.12 .................................................................... 44

La. R.S. 14:46.2 ................................................................ 44

La. R.S. 14:81.3 ................................................................ 44

La. R.S. 14:91.14 ............................................................. 44

La. R.S. 14:283.2 ............................................................. 44

La. R.S. 51:1751 ........................................................ *passim*

La. R.S. 51:1752 ........................................................ *passim*

La. R.S. 51:1753 ........................................................ *passim*

La. R.S. 51:1754 .............................................................. 10

La. R.S. 51:1755 .............................................................. 11

La. R.S. 51:1756 .............................................................. 11

## Other Authorities

U.S. Const. amend. I ....................................................... 52

U.S. Const. art. III, § 2 ................................................... 39

2023 La. Sess. Law Serv. Act 456 ....................................... 9

Eugene Volokh,
   *Apparent Massive Quotation/Citation Errors
   in NetChoice Expert's Report*, The Volokh Conspiracy
   (Reason.com) (Aug. 18, 2025), t.ly/S4y9c .......................... 14

Fed. R. Civ. P. 56(e) ................................................. 28, 29

Fed. R. App. P. 4(a)(1)(A) ................................................. 5

Meta,
   *Instagram Teen Accounts Will Be Guided by PG-13
   Ratings*, About FB: Newsroom
   (Oct. 14, 2025), t.ly/cGLlq ...................................................................... 36

Snap,
   *Offering Parents Deeper Insights with Snapchat's
   New Family Center Features*, Snap Newsroom
   (Jan. 22, 2026), t.ly/eJmIK ................................................................... 36

## INTRODUCTION

The State can do more than "encourage the use of available tools" (ROA.6570) to protect Louisiana minors from Big Tech's worst excesses. Nothing in the Due Process Clause or First Amendment requires the State to sit idly by or just issue a public service announcement while sexual predators groom and sextort minors through social media, while sexual content obscene for minor runs rampant on those platforms, while an entire generation of adolescents suffers escalating rates of depression, loneliness, self-harm, and suicide from those sites—all while company after company concedes that its own moderation efforts are losing a "constant battle against malicious actors." ROA.4915; *e.g.*, ROA.5028.

Faced with that reality, Louisiana, like most other States, took the modest step with Act 456 of asking those platforms to make commercially reasonable efforts to verify a user is 16 or older before opening an account and, if the child is 14 or 15, to ensure a parent consents to their doing so. *See* La. R.S. 51:1752(A)–(B). The Act also restricts unsolicited messages from adult strangers to children's accounts and limits platforms' ability to harvest minors' personal data for targeted advertising. La. R.S. 51:1753 ("minor-privacy provisions"). These are not novel

1

requirements. And they cost under a cent per user, take less than a minute to complete, and many of NetChoice's own members already employ them, both abroad and under existing federal law.

The district court's decision striking down those measures is wrong at every level. Most fundamentally, the district court lacked subject matter jurisdiction because NetChoice failed to satisfy its associational-standing burden at summary judgment. Believing Defendants would gather third-party discovery for it, NetChoice chose to never identify a single current or prospective user of a members' platform (whether Facebook, X, or otherwise) who would suffer an injury traceable any provision of the Act. And NetChoice's corporate representative swore under oath that it made zero effort during discovery to reach out to its members to develop a specific factual record of their supposed concrete, particularized, and actual or imminent injuries. NetChoice's evidentiary failures are fatal under both the first and third prongs of *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977), because NetChoice cannot prove a member's or platform user's Article III injury, and resolution of its as-applied claims necessarily will

require individualized member participation at trial. This case should have begun and ended with standing.

If the Court reaches the merits, reversal is still warranted. The district court concluded that the Act's definition of "social media platform" is unconstitutionally vague "in all its application" based on speculation about a single hypothetical edge case. But this Court has repeatedly rejected that kind of margins-based vagueness reasoning.

The lower court's First Amendment analysis was no sounder. Minimizing the Supreme Court's holding in *Free Speech Coalition, Inc. v. Paxton (FSC)*, 606 U.S. 461 (2025), the district court applied strict scrutiny to every challenged definition and provision of the Act largely because the platforms host third-party speech. But that is not the law. Each of the challenged provisions target nothing about a social media company's (or its users') speech or expressive conduct. And to the extent any First Amendment scrutiny is warranted at all, intermediate scrutiny is the appropriate standard. *See Computer & Commc'ns Indus. Ass'n v. Uthmeier*, No. 25-11881, 2025 WL 3458571, at *4 (11th Cir. Nov. 25, 2025). On a passing glance at this record and the State's unrebutted

3

expert testimony, the Act and each of its provisions plainly satisfy that lesser burden.

What NetChoice is seeking nationwide is not First Amendment protection but regulatory immunity for Big Tech just because speech appears on its members' platforms. The Constitution does not compel that result. Accordingly, the Court should reverse.

## JURISDICTIONAL STATEMENT

Although the district court lacked subject matter jurisdiction under Article III of the Constitution, *see infra* Argument Section I, the district court had statutory subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343. The district court's order granting Plaintiff's Motion for Summary Judgment and denying Defendant's Motion for Summary Judgment is a final decision over which this Court has appellate jurisdiction under 28 U.S.C. § 1291. If the district court's order granting a permanent injunction is interlocutory, this Court also would have jurisdiction under 28 U.S.C. § 1292(a)(1). The district court's order and judgment were entered on December 15, 2025. ROA.6504, 6598. Defendants-Appellants filed a notice of appeal on January 13, 2026.

ROA.6607. The appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(A).

## ISSUES PRESENTED

1.    Whether the district court lacks subject matter jurisdiction under Article III where (a) NetChoice failed to submit summary-judgment evidence of a concrete, particularized injury to any identified NetChoice member or member's user and (b) NetChoice concededly possesses no substantive knowledge about its members' platforms, practices, or expressive choices, making resolution of its as-applied claims impossible without individual member participation.

2.    Whether the Act's definition of "social media platform" is unconstitutionally vague in all its applications where the statute specifies in detail what is and is not a covered platform and the district court's contrary holding rested on speculation about a single hypothetical edge case.

3.    Whether the Act's definition of "social media platform," along with its age-verification, parental-consent, and minor-privacy provisions violate the First Amendment as applied to NetChoice's members where (a) the provisions regulate platforms' non-expressive conduct—not

5

speech, (b) each provision, at least, satisfies intermediate scrutiny under *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461 (2025) or *Central Hudson Gas & Electric Corp. v. Public Service Commission of N.Y.*, 447 U.S. 557 (1980), on a record of unrebutted expert testimony, (c) the district court applied strict scrutiny despite the Supreme Court's and Eleventh Circuit's contrary holdings for materially analogous laws, and (d) the district court failed to properly apply intermediate scrutiny.

4.    Whether the equitable factors support a permanent injunction where this Court and the Supreme Court concluded otherwise for a materially analogous Mississippi law and the State suffers irreparable harm from the inability to enforce its duly enacted laws protecting minors.

## STATEMENT OF THE CASE

### A. Social Media Poses Serious Risks to Minors.

Social media has deteriorated adolescent mental health. Defendants' expert Dr. Jean Twenge—whose testimony went unrebutted below—explained that social media use drives higher rates of depression, loneliness, self-harm, and suicide among teenagers, with the most severe effects falling on younger adolescents and girls. ROA.4256.

The scale of harmful content on major platforms underscores the risk. In just six months of 2023, Facebook alone saw at least 2.7 billion spam posts, 28 million posts containing antisemitic, racist, or other derogatory content, and 27 million violent or graphic posts. ROA.4912. Platforms thus operate in a "constant battle against malicious actors," including scammers, sex predators, and users distributing harmful material. ROA.4915. Bad actors adapt quickly to target and reach minors, evading detection mechanisms through coded language, manipulating platform features, and exploiting gaps in enforcement. ROA.4915; *e.g.*, ROA.4918 (describing "algospeak" like "unalive" for suicide or "mascara" for sexual assault).

These risks persist despite platforms' own alleged efforts to moderate content and enforce safety policies. Even under the moderation approaches promoted by NetChoice's members, harmful material and predatory conduct are not eliminated. ROA.4914, 4967-68. The record thus reflects that post hoc content moderation cannot fully protect minors from being exposed to harmful content or contacted by bad actors on large social-media platforms.

### B. Age Assurance and Parental Involvement Are Familiar Tools for Protecting Minors.

Age verification and parental consent are longstanding safeguards to protect minors in contexts involving heightened risks. Such measures are commonly required for activities like purchasing alcohol or tobacco, gambling, getting tattoos, and accessing pornography. ROA.5217.

Today, these safeguards are cheaper, more reliable, and more privacy-protective than ever. ROA.5220-23. Unlike device- or network-level filters, website-level age assurance is reliable and allows one verification to apply seamlessly to multiple sites. ROA.5215, 5232. Age can be confirmed in less than a minute, cost under a cent per check, and does not require retaining sensitive personal data. ROA.5220-23. More than forty third-party providers compete globally to deliver these services, and thousands of businesses use them daily. ROA.5219, 5224.

NetChoice's members are not strangers to these tools. Many already use age-verification mechanisms abroad, ROA.5211-15, and they employ parent-consent mechanisms for users under 13 under existing federal law, ROA.5231-32.

### C. Act 456 Adopts Those Traditional Tools for Large Social-Media Platforms.

In response to these concerns, the Louisiana Legislature enacted the Secure Online Child Interaction and Age Limitation Act of 2023. *See* 2023 La. Sess. Law Serv. Act 456 (S.B. 162) (codified at La. R.S. 51:1751 *et seq.*). The Act applies only to large, user-interactive social media companies. A "social media company" is "a person or entity that provides a social media platform that has at least five million account holders worldwide and is an interactive computer service." La. R.S. 51:1751(11). A covered "social media platform," in turn, is "a public or semipublic internet-based service or application that has users in Louisiana" and that (i) "connects users … to interact socially," and (ii) allows them to "construct a … profile," "populate a list of other users" to whom they share content, and "create or post content viewable by other users." La. R.S. 51:1751(12)(a). Among those, the Act excludes services whose "predominant or exclusive function is something else—such as "[e]lectronic mail," "[s]treaming service[s]," "[n]ews, sports, entertainment, or other content that is preselected by the provider," "[i]nteractive gaming," "[p]hotograph editing," "[o]nline shopping," and "[c]loud computing services," among others. La. R.S. 51:1751(12)(b).

9

Against this backdrop, the Act imposes three principal requirements on covered social media companies. *First*, a covered company must "make commercially reasonable efforts to verify the age of Louisiana account holders." La. R.S. 51:1752(A).

*Second*, a covered company must ensure that no minor opens or maintains an account without "the express consent of a parent or guardian," which may be obtained through several flexible "[a]cceptable methods"—such as signed forms, telephone or video calls, or other "commercially reasonable" mechanisms. La. R.S. 51:1752(B)(1)–(6). Companies must also equip consenting parents "with a means for the minor account holder or the parent or guardian to initiate account supervision," including "the ability for the parent to view privacy settings of the minor's account, set daily time limits for the service, schedule breaks, and offer the minor the option to set up parental notifications when the minor reports a person or issue." La. R.S. 51:1754.

*Third*, the Act includes targeted protections for minor accounts. Covered companies must (1) restrict "[a]dults from direct messaging a Louisiana minor account holder" unless already connected, (2) limit "[t]he display of any advertising" based on a minor user's "personal

information, except age and location," and (3) confine the "collection or use" of minor users' "personal information from the posts, content, messages, text, or usage activities" to only "what is adequate, relevant, and reasonably necessary" for the collection or use's disclosed purpose. La. R.S. 51:1753.

Enforcement authority rests exclusively with the Division of Public Protection within the Louisiana Department of Justice. La. R.S. 51:1756(A); *see* La. R.S. 51:1751(3). The Division may promulgate rules and regulations, La. R.S. 51:1752(D); receive and investigate complaints, La. R.S. 51:1755; and pursue enforcement actions, La. R.S. 51:1756(D)(1)–(3). Before any enforcement action, however, the Division must provide written notice and allow forty-five days to cure. La. R.S. 51:1756(D)(1)–(3). Only if a violation is not cured (or in cases of repeat violations) may the Division impose administrative fines up to $2,500 per violation or file suit for damages, civil penalties, or equitable relief. La. R.S. 51:1756(B)–(C).

### D. Proceedings Below.

NetChoice—a D.C.-based trade association of big tech giants—sued Attorney General Liz Murrill and Director of the Public Protection

11

Division Mike Dupree in March 2025 to challenge the Act. ROA.22. It sought, among other things, an injunction barring enforcement of the Act against NetChoice and its approximately 40 publicly disclosed members. ROA.26, 59. That day, NetChoice moved for a preliminary injunction supported by declarations from representatives Snap and Reddit, along with a declaration from its general counsel Bartlett Cleland. ROA.114.

Rather than litigate that motion to decision, the parties agreed to an expedited schedule for fact and expert discovery followed by cross-motions for summary judgment. ROA.248, 254.

What followed was not a typical discovery record. NetChoice chose not to develop any admissible evidence about its own members, instead attempting to force the State to conduct third-party discovery to fill the gap. *See* ROA.1305. The State declined. On the eve of the discovery deadline, NetChoice's corporate representative confirmed that NetChoice's knowledge of its members' technologies and practices was limited to what those companies publicly posted online—and that NetChoice had made no effort to verify any of that content. *E.g.*, ROA.4676-77 (Q: And no one at NetChoice sought to verify that with anyone affiliated with Reddit, correct? … A: As I said before, all

12

information that I'm aware of that we know as NetChoice is from their websites and how they explain their verification, whether they do.").[1]

When Defendants pressure-tested that position through a motion to compel testimony by a corporate witness that actually did know something about NetChoice's members, *see* ROA.276, NetChoice doubled down. It represented that "[a]t summary judgment, [it] will rely on the publicly available information about its members that it has produced to Defendants," ROA.1315, and emphasized repeatedly that it possessed no additional information beyond what appears on the members' websites, ROA.1294-96, 1312. The Magistrate Judge denied Defendants' motion to compel, but recognized the dangerous consequence of NetChoice's litigation choice: "That NetChoice was unable to provide information at its deposition that is relevant" to "its members and services" "raises the issue of whether NetChoice has associational standing to raise an 'as applied' First Amendment challenge on behalf of its members in the first place." ROA.1470 (citing *NetChoice v. Bonta*, 761 F. Supp. 3d 1202, 1230–

---

[1] *See also, e.g.*, ROA.4617 ("there seems to be this obsession with reaching out to somebody"); ROA.4446, 4454-55, 4457, 4485-86, 4489, 4510, 4568, 4570-71, 4608, 4622, 4630, 4663, 4669.

31 (N.D. Cal. 2024), *aff'd in part, rev'd in part and remanded sub nom. NetChoice, LLC v. Bonta*, 152 F.4th 1002 (9th Cir. 2025)).

NetChoice's failure of proof extended to expert discovery. It designated a single expert, Dr. Anthony Bean, and served his report under penalty of perjury. ROA.817-48. That report was riddled with hallucinated quotations and citations, including of authorities that do not exist; so the State moved to exclude Dr. Bean on reliability grounds and for fees and costs associated with having to do so. ROA.777-808. Rather than defend that submission, NetChoice withdrew Dr. Bean, disclaimed "any other expert witness in this case," and refused to accept any responsibility for what is likely an AI-fabricated expert report. ROA.1430-31; *see* Eugene Volokh, *Apparent Massive Quotation/Citation Errors in NetChoice Expert's Report*, The Volokh Conspiracy (Reason.com) (Aug. 18, 2025), t.ly/S4y9c. That litigation choice, too, left NetChoice without any admissible expert evidence.

Defendants thus built a summary-judgment record with unrebutted expert testimony from Dr. Jean Twenge (a psychologist who has studied adolescent mental health and the impacts of social media) and Tony Allen (a world-renowned expert in age-assurance and age-

14

verification technologies) establishing, respectively, that social media use is a causal factor in the youth mental health crisis, ROA.4254-312, and that modern age-assurance tools are effective, widely used, and minimally burdensome, ROA.4361-86.

The cross-motions for summary judgment were submitted on that record. ROA.4188 (Defendants' motion); ROA.1482 (NetChoice's motion).

**E. The District Court's Decision.**

In December 2025, the district court granted NetChoice's motion for summary judgment, denied Defendants' cross-motion, and permanently enjoined enforcement of Act 456 as to ten NetChoice members. ROA.6504, 6596.

The court first held that NetChoice had established associational standing on behalf of both its members *and* its members' users. ROA.6530–44. Without separate Article III analysis for the users, the court identified "two independent harms" to members arising from enforcement of the Act writ large: that members' "rights will be violated" and that they will "incur compliance costs." ROA.6534. It further concluded that those injuries are "fairly traceable" to "enforcement of the

15

Act"—without tying them to any particular provision—and that "an injunction would surely redress such injury." ROA.6539.

The court also found no individualized member inquiry necessary because the Act "imposes broad restrictions on threshold access to regulated website[s]" and because NetChoice "seeks only injunctive relief here." ROA.6541–42. That was so notwithstanding the absence of member-specific evidence showing how any provision of the Act would actually affect any covered company. *See NetChoice, LLC v. Bonta (Bonta I)*, 152 F.4th 1002, 1013–16 (9th Cir. 2025).

On the merits, the district court held that every challenged provision of Act 456 is unconstitutional in all its applications. ROA.6596. It began with the Act's coverage definition, holding it invalid on both facial vagueness and First Amendment grounds. ROA.6563-71, 6588-92.

As for vagueness, the court focused on "[t]he phrase 'predominant or exclusive function,'" reasoning that the Act "does not indicate how to compare platforms' functions in order to determine which is 'predominant.'" ROA.6590. From there, the court moved to hypotheticals, suggesting that an "online videogame" might be unsure whether it is covered if users begin to treat it as a space for "social interaction."

16

ROA.6590. Relying on materials outside the summary-judgment record, it pointed to Amazon's Twitch platform[2] as a "useful illustration" of that possibility. ROA.6591. On that basis, and raising possible compliance costs and "worrisome" enforcement discretion, the court concluded that platforms could face "unpredictable and arbitrary enforcement," and so held that "all applications of the Act are impermissibly vague." ROA.6591-92.

The court likewise held that the Act's coverage definition is "content-based" and subject to strict scrutiny, relying heavily on records developed in other NetChoice cases. ROA.6563, 6568. It reasoned that the Act burdens platforms' ability "to publish [] speech to minor users," and "users' ability to access and to engage in speech on covered platforms." ROA.6563. Applying strict scrutiny, the court assumed a compelling interest but concluded the Act is not narrowly tailored because minors can "encounter the same potentially harmful content on unregulated websites" and "gain more or less unrestricted access" after

---

[2] According to the district court, ""Twitch is a live-streaming service. Ordinary users can become content creators by making Twitch accounts and live-streaming their content on the platform. Account holders can also participate in live-streams via, inter alia, a live chat function. … [A]ccount creation, content creation, and participation in live-streams are all optional." ROA.6591.

age verification and parental consent and because "Louisiana can encourage the use of available tools," such as "parental controls." ROA.6570. On that reasoning, the district court held the entire Act unconstitutional.

"For the sake of completeness," the district court also held that each provision independently violates the First Amendment. ROA.6571. As to the age-verification and parental-consent requirements, the court invoked *Brown v. Entertainment Merchants Association*, 564 U.S. 786, 789 (2011), to reason that "[i]dentical speech on unregulated websites" remains accessible, that minors still have "unrestricted access" with parental consent, and that parents already have tools to "control and monitor their children's access to and use of social media." ROA.6573

The court further held (despite Defendants' unrebutted expert testimony) that "Defendants have not established a causal relationship between social media use and health," relying instead on "NetChoice's

18

substantive criticisms." ROA.6575.[3] And it concluded the Act is both "over- and under-inclusive," because it burdens "an enormous amount of protected speech," duplicates tools already available to parents, and does not regulate similar speech on smaller platforms. ROA.6576.

The court also held that the Act's restriction on targeted advertising "based on the Louisiana minor account holder's personal information, except age and location" also violates the First Amendment. ROA.6579. It reasoned that the provision "treats social media companies as publishers of speech" and "does not clarify whether the advertising prohibition applies only to *commercial* advertisements," rendering it subject to "strict scrutiny." ROA.6579-80. The court added that "[r]egardless of the level of scrutiny which applies," the provision fails because the State "could instead allow minor account holders to opt out of targeted advertising" and because the law "encompasses" speech beyond "commercial transactions." ROA.6580. It further faulted the State

---

[3] Those criticisms were attorney arguments raised in NetChoice's motion to exclude Dr. Twenge, filed with its summary-judgment opposition. ROA.6163. Defendants fully rebutted those arguments, ROA.6353, and they do not constitute competent summary-judgment evidence anyway, particularly where NetChoice forfeited any expert testimony. ROA.1430-31. The district court did not resolve that motion before granting summary judgment and, instead, denied it as moot. ROA.6597.

for not offering "a more specific causal relationship" tailored to that restriction. ROA.6581.

The prohibition on unsolicited adult-to-minor messaging incurred the same fate. ROA.6582. The court reasoned that it "burden[s], if not thwart[s], many innocuous—even productive—forms of communication," is "largely redundant of existing parental controls and content moderation," and is not completely effective because "minors can skirt them easily." ROA.6582-83. On that reasoning alone, the court invalidated yet another provision of the Act as unconstitutional.

Finally, notwithstanding that this Court and the Supreme Court concluded that preliminary injunctive relief was unwarranted for a materially analogous Mississippi law, the district court held that the equities cut the other way in Louisiana. ROA.6594. By its lights, those decisions are distinct because "Louisiana's law has not been enforced"— as part of the matter's joint case management order—so there was "no rollback necessary," as there was in Mississippi. ROA.6594.

For those reasons, the court granted NetChoice summary judgment, denied Defendants' cross-motion, and entered a permanent injunction against enforcing the Act against "(1) Meta (Facebook,

Instagram, WhatsApp), (2) Nextdoor, (3) Pinterest, (4) Reddit, (5) Snap (Snapchat), (6) X, (7) YouTube, (8) Automattic (Tumblr), (9) Discord, and (10) Amazon (Twitch)." ROA.6596. This appeal followed. ROA.6607.

## SUMMARY OF THE ARGUMENT

**I.** This case should begin and end with standing. NetChoice bears the burden of proving associational standing at summary judgment with evidence, and it failed to carry that burden by both (1) not identifying any user of a NetChoice member's platform and (2) not setting forth specific facts sufficient to prove standing at summary judgment. Its only member-specific evidence consists of two preliminary-injunction declarations from Snap and Reddit (recycled months later without any additional factual development) that offer nothing more than generalized assertions of cost and disruption. Its corporate representative confirmed under oath that NetChoice possesses no substantive knowledge about its members' platforms, technologies, or practices beyond what those companies post on their own websites.

That evidentiary vacuum is independently fatal under both prong one (no proof of member or user injury) and prong three (resolution of as-applied First Amendment claims is impossible without individualized

21

member participation) of *Hunt*, 432 U.S. at 343. As the Ninth Circuit recognized for a materially analogous NetChoice challenge, the First Amendment analysis will "surely vary" from platform to platform, *see Bonta I*, 152 F.4th at 1014—and NetChoice made no effort to develop the individualized record that variation demands.

**II.** On the merits, each of the district court's holdings is wrong. **A.** Start with vagueness. The Act defines "social media platform" in painstaking detail—specifying covered and excluded functions, setting a five-million-account-holder threshold, and excluding services whose "predominant or exclusive function" is something other than being a "social media platform." The district court held the definition vague in "all applications" based on speculation about a single hypothetical edge case. That is precisely the kind of vagueness-at-the-margins reasoning this Court has flatly disallowed.

**B.** The First Amendment challenges fare no better, starting with the Act's coverage definition. **1.** The district court held that defining "social media platform" is itself content-based and subject to strict scrutiny. But a State's decision to regulate a particular industry does not independently implicate the First Amendment. The Supreme Court

confirmed as much in *Free Speech Coalition* and *Moody*, where despite analogous coverage definitions, the Court declined to apply strict scrutiny. And the Ninth Circuit recently dismissed this precise argument from NetChoice, explaining that a coverage-definition challenge "is more appropriately raised against the substantive provisions." *NetChoice, LLC v. Bonta (Bonta II)*, No. 25-2366, 2026 WL 694471, at *7 n.3 (9th Cir. Mar. 12, 2026). Even if the definition itself implicated the First Amendment, defining platforms by their function, rather than the content they host, is content-neutral—which the Eleventh Circuit has correctly recognized. *Uthmeier*, 2025 WL 3458571, at *4. And the Act readily satisfies intermediate scrutiny on this record.

**2.** The age-verification and parental-consent provisions are on even stronger footing. Those provisions are triggered by a company's failure to verify age or obtain parental consent, not by any expressive choice. If those requirements implicated the First Amendment, so would every age-verification law for alcohol, tattoos, firearms, and tobacco. No one seriously contends that. And even if the First Amendment applied, intermediate scrutiny would be the "appropriate standard" since Louisiana has exercised its "traditional power" to protect minors with

23

"only an incidental effect on protected speech," intermediate scrutiny is the "appropriate standard." *FSC*, 606 U.S. at 478, 483.

The challenged provision readily satisfy intermediate scrutiny. Louisiana has a compelling interest in protecting children from the documented harms of social media (*e.g.*, sexual predators, sextortion, grooming, pro-suicide content, and addictive platform design) supported by unrebutted expert testimony that NetChoice chose not to contest after withdrawing an expert report riddled with fabricated citations. The Act advances that interest through traditional, minimally burdensome tools that cost under a cent per check, take less than a minute, and are already in use by many of NetChoice's own members.

**3.** The minor-privacy provisions independently survive for similar and additional reasons. Those provisions regulate the way platforms structure and operate their services with respect to minors by restricting unsolicited adult-to-minor messaging, limiting targeted advertising based on minors' personal data, and confining data collection to what is reasonably necessary. They do not regulate any platform's own speech. If they did regulate speech, it would be commercial speech (targeted advertising) that falls squarely within *Central Hudson*. And NetChoice

24

cannot even clear *Central Hudson*'s threshold inquiry, because the Act makes it unlawful to harvest minors' personal data for targeted advertising in the first place, and speech facilitating unlawful activity is not protected. Even setting that aside, the provisions satisfy intermediate scrutiny: They directly advance the State's substantial interest in protecting minors' privacy and well-being while permitting all targeted advertising to adults and restricting only the narrow practice of data-driven advertising to children.

**III.** The equitable factors confirm that a permanent injunction is unwarranted. This Court, the Supreme Court, and the Eleventh Circuit have all concluded that the equities favor enforcement of materially analogous laws. Every day Act 456 remains enjoined, Louisiana children are left without the protections their Legislature determined were necessary to shield them from online predators, addictive platform designs, and serious mental-health harms. NetChoice's speculative compliance costs and unproven First Amendment injury do not outweigh that harm.

## STANDARD OF REVIEW

The Court reviews de novo judgments rendered on cross-motions for summary judgment, examining each motion independently with evidence and inferences viewed in the light most favorable to the nonmoving party. *Century Sur. Co. v. Colgate Operating, L.L.C.*, 116 F.4th 345, 348–49 (5th Cir. 2024). Because the district court granted summary judgment for NetChoice, this Court takes Defendants' evidence as true, construes all justifiable inferences in Defendants' favor, and resolves any reasonable doubts against NetChoice. *Id.* at 349.

## ARGUMENT

This appeal presents two independent grounds for reversal. *First*, NetChoice failed to establish associational standing at summary judgment. It bore the burden of proving standing with evidence and failed to do so for any identified member or a user of one of the member's platforms. *Second*, the district court's merits analysis cannot be sustained. The challenged provisions regulate how social media platforms operate—age verification, parental consent, minor-privacy safeguards—not what platforms say. And under *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461 (2025), each provision satisfies intermediate scrutiny in any event. The Court should reverse and render.

26

## I.   THE DISTRICT COURT LACKS SUBJECT MATTER JURISDICTION.

This case should have begun—and ended—with Article III. As the party asserting jurisdiction, NetChoice "bears the burden of establishing standing as of the time [it] brought th[e] lawsuit and maintaining it thereafter." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020)). And at summary judgment, that burden must be carried with evidence. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Associational standing comes with added requirements: "[A]n organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (SFFA)*, 600 U.S. 181, 199 (2023) (quoting *Hunt*, 432 U.S. at 343); *e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 346 F. Supp. 3d 174, 190–92 & n.15 (D. Mass. 2018) (discussing evidence developed from specific

"Standing Members"). NetChoice did not satisfy those requirements on this record.

### A. NetChoice Failed to Prove Any Member or any User of a Member Platform Has Standing.

NetChoice has not proven anyone's Article III standing. Yet to satisfy *Hunt*'s first prong, it must "identify a specific member who 'would otherwise have standing to sue in [its] own right.'" *Deep S. Ctr. for Env't Just. v. EPA*, 138 F.4th 310, 320 (5th Cir. 2025) (quoting *SFFA*, 600 U.S. at 199). That, in turn, requires proof that an identified member has suffered an "invasion of a legally protected interest" that is "'concrete and particularized' and 'actual or imminent.'" *E.T. v. Paxton*, 41 F.4th 709, 715 (5th Cir. 2022) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)).

While that showing may be inferred from allegations at the pleading stage, it must be proven with evidence at summary judgment. *Cf. NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804–05 (5th Cir. 2025) (allegations of "financial harm" or "financial injury" sufficient). At this point, a plaintiff must support standing "with the manner and degree of evidence required" by Rule 56, not "mere allegations." *Lujan*, 504 U.S. at 561. The plaintiff must "'set forth' by affidavit or other evidence 'specific

facts,'" establishing each element of standing. *Id.* (quoting Fed. R. Civ. P. 56(e)). At summary judgment, in short, "trust is not enough." *Christian Lab. Ass'n v. City of Duluth*, 142 F.4th 1107, 1114 (8th Cir. 2025).

That requirement has teeth. For "[w]ithout actual evidence" from the plaintiff, courts will not "'wade' into the 'morass' of such empirical questions" to tease out standing. *Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality*, 968 F.3d 419, 425 (5th Cir. 2020) (quoting *Crete Carrier Corp. v. EPA*, 363 F.3d 490, 494 (D.C. Cir. 2004)). Nor can an association rely on declarations about "concerns of the unidentified … members" that are "beyond the scope of [the declarant's] personal knowledge" because those "are not evidence." *Sierra Club v. EPA*, 292 F.3d 895, 901 (D.C. Cir. 2002).

NetChoice claimed associational standing on two independent theories: (1) on behalf of current and prospective users of its members' platforms (say, a 14-year-old Louisiana girl who wants to open a Facebook account who is not a member of NetChoice), and (2) on behalf of the member companies themselves. Neither theory survives scrutiny.

29

**1. The district court erred in finding associational standing based on alleged injuries to unidentified users.**

Begin with the prospective user. NetChoice failed to submit any evidence of a specific, identifiable user or prospective user of a member's platform who will suffer a concrete, particularized, and imminent injury traceable to any provision of the Act. That failure of proof is fatal at summary judgment under *Hunt* prong one. *Deep S. Ctr.,* 138 F.4th at 320. The district court held otherwise by invoking prudential standing principles to conclude that "NetChoice plainly has standing to sue on behalf of covered members' Louisiana users[.]" ROA.6544 (quoting *Fitch,* 134 F.4th at 807). That was error.

To be sure, such an associational standing theory may be inferred without identifying a particular user at the pleading stage. *See Fitch*, 134 F.4th at 807; *cf. Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (preliminary-injunction stage). There may be instances, moreover, when an associational plaintiff *could* proceed to trial on such a theory with sufficient summary-judgment evidence. *Lujan,* 504 U.S. at 561 (requiring party to "'set forth' by affidavit or other evidence 'specific facts,'" that "(if controverted) must be 'supported adequately by the

evidence adduced at trial.'" (citation omitted)). But not here. NetChoice, at this stage, was required to come forward with evidence of a specific, identifiable user and his concrete, particularized, and imminent injury. *Id.* It declined to do so and cannot now proceed with an as-applied challenge on behalf of a pseudo-class of members' users. *See Trump v. CASA, Inc.*, 606 U.S. 831, 867 (2025) (Alito, J., concurring) ("So long as third-party standing doctrine remains good law, federal courts should take care to apply these limitations conscientiously[.]"). Accordingly, the Court should reverse the judgment as to the members' users and vacate the permanent injunction to the extent it extends to those users.

### 2. The district court erred in finding associational standing without specific evidence of injury to any identified member.

NetChoice likewise failed to substantiate its standing on behalf of its member companies. At summary judgment, its evidence "must show that" a member "has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy*, 603 U.S. at 57 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). And because "standing is not dispensed in gross," NetChoice "'must

demonstrate standing for each claim that [it] press[es]' against each defendant, 'and for each form of relief that [it] seek[s].'" *Id.* at 61 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). It also "must establish [a member's] standing for each and every provision [it] challenge[s]." *In re Gee*, 941 F.3d 153, 160 (5th Cir. 2019) (per curiam).

At summary judgment, "Article III demands more than … conclusory assertions." *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 545 (5th Cir. 2019). It follows that vagaries in made-for-preliminary-injunction declarations often fall shy of the "specific[ity]" summary judgment requires. *Lujan*, 504 U.S. at 561; *e.g.*, *Ctr. for Biological Diversity*, 937 F.3d at 536–37 ("We start with the injury-in-fact requirement and hold Petitioners have not shown that one of their members could independently satisfy it."); *US Inventor Inc. v. Vidal*, No. 21-40601, 2022 WL 4595001, at *4 & n.6 (5th Cir. Sept. 30, 2022) ("speculative theory of injury" precludes "individual" and "associational standing"); *Deep S. Ctr.*, 138 F.4th at 320–26 (rejecting associational standing for environmental organizations despite declarations from each one).

Here, outside of NetChoice's own declaration and allegations, only Snap and Reddit submitted stand-alone declarations at the preliminary injunction stage. *See* ROA.180-84 (Boyle Declaration for Snap), ROA.185-94 (Kessel Declaration for Reddit). Even with an opportunity to add specificity during discovery, NetChoice refused to build declarations and, instead, simply resubmitted the same declarations, months stale and just as strategically opaque. *See* ROA.1565-79; *e.g.*, ROA.4676-77 (NetChoice admitting it did not contact member companies for this litigation).

Those declarations offer no "specific facts." *Lujan*, 504 U.S. at 561. Boyle (Snap) provides only generalized assertions that the Act "implicates fundamental aspects of Snap's current services," claiming it would "fundamentally alter the nature of those services," with "costly" "changes." ROA.183. Kessel (Reddit) similarly speculates that age verification and parental consent "will be costly to implement and maintain" and undermine "pseudonymity on the service," thereby "driv[ing] away some users and some communities on Reddit"—though conceding that Reddit "likely has few users deemed 'minors' regulated by the Louisiana law." ROA.192-93. Kessel adds that any "[i]mpediments on account creation will limit Reddit's ability to disseminate speech and

33

users' ability engage in and to receive speech" ROA.193. Without the requisite specificity for the summary judgment stage, it was wrong for the district court to "'wade' into the 'morass' of such empirical questions" to find standing. *Shrimpers*, 968 F.3d at 425. Accordingly, NetChoice failed to prove up *Hunt* prong one as to its members.[4]

### B. NetChoice Also Failed to Prove That Its Claims and Requested Relief Can Be Resolved Without the Participation of Individual Members.

Nor did NetChoice satisfy *Hunt*'s third prong. To invoke associational standing, it must show that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *SFFA*, 600 U.S. at 199. Where claims turn on member-specific circumstances, associational standing is inappropriate because "individual members are better positioned to present [their] case." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 552 (5th Cir. 2010). To invoke associational standing, therefore, an

---

[4] Even accepting the sufficiency and truth of those declarations, they also do not establish standing across every provision NetChoice challenges. *See Gee*, 941 F.3d at 160 (requiring "standing for each and every provision [it] challenge[s]"). At most, they gesture toward alleged burdens from age verification and parental consent. But neither says a word about the Act's coverage or the minor-privacy provisions. At minimum, therefore, NetChoice failed to carry its *Hunt*-prong-one burden as to those provisions.

association must be able to "prove[] by evidence from representative injured members" the elements of its claims "without a fact-intensive-individual inquiry." *Id.*

In *NetChoice v. Fitch*, NetChoice led this Court to believe that NetChoice would do just that—"prove[]" its "claims … by evidence from representative injured members" at summary judgment. 134 F.4th at 805 (quoting *Ass'n of Am. Physicians*, 627 F.3d at 552). It did the opposite. NetChoice deliberately declined to gather any member-specific evidence, instead relying on websites and then, remarkably, trying to fault *Defendants* for not "attempt[ing] to secure information in third-party discovery[.]" ROA.1305. NetChoice's corporate representative emphasized repeatedly that it lacks any substantive knowledge about its members beyond what they post online and a membership check in the mail. ROA.4505. Discovery exposed the shell game: NetChoice cannot press these claims, and especially its as-applied claim, without the active participation of its members.[5]

---

[5] The district court effectively recognized as much when it treated NetChoice's hearsay as competent summary-judgment evidence because "[p]lausibly, the information on members' websites is true and accurate, and members are capable of designating employees or representatives to testify as much." ROA.6523-24.

That matters for at least two reasons. *First*, NetChoice and its membership are not aligned in the way NetChoice, and the district court, assumes. As the record shows, many of NetChoice's members already implement Act-456-compliant measures. *See* ROA.5212-14, 5231-32. And every day, more member companies like Meta and Snap are publicly acknowledging the risks social media poses to minors and, in many instances, have adopted reforms that do *more* than what Act 456 requires. *See* ROA.5028 (citing Meta, *Instagram Teen Accounts Will Be Guided by PG-13 Ratings*, About FB: Newsroom (Oct. 14, 2025), t.ly/cGLlq; *see also*, *e.g.*, Snap, *Offering Parents Deeper Insights with Snapchat's New Family Center Features*, Snap Newsroom (Jan. 22, 2026), t.ly/eJmIK. Without individualized member participation, therefore, the Court is left to speculate whether any claimed burden is attributable to Act 456, rather than to changes member companies are already making in response to market pressures, public scrutiny, and their own independent choices.

*Second*, even if causation were clear, the "First Amendment analysis is 'fact intensive' and will 'surely vary' from 'platform to platform.'" *Bonta I*, 152 F.4th at 1014 (quoting *Moody*, 603 U.S. at 747

36

(Barrett, J., concurring)); *accord Justice v. Hosemann*, 771 F.3d 285, 292 (5th Cir. 2014) (a "developed factual record is essential" to as-applied First Amendment challenges). That variability "means, in turn, that the merits of 'the claim asserted' and the 'relief requested' require[] the participation of individual NetChoice members, making associational standing inappropriate." *Bonta I*, 152 F.4th at 1014. "NetChoice" itself "acknowledges that each of its members is unique," so "the unique design of each platform and its algorithm affects whether the algorithm at issue is expressive" in the first place. *Id.* Some "[p]ersonalized algorithms might express a platform's unique message to the world"; others may simply "reflect users' revealed preferences to them." *Id.* And "[k]nowing where *each* NetChoice member's algorithm falls on that spectrum reasonably requires some individual platforms' participation." *Id.* (citing *Hunt*, 432 U.S. at 343). But NetChoice cannot even begin to tease out that (or any) member-by-member inquiry without member participation when it concededly has no substantive knowledge in its possession about member companies or their products.

The district court tried to distinguish *Bonta I* because, it said, Louisiana's law "does not take aim at covered NetChoice members'

37

unique algorithms." ROA.6541. But that misses the point. Whether the First Amendment is implicated at all turns on whether an individual member company's actions are "expressive" or simply "reflect[ing] users' revealed preferences to them," and that question "reasonably requires some individual platforms' participation." *Bonta I*, 152 F.4th at 1014. All the same here.

Whatever the answer may be, NetChoice has made no effort to develop it to this point. As the district court itself recognized, any trial (if warranted) would require "employees or representatives to testify" and further elucidate this jurisdictional problem. ROA.6523–24. This case is thus far removed from those where "minimal factual development" suffices or where "once proved as to some, the [claims] would be proved as to all." *Ass'n of Am. Physicians*, 627 F.3d at 552. And those "individual members are better positioned to present [their] case." *Id.*

Because NetChoice failed to satisfy either the first or third prongs of *Hunt*, this case should "begin—and end—with standing"—and

38

summary judgment in Defendants' favor. *Murthy*, 603 U.S. at 56.[6] The Court should thus reverse and render summary judgment for Defendants.

## II.    THE DISTRICT COURT ERRED ON THE MERITS.

Even if the Court reaches the merits (it need not), the district court's decision should still be reversed. Defendants are entitled to summary judgment because (A) the Act's coverage definition is not void for vagueness, and (B) NetChoice's as-applied First Amendment challenges—to the definition of "social media platform," the parental-consent requirement, the age-verification provision, and the minor-privacy provisions—fail as a matter of law.

### A. The Act's Definition of "Social Media Platform" Is Not Unconstitutionally Vague.

Start with the vagueness claim. NetChoice argued (and the district court agreed) that the Act's definition of "social media platform" is unconstitutionally vague in "all applications of the Act." ROA.6591-92;

---

[6] If NetChoice could satisfy its associational-standing burden on this record and in this posture, then this case would be the poster child for why "[a]ssociational standing seems to run roughshod over th[e] traditional understanding of the judicial power." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring). Defendants thus preserve for purposes of appeal that the doctrine of associational standing is inconsistent with the judicial power. *See* U.S. Const. art. III, § 2.

*see* La. R.S. 51:1751(11)–(12). That was so, it reasoned, because some companies might be uncertain whether their platform's "predominant or exclusive function" places them inside or outside the Act's coverage. ROA.6590-91. That sort of vagueness-at-the-margins reasoning has been repudiated thoroughly by this Court.

"Prevailing in a void-for-vagueness challenge requires a plaintiff to establish that the law is vague, 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.'" *La Union del Pueblo Entero v. Abbott*, 167 F.4th 743, 756 (5th Cir. 2026) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)). So "a challenger bears the weighty burden of demonstrating that the law is 'impermissibly vague in all of its applications.'" *Id.* (quoting *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023)).

That bar is especially high in civil cases: "[T]he statute must be so vague and indefinite as really to be no rule at all." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020) (quoting *Groome Res. Ltd. v. Parish of Jefferson*, 234 F.3d 192, 217 (5th Cir. 2000)). That starts by "examin[ing] the complainant's conduct before analyzing other

40

hypothetical applications of the law." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982). Even thereafter, unconstitutional vagueness does not spring up "merely because a company or an individual can raise uncertainty about its application," *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 509 (5th Cir. 2001), and "divergent views at the margins of statutory applicability do not demonstrate that a provision is unconstitutionally vague 'in all of its applications,'" *La Union del Pueblo Entero*, 167 F.4th at 756 n.2 (quoting *Vill. of Hoffman Ests.*, 455 U.S. at 495). This Court has thus flatly disallowed "invert[ing] this process with [a] facial, hypothetical approach." *Id.* at 757.

Act 456 is nowhere close to "no rule at all." The Act clearly defines a "[s]ocial media company" as any "person or entity that provides a social media platform that has at least five million account holders worldwide and is an interactive computer service." La. R.S. 51:1751(11). The statute then specifies in painstaking detail what is—and is not—a "[s]ocial media platform." La. R.S. 51:1751(12)(a)–(b). The district court nonetheless hypothesized (on its own research) that it is unclear whether gaming platform Twitch's "predominant or exclusive function" is "internet

41

gaming" or "social interaction." ROA.6591-92. But that speculation about one edge case does not render the statute impermissibly vague in all its applications. *La Union del Pueblo Entero*, 167 F.4th at 757. Accordingly, the Court should reverse and render as to NetChoice's vagueness claim.

### B. The Act Does Not Violate the First Amendment As Applied to NetChoice's Members.

Each of NetChoice's as-applied First Amendment challenges likewise fails because the provisions of Act 456 regulate conduct, not speech. And even if any of those provisions incidentally burdens speech, it is a content-neutral regulation subject to intermediate scrutiny, which it readily satisfies. Defendants take each challenged provision in turn.

### 1. The district court erred in holding the Act's definition of "social media platform" violates the First Amendment as applied to NetChoice's members.

The Court should reverse the district court's conclusion that the Act's definition of "social media platform" violates the First Amendment.[7]

---

[7] Recall that the Act defines a "social media company" as one "that provides a social media platform that has at least five million account holders worldwide and is an interactive computer service." La. R.S. 51:1751(11). A covered "social media platform" is a "a public or semipublic internet-based service or application that has users in Louisiana" and that (i) "connects users … to interact socially," and (ii) allows them to "construct a … profile," "populate a list of other users" to whom they share content, and "create or post content viewable by other users." La. R.S. 51:1751(12)(a). And a "social media platform" does not include services whose "predominant or exclusive function" is something else besides social media. La. R.S. 51:1751(12)(b).

That conclusion fails twice over: (a) the Act's coverage definition does not itself burden speech, and, even if it did, (b) it is a content-neutral line-drawing rule that does satisfy intermediate scrutiny.

**a. The Act's definition of "social media platform" does not itself burden any protected speech.** It is well settled that the State's decision to regulate a particular industry does not itself implicate the First Amendment. An entity "cannot claim a First Amendment violation simply because it may be subject to ... government regulation." *Univ. of Penn. v. EEOC*, 493 U.S. 182, 200 (1990); *accord Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 470 (1997) ("The fact that an economic regulation may indirectly lead to a reduction in a[n] ... advertising budget does not itself amount to a restriction on speech."). Legislatures routinely draw industry lines—or "coverage definitions"—without triggering constitutional scrutiny. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 579 (2011) ("a State may choose to regulate price advertising in one industry, but not others, because the risk of fraud … is in its view greater there"). Nothing about the State's choosing to regulate the "social media platform[s]" industry creates a First Amendment problem that triggers strict scrutiny.

43

More recently, *Free Speech Coalition* confirmed that such a law does not "always trigger[] strict scrutiny." 606 U.S. at 485. There, the Supreme Court considered a Texas law requiring age verification for websites on which "more than one-third" of the content "is sexual material harmful to minors." *Id.* at 467. The Court acknowledged that the law "targets speech that is obscene for minors based on its communicative content," yet held it "fit[] comfortably within the *O'Brien* [intermediate scrutiny] framework." *Id.* at 492. Much the same here. Act 456 targets the platforms "where children are [most] likely to find sexually explicit content" (*id.* at 498; La. R.S. 14:91.14), "malicious actors" (ROA.4915), sexual predators (La. R.S. 14:81.3), and human traffickers (La. R.S. 14:46.2), or be exposed to suicidality content (ROA.4918, 5112; La. R.S. 14:32.12), sextortion (La. R.S. 14:283.2), and grooming (La. R.S. 14:81.3). That "lawful end"—with, at most, incidental burdens on protected speech—does not demand strict scrutiny. *Id.* at 466.

Consider, too, *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). There, the Court considered laws regulating, as here, "social media platforms." *Id.* at 719. If that supposedly content-based coverage definition per se required strict scrutiny, the Court could have said so on the face of the

44

law. Instead, the Court said it "need not" decide to "apply strict or intermediate scrutiny," *id.* at 740, and remanded for further factual development. The lesson from *Free Speech Coalition* and *Moody* is that delineating the reach of a law does not transform it into a content-based regulation subject to strict scrutiny.

That is why the Ninth Circuit recently summarily dismissed this precise argument from NetChoice. Like here, NetChoice tried to "argue[] that the coverage definition raises the same First Amendment issues in every application because it compels every covered business to comply with the [law]'s substantive provisions." *Bonta II*, 2026 WL 694471, at *7 n.3. But, the Ninth Circuit explained, "[s]uch a challenge is more appropriately raised against the substantive provisions with which NetChoice finds issue." *Id.* The same is true here.

The district court's only answer was to say writ large "the Act implicates the First Amendment" by burdening minors' ability "to access and to engage in speech," and so "user-ship of covered websites will decrease." ROA.6563. But that reasoning falls into the *Bonta II* trap by conflating the Act's coverage with the effect of the substantive provisions. *See Bonta II*, 2026 WL 694471, at *7 n.3. A statutory provision, moreover,

45

does not trigger First Amendment scrutiny just because it might lead to a loss in a social media company's user base. *Glickman*, 521 U.S. at 470. The district court therefore erred in treating the Act's coverage definition as independently implicating the First Amendment. Accordingly, the Court can reverse the judgment as to the coverage-definition claims and, if necessary, confine its analysis to the Act's substantive provisions.

**b. The Act's definition of "social media platform" is content-neutral and, at most, subject to intermediate scrutiny.** In all events, this challenges fails on the merits, as the Eleventh Circuit recently recognized in rejecting the same "coverage definition" argument. *Uthmeier*, 2025 WL 3458571, at *4. There, as here, the plaintiff complained that Florida's law "targets websites based on the social subject matter of the material they disseminate." *Id.* The court disagreed. By defining "social media platform," it reasoned, the State had not "ma[de] any reference to the type of content involved." *Id.* What it had done, instead, is "define[] social media platforms by reference to a *form* of expression, not a *subject matter*." *Id.* (citing *LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941, 945 (11th Cir. 2022)). That kind of line

46

drawing is content neutral and does not trigger heightened scrutiny. *Id.* Just so here.

The district court attempted to distinguish *Uthmeier*, asserting that "the Florida law's coverage definition is wholly unlike" Louisiana law's. ROA.6510. That is not so in any meaningful way. Like Act 456, the Florida statute contains a function-based carve out for any "online service, website, or application where the exclusive function is e-mail or direct messaging … without displaying or posting publicly…." Fla. Stat. § 501.1736(1)(e). The relevant feature according to the district court—defining covered platforms by their function rather than the content they host, ROA.6566-67—is therefore all the same.

To be sure, as the district court observed, "[a] regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." ROA.6566 (quoting *City of Austin v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61, 74 (2022)). But the Supreme Court also cautioned that "[t]hat does not mean that any classification that considers function or purpose is *always* content based." *City of Austin*, 596 U.S. at 74. That latter principle controls here. Like Florida's

47

analogous law, the Act's definition of "social media platform" is, at most, a "content-neutral regulation," *Uthmeier*, 2025 WL 3458571, at \*5, so the "appropriate standard" is "intermediate scrutiny." *FSC*, 606 U.S. at 482–83.

**c. The Act as a whole satisfies intermediate scrutiny.** Under that standard, the provisions need only "advance[] important governmental interests unrelated to the suppression of free speech and [] not burden substantially more speech than necessary to further those interests." *Id.* at 495–96. And "latitude" must be "afford[ed]" to "the [State] to design regulatory solutions to address content-neutral interests." *TikTok Inc. v. Garland*, 604 U.S. 56, 77 (2025) (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 213 (1997)).

That is not a demanding test. The State's solutions "'need not be the least restrictive ... means of' serving the State's interest." *FSC*, 606 U.S. at 496 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)). Nor does it matter "'that the government's interest could be adequately served by some less-speech-restrictive alternative.'" *Id.* at 497–98 (quoting *Ward*, 491 U.S. at 800); *see Turner*, 520 U.S. at 218 (collecting cases). In that sense, "[a] regulation's validity 'does not turn

48

on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests.'" *Uthmeier*, 2025 WL 3458571, at *6 (quoting *Turner*, 520 U.S. at 218). The State plainly satisfies that standard on this record.

**(i) Act 456 advances important governmental interests.** The Act "undoubtedly advances an important governmental interest." *FSC*, 606 U.S. at 496. Louisiana has a "compelling interest in protecting the physical and psychological well-being of minors." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). And, as the Eleventh Circuit reasoned, that means the State must have a "legitimate and substantial interest in regulating young minors' use of platforms employing addictive features." *Uthmeier*, 2025 WL 3458571, at *6.

**(ii) Act 456 does not burden substantially more speech than is necessary to further those interests.** "The law does not apply at all to older minors"; it reaches only those under 16. *Id.*; *see* La. R.S. 51:1751(9) (defining "minor" in part as "individual is under the age of sixteen and is not emancipated or married"). And "[r]ather than blocking children from accessing social media altogether," Act 456 "simply prevents them from creating accounts on platforms that employ

49

addictive features." *Uthmeier*, 2025 WL 3458571, at *6. Even then, covered minors "have full access" to platforms with parental consent and may view social media "without an account" or with "a parent's account." *Id.* Add the unrebutted expert testimony that age-verification and parental-consent measures are inexpensive and easy to implement, and this becomes an even easier intermediate-scrutiny case. *See infra* pp. 58–62.

**(iii) The district court misapplied intermediate scrutiny.** The lower court's three reasons for departing from that conclusion reflects a misapplication of intermediate scrutiny. *One*, the court reasoned that "minors will still be able to interact socially on *unregulated* websites." ROA.6569. But the Supreme Court has repeatedly warned, when applying intermediate scrutiny, the State "'need not address all aspects of a problem in one fell swoop.'" *TikTok*, 604 U.S. at 76 (quoting *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015)).

*Two*, the court emphasized "parents already have tools by which they can control their children's access to, and regulate their children's use of, covered platforms." ROA.6569. But intermediate scrutiny does not require "'the least restrictive ... means of' serving the State's interest."

*FSC*, 606 U.S. at 496 (quoting *Ward*, 491 U.S. at 798). Nor may a court invalidate a law simply because it can imagine "some less-speech-restrictive alternative." *Id.* at 497–98 (quoting *Ward*, 491 U.S. at 800). The existence of parental tools does not disable the State from adopting additional safeguards of its own.

*Three*, the court observed that minors "can gain more or less unrestricted access to covered platforms upon satisfying the one-time age-verification and parental-consent requirements." ROA.6570. But that does not show under-inclusiveness or overbreadth. It shows tailoring. As the *Uthmeier* court recognized, a law that conditions minors' access on parental involvement, rather than forbidding access altogether, is far narrower. 2025 WL 3458571, at *6.

Summed up: The Act's definition of "social media platform" does not implicate the First Amendment and satisfies intermediate scrutiny in all events, and the district court's contrary conclusion should be reversed.

**2. The district court erred in holding the Act's parental-consent and age-verification requirements violate the First Amendment as applied to NetChoice's members.**

Nor can the district court's judgment stand as to the parental-consent and age-verification provisions. If implicating a member

51

company's speech at all, such laws are "traditional approach[es]" for protecting minors in "the digital age" without burdening "substantially more speech than necessary" to do so. *FSC*, 606 U.S. at 496 (citation omitted).

**a. The Act's age-verification and parental-consent provisions are not triggered by speech or expressive conduct.** The age-verification and parental-consent provisions are triggered by a failure to obtain parental consent or to verify a minor's age—not speech. The First Amendment protects "the freedom of speech." U.S. Const. amend. I. Although sometimes "generally applicable regulation[s] of conduct" may raise expressive-conduct or speech issues, that is only when "a particular act constitutes protected speech, rather than unprotected conduct." *Hines v. Pardue*, 117 F.4th 769, 776 (5th Cir. 2024). The threshold question, even for an as-applied challenge, is whether the law primarily affects speech or expressive conduct—a question answered "by looking at what 'trigger[s] coverage under the statute.'" *Id.* at 777 (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010)).

That laws "regulating conduct often have incidental effects on speech … does not require courts to treat them as if they were regulations

52

*of* speech." *Morgan v. White*, 964 F.3d 649, 652 (7th Cir. 2020); *see Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006) ("we have extended First Amendment protection only to conduct that is inherently expressive"). To warrant First Amendment scrutiny, therefore, the law must be "specifically addressed to speech or to conduct necessarily associated with speech." *Virginia v. Hicks*, 539 U.S. 113, 124 (2003). The parental-consent and age-verification provisions are not.

Penalties under the Act are triggered by a company's "provid[ing] a social media platform" in Louisiana, La. R.S. 51:1751(12), and then failing to "make commercially reasonable efforts to verify the age of Louisiana account holders" or "permitting a Louisiana resident who is a minor to be an account holder … unless the minor has the express consent of a parent or guardian," La. R.S. 51:1752(A)–(B); *e.g.* ROA.1720. But a company's verifying age (or not) and collecting parental consent (or not) are not "expressive choices." *Cf. Moody*, 603 U.S. at 740.

If they were, every age-assurance requirement—whether for alcohol, consumable hemp products, lottery tickets, employment, handguns, fireworks, body piercings, or tattoos—would trigger First Amendment scrutiny. *See FSC*, 606 U.S. at 479 (collecting examples). Yet

53

no one can seriously contend, for example, that a tattoo artist—even though "the process of tattooing is *purely expressive* activity," *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010) (emphasis altered)—has a First Amendment right to ink a teenager without checking her ID or obtaining parental consent. Same, too, for social media companies' speaking to children.

NetChoice's contrary theory conflates two very different things: (1) the downstream expressive content that flows across its members' platforms, and (2) the members' upstream business decisions not to verify users' ages or collect minor users' parental consent. Act 456 regulates only the latter—NetChoice's member companies remain free to speak as much or as little on their platforms or elsewhere; they simply have a non-publishing duty to filter their audience in Louisiana. *FSC*, 95 F.4th at 286 ("publishers do not filter audiences; they filter content").

Nor does anything in the statute prevent Louisiana citizens from "discussing their faith on a forum dedicated to religion, petition[ing] their elected representatives on X, shar[ing] vacation photos with friends and neighbors on Facebook, looking for work around the neighborhood on Nextdoor, [or] learning how to solve math problems on YouTube." *See*

54

ROA.131 (citation omitted); *contra Packingham v. North Carolina*, 582 U.S. 98, 108 (2017) (addressing law that "foreclose[s] access to social media altogether"). All of that speech remains untouched.

Because Act 456 has "nothing to do with speech or even expressive activity"—and everything to do with protecting minors from predators on the Internet—the age-verification and parental-consent provisions "do not implicate the First Amendment" at all. *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 788 (5th Cir.), *cert. denied sub nom. Nat'l Press Photographers Ass'n v. Higgins*, 145 S. Ct. 140 (2024). As it relates to those requirements, this Court's analysis can and should end there.

**b. The Act's age-verification and parental-consent provisions are content-neutral and, at most, subject to intermediate scrutiny.** Even assuming the challenged provisions could be subject to First Amendment scrutiny, the Act would still stand. When a State uses its "traditional power" to protect minors and has "only an incidental effect on protected speech," "intermediate scrutiny" is "the appropriate standard." *FSC*, 606 U.S. at 478, 483 (citation omitted). That standard would necessarily govern here as well, and the challenged provisions "readily satisf[y]" it. *Id.* at 496.

Intermediate scrutiny is the "appropriate standard." *Id.* at 483. Act 456's parental-consent and age-verifications requirements are a straightforward exercise of Louisiana's "traditional power" to protect minors. *Id.* at 478. In today's world, that means protecting children from the predations that flourish on social media and the harmful effects. *See* ROA.4256. And the tools Louisiana has chosen—age verification and parental consent—are nothing new, nothing costly, and nothing that compromises privacy. *See* ROA.5220-23. They are the same kind of ordinary safeguards legislatures have long required in other contexts that expose minors to serious risks—from alcohol and tobacco to tattoos and firearms. *See FSC*, 606 U.S. at 479 (collecting examples).

Nor does Act 456 "directly regulate … protected speech." *Id.* at 482. On its face, the Act regulates predatory conduct by requiring age verification and parental consent for minors to maintain a social media account. Any burden on access to speech is thus only "incidental to" Louisiana's regulation of activity outside the First Amendment. *Id.* at 483. So, at most, the Act is subject to intermediate scrutiny. *See Uthmeier*, 2025 WL 3458571, at *5.

The district court briefly resisted the Supreme Court's *Free Speech Coalition* holding by cabining it as a "pornography" case. ROA.6575. But the Court itself rejected that notion by grounding its holding in "basic principles of freedom of speech" that apply to any regulation of platforms hosting both protected expression and unprotected conduct. *FSC*, 606 U.S. at 481.

The district court likewise accepted NetChoice's overblown reliance on *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011). ROA.6572-73. That, too, was a mistake. *Brown* struck down a law that barred minors from purchasing violent video games precisely because it directly targeted and banned access to protected speech. *Id.* at 789–805.

Act 456 does nothing of the sort. It bans no game, book, post, or "idea[] or image[]." *Id.* at 795; *accord Uthmeier*, 2025 WL 3458571, at *5. Instead, it regulates the upstream, non-expressive conduct that enables predators to exploit children online. And, unlike the law in *Brown*, Act 456 does not "outright ban" minors from accessing speech. *FSC*, 606 U.S. at 486. And it targets unlawful conduct—sexual abuse, trafficking, harassment, sextortion—that is "not fully protected speech." *Id.* at 485. All the same as *Free Speech Coalition*.

Just as the Court reasoned there, because "[a]ny burden" the Act imposes on protected speech is "only incidental to" the Act's "regulation of activity that is not protected by the First Amendment," intermediate scrutiny (at most) is "the appropriate standard." *Id.* at 483.

**c. The Act's age-verification and parental-consent provisions satisfy intermediate scrutiny.** As explained above, the challenged provisions need only advance "important governmental interests unrelated to the suppression of free speech" without burdening "substantially more speech than necessary to further those interests." *Supra* pp. 46–47 (quoting *FSC*, 606 U.S. at 495–96). The chosen means need not be the least restrictive, and State's get "latitude" to regulate in furtherance of "content-neutral interests." *TikTok*, 604 U.S. at 77. The State again plainly satisfies that burden on this record.

**(i) The Act's age-verification and parental-consent requirements advance important governmental interests.** The age-verification and parental-consent requirements further Louisiana's "legitimate and substantial interest in regulating young minors' use of platforms employing addictive features." *Uthmeier*, 2025 WL 3458571, at *6; *accord Sable Commc'ns*, 492 U.S. at 126. The age-verification

58

requirement ensures that platforms identify when a user is a minor before exposing her to the negative psychological effects of social media. *See* ROA.4256; *see also* ROA.5220-23. The parental-consent requirement, in turn, adds another guardrail by involving parents before a minor enters that risky online environment. *See* ROA.4256; *see also* ROA.5231-32. These measures operate precisely as *FSC* envisioned: "preventing minors from easily circumventing" safeguards and being exposed to online dangers. 606 U.S. at 496; *see* ROA.5215, 5232.

**(ii) The age-verification and parental-consent provisions do not burden substantially more speech than is necessary to further those interests.** The Act is also "sufficiently tailored" to the State's interests without substantially burdening speech, *FSC*, 606 U.S. at 496, for all the reasons already given about the Act as a whole, *see supra* 49–50, and more. "[S]imply requir[ing] established verification methods already in use" "does not impose excessive burdens." *Id.* at 497, 498 & n.14; *contra Brown*, 564 U.S. at 789–805. This record proves that settled principle yet again. The State submitted unrebutted expert testimony confirms that conclusion: "the burden and cost of verifying age under Louisiana's Act is minimal and continues to decrease as technology

59

evolves." ROA.5214, 5223-24. Moreover, the existing technology is safe (ROA.5224), reliable (ROA.5219), more effective than alternatives (ROA.5225-30), and readily available to (if not already implemented by) NetChoice's members (ROA.5212-15, 5219). And the same is true of parental-consent measures, which "many of the NetChoice's members [also] already operate" to benefit from the safe harbor provision in the Children's Online Privacy Protection Act. ROA.5231-32. On this record, the Act's modest requirements plainly survive intermediate scrutiny.

**(iii) The district court misapplied intermediate scrutiny.**
Assuming a compelling interest, the district court first resisted that conclusion because, it reasoned, "Defendants have not established a causal relationship between social media use and health harms to minors" because the court did not find the State's expert convincing. ROA.6575. With due respect, that is not serious. Defendants submitted a 48-page expert report from Dr. Jean Twenge, one of the world's foremost experts on this precise topic. ROA.5102. At minimum then, Defendants were entitled to have the facts viewed and reasonable inferences drawn in their favor. *Century Sur. Co.*, 116 F.4th at 348–49. More importantly, NetChoice submitted *nothing* to rebut Dr. Twenge's testimony. *See*

ROA.6610-15 (excluding Dr. Bean). Put otherwise, because NetChoice forfeited any contrary expert through its own litigation choices, there can be no genuine factual dispute on this record that social media use harms minors' health. The district court was wrong to speculate otherwise.

The district court also attempted to identify what-it-called "manifold tailoring issues," ROA.6576. *One*, a hypothetical 13-year-old "can access, engage with, and proliferate potentially harmful content on a social media platform with 4,999,999 account holders or any website" ROA.6577. *Two*, "parents already have several ways to control their children's access to—and to monitor their children's use of—social media platforms." ROA.6576. *Three*, a minor "gains more or less unrestricted access to whatever potentially harmful content exists on such platforms." ROA.6577.

But just as with the Act's definition of "social media platform," *see supra* pp. 50–51, that is a plain misapplication of intermediate scrutiny. The State "'need not address all aspects of a problem in one fell swoop,'" *TikTok*, 604 U.S. at 76 (citation omitted); a law is not unconstitutional just because "some less-speech-restrictive alternative" exists, *FSC*, 606 U.S. at 496 (citation omitted); and the law's allowing access after age

61

verification and parental consent proves tailoring on the State's part. *Uthmeier*, 2025 WL 3458571, at \*6.

In short, the State has adopted a traditional, "modest burden of providing proof of age" and obtaining parental consent long familiar in other contexts—and "adapts this traditional approach to the digital age." *FSC*, 606 U.S. at 496. Nothing about that creates a constitutional problem. The district court erred in holding otherwise. The Court should thus reverse and render judgment in Defendants' favor as to the age-verification and parental-consent claims.

> **3. The district court erred in holding that the Act's minor-privacy provisions violate the First Amendment as applied to NetChoice's members.**

NetChoice's challenge to Act 456's minor-privacy provisions regulating how platforms use minors' accounts and data fares no better. *See* La. R.S. 51:1753. Its as-applied First Amendment claim fails for three independent reasons: (1) the provisions regulate conduct, not speech; (2) if anything, the speech is commercial, and NetChoice has not shown the Act targets only lawful, non-misleading speech; and (3) NetChoice has not carried its burden under *Central Hudson Gas & Electric Corp. v. Public Service Commission of N.Y.*, 447 U.S. 557 (1980).

**a. The Act's minor-privacy provisions do not regulate conduct without burdening any protected speech.** The minor-privacy provisions regulate the commercial use of minors' accounts and data. They prohibit (1) unsolicited messaging from adults to minors with whom they are not connected; (2) the use of minors' personal data (other than age or location) to serve targeted advertisements; and (3) the collection of minors' information beyond what is reasonably necessary for the service's disclosed purpose. La. R.S. 51:1753. Read together, the provisions address how platforms structure and operate their services with respect to minors. They do not regulate anything about NetChoice's members' own messages, posts, or communications. Nor are they "specifically addressed to speech or to conduct necessarily associated with speech." *Hicks*, 539 U.S. at 124. The First Amendment is therefore not implicated as applied to the platforms.

**b. If speech-regulating at all, the Act's minor-privacy provisions regulate third-parties' commercial speech.** In all events, NetChoice would lose a straightforward commercial-speech analysis. The minor-privacy provisions regulate commercial speech. Commercial speech is "[e]xpression related solely to the economic

63

interests of the speaker and its audience." *Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 487 n.2 (5th Cir. 2019). The State's regulation on targeted advertising falls in the heartland of the commercial speech doctrine. *See* La. R.S. 51:1753 ("Prohibition on data collection for certain accounts and advertising").

"Though courts have not settled 'the precise bounds of the category of expression that may be termed commercial speech, … it is clear enough that … advertising pure and simple—falls within those bounds.'" *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 280 (5th Cir. 2024) (quoting *Zauderer v. Off. of Disciplinary Counsel of Supreme Ct. of Ohio*, 471 U.S. 626, 637 (1985)), *aff'd on other grounds*, 606 U.S. 461 (2025). "That suffices for the part of the statute that covers advertisements." *Id.* It suffices, too, here.

**c. Because the Act's minor-privacy provisions regulate commercial speech that furthers unlawful activity, First Amendment scrutiny is unnecessary.** Commercial speech enjoys no First Amendment protection unless it "'concern[s] lawful activity and [is] not [] misleading.'" *Am. Acad. of Implant Dentistry v. Parker*, 860 F.3d 300, 306 (5th Cir. 2017) (quoting *Cent. Hudson*, 447 U.S. at 566).

64

NetChoice cannot clear that threshold. For one, it is not lawful for a social media company to "collect[]"—let alone share with advertisers—the "personal information" of minor users beyond what is "adequate, relevant, and reasonably necessary." La. R.S. 51:1753(3). Thus, the complementary provisions make clear that it is not "adequate, relevant, and reasonably necessary," La. R.S. 51:1753(3), to collect any data beyond "age and location" for purposes of "display[ing] of any advertising in the [minor's] account," La. R.S. 51:1753(2). Read together as intended, these provisions foreclose the practice of social media companies harvesting minors' personal data for targeted advertising. By definition, *any* extra-targeted advertising to a minor facilitates an unlawful activity. That is not protected commercial speech.

**d. Even if the Act's minor-privacy provisions regulate protected commercial speech, the provisions satisfy intermediate scrutiny under *Central Hudson*.** As articulated in the commercial speech context, intermediate scrutiny requires only that the provisions "directly and materially advance[] a substantial state interest in a manner no more extensive than necessary to serve that interest." *Express Oil*, 916 F.3d at 488. Put otherwise, there must be a "reasonable

65

fit between the legislature's ends and the means chosen to accomplish those ends." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001) (citation modified).

**(i) The minor-privacy provisions advance a substantial state interest.** The State has a compelling interest protecting "the physical and psychological well-being of minors," *Sable Commc'ns*, 492 U.S. at 126; *accord Lorillard Tobacco Co.*, 533 U.S. at 555 (no one "contests the importance of the State's interest in preventing the use of tobacco products by minors"), and ensuring the privacy interests of minors, *see* 15 U.S.C. §§ 6501–6506 (Children's Online Privacy Protection Act); ROA.5231-32. So here.

**(ii) The minor-privacy provisions are no more extensive than necessary to serve those interests.** The State directly advances its interests by specifically prohibiting the "collection" of *minors'* "personal information" and the display of targeted ads to *minors* based on that data. La. R.S. 51:1753(2)–(3). The State has thus "'carefully calculated' the costs and benefits associated with the burden on speech imposed," *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 (1993), by ensuring the minor-only commercial speech restriction permits

66

every targeted ad *targeted at adults* and does not "unduly impinge on …
the *adult listener's* opportunity to obtain information." *Lorillard*, 533
U.S. at 565 (emphasis added). Even if necessary, therefore, the State
plainly satisfies its modest *Central Hudson* burden, if any even applies.[8]

Accordingly, the Court should reverse and render as to the minor-
privacy provisions as well.

## III.   THE EQUITABLE FACTORS FAVOR THE STATE.

The district court also incorrectly concluded that the equitable
factors cut in NetChoice's favor. ROA.6594. That is wrong, not least
because this Court and the Supreme Court have concluded otherwise for
a materially analogous Mississippi law. *See Fitch*, 134 F.4th at 809;
*NetChoice, L.L.C. v. Fitch*, No. 25-60348, 2025 WL 2078435, at *1 (5th
Cir. July 17, 2025); *NetChoice, LLC v. Fitch*, 145 S. Ct. 2658 (2025); *id.*
(Kavanaugh, J., concurring in denial of application to vacate stay)
(opining that NetChoice "has not sufficiently demonstrated that the
balance of harms and equities favors it at this time"); *see also Uthmeier*,
2025 WL 3458571, at *9–10.

---

[8] Perhaps recognizing as much, NetChoice suggests that the commercial
speech doctrine is wrong—a complaint for the Supreme Court, not this Court. *See*
ROA.33 (citing *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 522 (1996)
(Thomas, J., concurring in part and concurring in the judgment)).

Consider first the State's harm, which collapses with the public interest. Louisiana unquestionably has a compelling interest in protecting "the physical and psychological well-being of minors." *Sable Commc'ns*, 492 U.S. at 126. And "the inability to enforce its duly enacted plans" to do that "clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *accord Trump*, 606 U.S. at 860–61 (collecting cases). And on the other side of the ledger is NetChoice's speculative First Amendment injury and unproven compliance costs. ROA.6594. But NetChoice cannot succeed on the merits for the reasons above, and compliance costs do not by themselves outweigh the State's interest in enforcing a duly enacted law, especially one aimed at protecting minors.

The equitable factors thus favor the State and confirm that injunctive relief is unwarranted.

## CONCLUSION

The Court should reverse and render judgment for Defendants.

68

Dated: March 25, 2026          Respectfully submitted,

ELIZABETH B. MURRILL
Attorney General of Louisiana

J. BENJAMIN AGUIÑAGA
Solicitor General

*/s/ Zachary Faircloth*
ZACHARY FAIRCLOTH
Principal Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 421-4088

*Counsel for Defendants-Appellants*

## CERTIFICATE OF SERVICE

I certify that on March 25, 2026, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

*/s/ Zachary Faircloth*
ZACHARY FAIRCLOTH

## CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this brief complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,831 words, excluding the parts of the document exempted by Rule 32(f); and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook font, except for footnotes in 12-point font) using Microsoft Word (the same program used to calculate the word count).

*/s/ Zachary Faircloth*
ZACHARY FAIRCLOTH

Dated:  March 25, 2026