No. 26-30016

# In the United States Court of Appeals
# for the Fifth Circuit

NETCHOICE,

*Plaintiff–Appellee,*

v.

LIZ MURRILL,
IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF LOUISIANA;
MIKE DUPREE,
IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE PUBLIC PROTEC-
TION DIVISION, LOUISIANA DEPARTMENT OF JUSTICE

*Defendants-Appellants,*

On Appeal from the United States District Court
for the Middle District of Louisiana
Case No. 25-231 (Hon. John W. deGravelles)

**BRIEF OF *AMICI CURIAE* FLORIDA, 29 STATES, AND
THE DISTRICT OF COLUMBIA IN SUPPORT OF
APPELLANTS**

JAMES UTHMEIER
  *Attorney General*


OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3300
Christine.pratt@myfloridalegal.com

DAVID M.S. DEWHIRST
  *Solicitor General*


JASON J. MUEHLHOFF
  *Chief Deputy Solicitor General*
CHRISTINE K. PRATT
  *Assistant Solicitor General*
THOMAS F. KELLY
  *Solicitor General Fellow*


April 1, 2026

*Counsel for Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS

Under Fifth Circuit Rule 28.2.1, *Amici Curiae,* as governmental parties, need not provide a certificate of interested persons.

*/s/ Christine K. Pratt*
Counsel for *Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................i

TABLE OF AUTHORITIES...................................................................iii

INTRODUCTION AND INTEREST OF AMICI ..................................... 1

ARGUMENT ........................................................................................5

I.   STATES HAVE A COMPELLING INTEREST IN PROTECTING
     CHILDREN FROM SOCIAL-MEDIA COMPANIES' PREDATORY
     BUSINESS PRACTICES. ..........................................................5

     A.   Social-media companies are misleading the public and
          harming children.......................................................5

     B.   Regulation is needed to protect the next generation of
          children......................................................................11

II.  THE SECURE ONLINE CHILD INTERACTION AND AGE LIMITATION
     ACT IS A REASONABLE, CONSTITUTIONALLY VALID RESPONSE TO
     SOCIAL-MEDIA COMPANIES' PREDATORY BUSINESS PRACTICES. ..........14

     A.   The Act does not trigger heightened scrutiny. ....................14

     B.   Even if heightened scrutiny applied, NetChoice has not
          established that the Act is facially unconstitutional. ..........23

III. IN ANY EVENT, NETCHOICE LACKS PRUDENTIAL STANDING TO
     ASSERT THE RIGHTS OF SOCIAL-MEDIA USERS. ...................................28

CONCLUSION ................................................................................. 30

CERTIFICATE OF COMPLIANCE.........................................................34

CERTIFICATE OF SERVICE.................................................................35

# TABLE OF AUTHORITIES

**Cases**

*44 Liquormart, Inc. v. Rhode Island,*
  517 U.S. 484 (1996)................................................................16

*Anderson v. TikTok,*
  116 F.4th 180 (3d Cir. 2024)..........................................7, 27

*Arcara v. Cloud Books,*
  478 U.S. 697 (1986).................................................. 14, 19, 23

*Ark. Times LP v. Univ. of Ark. Bd. of Trs.,*
  37 F.4th 1386 (8th Cir. 2022) ...........................................19

*Bellotti v. Baird,*
  443 U.S. 622 (1979)................................................................24

*Bethel Sch. Dist. No. 403 v. Fraser,*
  478 U.S. 675 (1986)................................................................26

*Brown v. Ent. Merchants Ass'n,*
  564 U.S. 786 (2011)................................................................25

*C.S. v. McCrumb,*
  135 F.4th 1056 (6th Cir. 2025) ...................................26, 27

*CCIA v. Uthmeier,*
  No. 25-11881, 2025 WL 3458571 (11th Cir. Nov. 25, 2025)...............13

*Christian Lab. Ass'n v. City of Duluth,*
  142 F.4th 1107 (8th Cir. 2025) .........................................30

*District of Columbia v. Meta,*
  No. 2023-CAB-006550 (D.C. Super. Ct. Oct. 23, 2025).......................2

*Erznoznik v. City of Jacksonville,*
  422 U.S. 205 (1975)......................................................24

*Free Speech Coal. v. Paxton,*
  606 U.S. 461 (2025)..................................................25, 26

*Gary v. City of Warner Robins,*
  311 F.3d 1334 (11th Cir. 2002)................................. 19, 21

*Indigo Room v. City of Fort Myers,*
  710 F.3d 1294 (11th Cir. 2013)................................. 19, 21

*Johnson v. City of Opelousas,*
  658 F.2d 1065 (5th Cir. 1981).................................25, 28

*Mahmoud v. Taylor,*
  606 U.S. 522 (2025)......................................................26

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of
  Revenue,*
  460 U.S. 575 (1983)......................................................21

*Moody v. NetChoice,*
  603 U.S. 707 (2024)............................................ 13, 23, 28

*Morgan v. Swanson,*
  659 F.3d 359 (5th Cir. 2011)...........................................27

*NetChoice v. Fitch,*
  134 F.4th 799 (5th Cir. 2025) .........................................28

*NRA v. Bondi,*
  133 F.4th 1108 (11th Cir. 2025) ............................ 14, 23, 25

*Ogden v. Saunders,*
  25 U.S. 213 (1827).......................................................17

*Pa. Psychiatric Soc'y v. Green Spring Health Servs.*,
280 F.3d 278 (3d Cir. 2002) ...................................................29

*Packingham v. North Carolina*,
582 U.S. 98 (2017)...................................................................18

*Prince v. Massachusetts*,
321 U.S. 158 (1944)......................................... 5, 23, 24, 26, 28

*Project Veritas v. Schmidt*,
125 F.4th 929 (9th Cir. 2025) ...............................................28

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992)....................................................................4

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984)..................................................................17

*Sable Commc'ns of Cal. v. FCC*,
492 U.S. 115 (1989)..................................................................13

*Sorrell v. IMS Health*,
564 U.S. 552 (2011)..................................................................19

*TikTok v. Garland*,
604 U.S. 56 (2025)........................................................... passim

*UAW v. Brock*,
477 U.S. 274 (1986)..................................................................30

*United Food & Com. Workers Union Loc. 751 v. Brown Grp.*,
517 U.S. 544 (1996)..................................................................30

*Virginia v. Hicks*,
539 U.S. 113 (2003)..................................................................23

*Walker-Serrano ex rel. Walker v. Leonard*,
325 F.3d 412 (3d Cir. 2003) ...................................................26

## Statutes

Book of the Gen. Laws and Liberties of Mass. (1649) ...........................26

Cal. Civ. Code § 1798.99.31.................................................................12

Del. Code Ann. tit. 6, § 1204C............................................................12

Fla. Stat. § 501.1736..........................................................................12

La. Stat. Ann. § 51:1752...............................................................4, 15

La. Stat. Ann. § 51:1753.....................................................................12

Miss. Code Ann. § 45-38-7..................................................................12

N.Y. Gen. Bus. Law § 1501 ................................................................12

Ohio Rev. Code § 1349.09...................................................................12

## Treatises & Commentary

Holly Brewer, *By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority* (2005)..........................17, 18

## Other Authorities

Bobby Allyn et al., *TikTok Executives Know About App's Effect on Teens, Lawsuit Documents Allege*, NPR (Oct. 11, 2024).................................................................................................10

Bobby Allyn, *States Sue Meta, Claiming Instagram, Facebook Fueled Youth Mental Health Crisis*, NPR (Oct. 24, 2023)...............................................................................................1

Brian Fung, *Execs Ignored the Damage Instagram Does to Teens, Meta Whistleblower Tells Congress*, CNN Business (Nov. 7, 2023) ...................................................................................7

Decl. of Adam Alter, Ph.D., *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 13, 2025), ECF No. 51-2.....................................12

Decl. of Jean M. Twenge, Ph.D., *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 12, 2025), ECF No. 51-1 ..................... 1, 5, 6, 11

Decl. of Tony Allen, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 9, 2025), ECF No. 51-3 ................................. 12

Dep. of Adam Alter, Ph.D., *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 23, 2025), ECF No. 63-3 .................................. 11

Fed. Trade Comm'n, *A Look Behind the Screens*, 2024 WL 4272104 (Sep. 1, 2024) ................................................. 12

*Five Ways to Respond to Sextortion*, Meta (Aug. 20, 2025) ..................... 7

*Hidden Harms: Examining Whistleblower Allegations that Meta Buried Child Safety Research Before the Subcomm. on Priv., Tech., and the L. of the S. Comm. on the Judiciary*, 119th Cong. (2025) ................................................. 2, 3, 8

Jacqueline Thomsen, *NetChoice Pulls Expert After Allegations of AI Fabrications*, Bloomberg Law (Aug. 17, 2025) ................................................................. 13

Juries verdict agst Alice Thomas, Volume 29: Records of the Suffolk Cnty. Ct. 1671-1680 Part 1 ................................... 25

Justin Rohrlich, *A 10-year-old girl died during the viral 'blackout challenge.' Now TikTok could be held liable*, The Independent (Aug. 28, 2024) ............................................. 8

Kalhan Rosenblatt et al., *Senate Hearing Highlights: Lawmakers Grill CEOs from TikTok, X and Meta About Online Child Safety*, NBC News (Jan. 31, 2024) ............................... 2

Letter from Senators Richard Blumenthal and Marsha Blackburn to Mark Zuckerberg, June 21, 2023 .................................. 7

Off. of the Surgeon Gen., *Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory* (2023) ................ passim

Response to Questions for the Record from Evan Spiegel, Snap Co-Founder & CEO, to Senate Judiciary Comm. (Feb. 28, 2024)..................................................................12

Shannon Bond & Bobby Allyn, *Whistleblower Tells Congress that Facebook Products Harm Kids and Democracy*, NPR (October 5, 2021) ....................................................2

*Snap Inc. Terms of Service*, Snap (Apr. 7, 2025) .............................15, 16

*Snapchat Ads Transparency*, Snap (Oct. 10, 2025) ................................15

Sue Halpern, *Instagram for Kids and What Facebook Knows About the Effects of Social Media*, New Yorker (Sept. 30, 2021)..................................................................9

*What You Need to Know About Financial Sextortion*, Snap Inc. (Aug. 20, 2025) .............................................................7

# INTRODUCTION AND INTEREST OF AMICI

The public has learned—through whistleblowers and leaked internal documents—what social-media platforms have known for years: Their design features are destroying children's mental health. There is a "clear link" between compulsive social-media use and our kids' skyrocketing rates of depression, anxiety, self-harm, and suicide.[1] In the words of the Biden Administration's Surgeon General, "[o]ur children have become unknowing participants in a decades-long experiment."[2]

States and the federal government have come together to take swift, bipartisan action. Many States—including Louisiana and several *Amici*—have passed laws regulating social-media platforms' transactions with vulnerable children, and more than 40 States have sued platforms for the harm they have caused children.[3] Last year, several CEOs were subjected to "a bipartisan thrashing" in the Senate Judiciary Committee,

---

[1] Decl. of Jean M. Twenge, Ph.D. ¶¶ 6, 59, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 12, 2025), ECF No. 51-1.

[2] Off. of the Surgeon Gen., *Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory* 11 (2023), https://tinyurl.com/33u2t7kn.

[3] Bobby Allyn, *States Sue Meta, Claiming Instagram, Facebook Fueled Youth Mental Health Crisis*, NPR (Oct. 24, 2023), https://tinyurl.com/y882nt5f.

at which Mark Zuckerberg famously apologized to parents whose children had been harmed by Meta platforms.[4]

Rather than scale back their predatory business practices—which range from confusing account-holder contracts to design features that manipulate kids into compulsively using social media—tech companies have doubled down on their nothing-to-see-here approach. They refuse "access to [their] data," "bury evidence" of the harm they are inflicting on children, and battle regulation at every turn.[5] It has even come to light that "Meta's counsel" advised "researchers" at Meta "to block or redesign research about teen mental health harms" caused by Meta platforms.[6]

---

[4] Kalhan Rosenblatt et al., *Senate Hearing Highlights: Lawmakers Grill CEOs from TikTok, X and Meta About Online Child Safety*, NBC News (Jan. 31, 2024), https://tinyurl.com/2p9vvy62.

[5] Surgeon General Advisory, *supra* n.2 at 11 (first quote); *Hidden Harms: Examining Whistleblower Allegations that Meta Buried Child Safety Research Before the Subcomm. on Priv., Tech., and the L. of the S. Comm. on the Judiciary*, 119th Cong. 1 (2025) (written statement of Jason Sattizahn), https://tinyurl.com/37jmj2a8 (second quote); *see also* Shannon Bond & Bobby Allyn, *Whistleblower Tells Congress that Facebook Products Harm Kids and Democracy*, NPR (October 5, 2021), https://tinyurl.com/yc4zex93 (Meta whistleblower exposing that "Facebook executives hide research about the social network's risks to keep its business humming").

[6] *District of Columbia v. Meta*, No. 2023-CAB-006550, slip op. at 10 (D.C. Super. Ct. Oct. 23, 2025).

The reason for that deception is clear: Addicting children and destroying their mental health pays. Platforms rake in "$11 billion" a year from ads directed at children, including "nearly $2 billion in ad profits derived from users age 12 and under."[7]

Platforms have enlisted their trade association, NetChoice, to fight all efforts to regulate their business practices and protect kids online. According to NetChoice, the Constitution gives tech giants like Google and Meta a veto for any law that regulates their practices simply because their platforms host speech. The First Amendment, they say, grants platforms not just a right to speak but also a right to contract with children, exploit their developing brains with addictive design features, expose them to sexual predators, and drive them to self-harm and suicide—all while misleading the public about their products.

*Amici* have an interest in resisting NetChoice's attempt to distort the First Amendment into an absolute regulatory immunity for internet

---

[7] *See Hidden Harms: Examining Whistleblower Allegations that Meta Buried Child Safety Research Before the Subcomm. on Priv., Tech., and the L. of the S. Comm. on the Judiciary*, 119th Cong. 18:43–19:04 (2025) (statement of Sen. Amy Klobuchar), https://tinyurl.com/y5wtez98.

platforms. The First Amendment is not a shield for platforms' harmful business practices.

The district court erred in permanently enjoining Louisiana from enforcing the Secure Online Child Interaction and Age Limitation Act (the "Act"). Even assuming that NetChoice has associational and prudential standing to assert the rights of its members' Louisiana users, the Act is a constitutionally valid response to the harm that platforms are causing children. It zeroes in on commercial activity, regulating only platforms' "account holder" contracts with children, La. Stat. Ann. § 51:1752, and it in no way threatens to "drive certain ideas or viewpoints from the marketplace." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992) (quotation omitted). If two social-media platforms were identical in all respects except that one required users to become account holders and the other did not, the Act would impose no restrictions on the latter even though both platforms provide the same speech to children. That makes the Act "different in kind from the regulations of non-expressive activity that [the Supreme Court] ha[s] subjected to First Amendment scrutiny." *TikTok v. Garland*, 604 U.S. 56, 69 (2025).

But even if the Act triggers First Amendment scrutiny, NetChoice is still wrong that it is entitled to a permanent injunction because the Act regulates conduct, not speech, and at most imposes only incidental burdens on expression. The Act can be validly enforced against covered platforms when they provide accounts to children of "tender years." *Prince v. Massachusetts*, 321 U.S. 158, 169–70 (1944). States have the power to protect young children—who have more limited First Amendment interests than older children—from the harms posed by social media.

## ARGUMENT

I. **STATES HAVE A COMPELLING INTEREST IN PROTECTING CHILDREN FROM SOCIAL-MEDIA COMPANIES' PREDATORY BUSINESS PRACTICES.**

A. **Social-media companies are misleading the public and harming children.**

In recent years, mounting evidence has emerged that social-media platforms are knowingly harming children. As child social-media use proliferated over the last 15 years, adolescent depression rates more than doubled,[8] and children experienced a rise in anxiety, low self-esteem,

---

[8] Twenge Decl., *supra* n.1 ¶ 15.

5

poor body image, and eating disorders.[9] Associated behaviors like self-harm and suicide also "skyrocketed."[10] "Between 2010 and 2022, emergency room admissions for self-harm increased 192% among 15- to 19-year-old girls" and "an incredible 411% among 10- to 14-year-old girls."[11] "The suicide rate among 10- to 14-year-old boys increased 166%," and "the suicide rate among 10- to 14-year-old girls increased 217%."[12] But for those spikes in youth suicide, "3,604 more" sons and daughters "would be alive today."[13]

Studies reveal that the correlation is no coincidence: Social media is a causal factor.[14] Children who spend at least 3 hours a day on social media double their likelihood of developing anxiety and depression.[15]

---

[9] Surgeon General Advisory, *supra* n.2 at 6–7; *see also* Twenge Decl., *supra* n.1 ¶ 59.

[10] Twenge Decl., *supra* n.1 ¶¶ 17–18.

[11] *Id.* ¶ 17.

[12] *Id.* ¶ 18.

[13] *Id.*

[14] *Id.* ¶¶ 34, 47.

[15] Twenge Decl., *supra* n.1 ¶¶ 39, 47; Surgeon General Advisory, *supra* n.2 at 6.

The harm does not stop there. Children are being victimized by "predatory behaviors"—including "sexual solicitation"—on platforms.[16] More than 25% of girls between ages 13 and 15 have "receiv[ed] unwanted sexual advances on Instagram."[17] And Senators Richard Blumenthal and Marsha Blackburn recently wrote to Meta after "reports that Instagram has harbored an open-air market for the sale of child sexual abuse material and the trafficking of children."[18] The problem is so bad that Meta and Snap actively warn children of the dangers of "sextortion" on their platforms.[19]

Platforms also market dangerous "challenges" to children, like "ten-year-old Nylah Anderson." *Anderson v. TikTok*, 116 F.4th 180, 181 (3d Cir. 2024). TikTok, "via its algorithm, recommended and promoted" to

---

[16] Surgeon General Advisory, *supra* n.2 at 9; Twenge Decl., *supra* n.1 ¶ 22.

[17] Brian Fung, *Execs Ignored the Damage Instagram Does to Teens, Meta Whistleblower Tells Congress*, CNN Business (Nov. 7, 2023), https://tinyurl.com/ak3d34p9.

[18] Letter from Senators Richard Blumenthal and Marsha Blackburn to Mark Zuckerberg, June 21, 2023, https://tinyurl.com/2s4j243y.

[19] *Five Ways to Respond to Sextortion*, Meta (Aug. 20, 2025), https://tinyurl.com/292hmv44; *What You Need to Know About Financial Sextortion*, Snap Inc. (Aug. 20, 2025), https://tinyurl.com/4vwn9f39.

Nylah a video that "depicted the 'Blackout Challenge,' which encourages viewers to record themselves engaging in acts of self-asphyxiation." *Id.* "After watching the video, Nylah attempted the conduct depicted in the challenge and unintentionally hanged herself." *Id.* Her mother found her "lifeless body on the bedroom floor" and "rushed" her "to the hospital," where she died.[20]

Still, platforms have resisted any effort to research or mitigate their products' effects. As the U.S. Surgeon General has explained, researching the danger that platforms' practices pose to children is difficult because platforms do not allow "access to data" and insist on a "lack of transparency."[21] Or as a whistleblower testified to the Senate Judiciary Committee a few months ago, platforms "manipulate, control, and erase data" that documents the harm their products are causing.[22] As a result, only because of whistleblowers and accidental leaks do Americans know that

---

[20] Justin Rohrlich, *A 10-year-old girl died during the viral 'blackout challenge.' Now TikTok could be held liable*, The Independent (Aug. 28, 2024), https://tinyurl.com/yw3ebwj2.

[21] Surgeon General Advisory, *supra* n.2 at 11.

[22] *Hidden Harms: Examining Whistleblower Allegations that Meta Buried Child Safety Research Before the Subcomm. on Priv., Tech., and the L. of the S. Comm. on the Judiciary*, 119th Cong. 3 (2025) (written statement of Jason Sattizahn), https://tinyurl.com/37jmj2a8.

platforms have long been aware of the harm they are inflicting on children.

Meta, which operates Facebook and Instagram, is a prime example. A whistleblower exposed internal research showing that many of Instagram's youngest users "felt addicted to the app," "lacked the wherewithal to limit their use of it," and reported "that the app contributed to their depression and anxiety."[23] Meta also acknowledged—internally—that Instagram was causing nearly one third of adolescent-girl users to develop body-image issues.[24] Rather than roll back the features it was privately acknowledging are addictive and destructive, Meta pressed on and even sought to expand its products to younger children. The company "commissioned strategy papers about the long-term business opportunities" with preteens and discussed "whether there might be a way to engage children during play dates."[25] Delivering its products to more "tweens,"

---

[23] Sue Halpern, *Instagram for Kids and What Facebook Knows About the Effects of Social Media*, The New Yorker (Sept. 30, 2021), https://tinyurl.com/y3vrehyh.

[24] *Id.*

[25] *Id.*

Meta explained in internal meetings, was imperative because "[t]hey are a valuable but untapped audience."[26]

Leaked documents from TikTok showed that it too "was aware its many features designed to keep young people on the app led to a constant and irresistible urge to keep opening the app" and that such "compulsive usage correlates with a slew of negative mental health effects like loss of analytical skills, memory formation, contextual thinking, conversational depth, empathy, and increased anxiety."[27] TikTok acknowledged that features like infinite scroll were most likely to addict children, stating that "across most engagement metrics, the younger the user, the better the performance" because "[m]inors do not have executive function to control their screen time."[28] And although TikTok has publicly touted some features ostensibly aimed at reducing the platform's addictive effects—like allowing parents to set time limits and prompting users to take a break— TikTok determined that those features "had little impact" and are "not

---

[26] *Id.*

[27] Bobby Allyn et al., *TikTok Executives Know About App's Effect on Teens, Lawsuit Documents Allege*, NPR (Oct. 11, 2024), https://tinyurl.com/4e5un4ru.

[28] *Id.*

altogether effective."[29] But that did not matter because TikTok adopted the features solely to give it "a good talking point with policymakers."[30]

## B. Regulation is needed to protect the next generation of children.

Because deceptive practices like Meta's and TikTok's have fueled the Nation's "youth mental health crisis,"[31] the U.S. Surgeon General has called on policymakers to develop "health and safety standards" for platforms and to adopt "policies that further limit access . . . to social media for all children"—including "strengthening and enforcing age minimums."[32]

Those policy responses are necessary because platforms' own interventions have proven inadequate. Platforms have long had parental controls, but they have made no dent in child addiction.[33] That is both because parents do not use them and because they are ineffective. Less than

---

[29] *Id.*

[30] *See id.*

[31] Surgeon General Advisory, *supra* n.2 at 13; *accord* Twenge Decl., *supra* n.1 ¶ 26.

[32] Surgeon General Advisory, *supra* n.2 at 15.

[33] Dep. of Adam Alter, Ph.D. at 183:16–23, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 23, 2025), ECF No. 63-3.

1% of parents use Snapchat's controls, for example.[34] And parental controls are difficult to manage[35]; they do not address the features that make platforms addictive[36]; and platforms do not implement them with fidelity. *See* Fed. Trade Comm'n, *A Look Behind the Screens*, 2024 WL 4272104, at *9 (Sept. 1, 2024) (Facebook has "misled parents about their ability to control" their children's accounts).

Louisiana and other States have therefore passed laws that regulate platforms' harmful practices.[37] States and the federal government have a compelling interest in regulating platforms' practices given their undeniable role in the Nation's youth mental-health crisis. *See Moody v.*

---

[34] *See* Response to Questions for the Record from Evan Spiegel, Snap Co-Founder & CEO, to Senate Judiciary Comm. at 1–2 (Feb. 28, 2024), https://tinyurl.com/55amwdfc.

[35] Decl. of Tony Allen ¶¶ 51–61, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 9, 2025), ECF No. 51-3.

[36] Decl. of Adam Alter, Ph.D. ¶¶ 48–50, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 13, 2025), ECF No. 51-2.

[37] *See, e.g.*, Ohio Rev. Code § 1349.09(B)(1) (limits on social-media platforms contracting with children); Miss. Code Ann. § 45-38-7 (same); Fla. Stat. § 501.1736 (regulating platforms' use of "addictive features"); N.Y. Gen. Bus. Law § 1501-1502 (limits on "addictive feeds" and push "notifications"); Cal. Civ. Code § 1798.99.31(b)(7) (limits on targeting children with deceptive practices); Del. Code Ann. tit. 6, § 1204C (limits on advertising to children); La. Stat. Ann. § 51:1753(2) (same).

*NetChoice*, 603 U.S. 707, 733 (2024) (acknowledging that social media poses unique "dangers" to kids' "mental health"); *Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989) (States have a "compelling interest in protecting the physical and psychological well-being of minors."); *CCIA v. Uthmeier*, No. 25-11881, 2025 WL 3458571, at \*6 (11th Cir. Nov. 25, 2025) ("The State has a compelling interest in protecting minors in general, and it has demonstrated that they are particularly susceptible to the potentially addictive features built into some social media platforms."). NetChoice cannot seriously dispute that when much of the evidence stems from its own members' leaks. Indeed, in one of its challenges to a State law, NetChoice tried to dispute the harm that social-media companies are causing kids, but it had to withdraw its expert report after the State defendant moved to strike the report because it relied on non-existent studies fabricated by artificial intelligence.[38]

---

[38] *See* Memo. in Support of Mot. to Exclude at 1–2, *NetChoice v. Murrill*, No. 3:25-cv-231 (M.D. La. Aug. 15, 2025), ECF No. 42-1; Jacqueline Thomsen, *NetChoice Pulls Expert After Allegations of AI Fabrications*, Bloomberg Law (Aug. 17, 2025), https://tinyurl.com/2nk64wss.

## II. THE SECURE ONLINE CHILD INTERACTION AND AGE LIMITATION ACT IS A REASONABLE, CONSTITUTIONALLY VALID RESPONSE TO SOCIAL-MEDIA COMPANIES' PREDATORY BUSINESS PRACTICES.

### A. The Act does not trigger heightened scrutiny.

The Act is a quintessential consumer-protection law: It protects Louisiana's most vulnerable citizens from predatory business practices. It does not trigger heightened scrutiny because it regulates only commercial activity with children, not speech. The Act limits social-media platforms' ability to enter account-holder contracts with children, who "lack[]" the "reason and judgment" to weigh the risks and benefits of the contracts. *NRA v. Bondi*, 133 F.4th 1108, 1117 (11th Cir. 2025) (en banc).

That restriction is a valid exercise of the State's police power. First Amendment scrutiny applies only if a law either "directly regulates protected expressive activity" or regulates non-expressive activity but "impose[s] a disproportionate burden upon" "First Amendment activities." *TikTok*, 604 U.S. at 68; *Arcara v. Cloud Books*, 478 U.S. 697, 704 (1986). The Act does neither. It directly regulates commercial activity without directly "singl[ing] out" any expression. *Arcara*, 478 U.S. at 705.

**1.** There is no disputing that the Act does not directly regulate expression. The Act prevents covered platforms only from making children

14

"account holder[s]" without parental consent. La. Stat. Ann. § 51:1752.
Becoming an account holder is not itself speech—it is a commercial trans-
action.

Social-media platforms require account holders to enter complex
contracts that shield the platforms from liability, allow the platforms to
profit from users' online activity, and guarantee the platforms access to
vast amounts of users' sensitive personal data. Take Snap, for example.
It requires account holders—including teens—to "form a legally binding
contract" with it.[39] That contract requires teens to (1) authorize Snap to
"collect" and "obtain" personal information "about [them],"[40] including
their "activity" on other "websites and platforms," data stored on their
mobile "device," and their "location information"[41]; (2) "grant Snap and
[its] affiliates a worldwide, royalty-free, sublicensable, and transferable
license to host, store, cache, use, display, reproduce, modify, adapt, edit,
publish, analyze, transmit, and distribute [their content], including the

---

[39] *Snap Inc. Terms of Service*, Snap (Apr. 7, 2025),
https://www.snap.com/terms.

[40] *Id.*

[41] *Snapchat Ads Transparency*, Snap (Dec. 9, 2025), https://val-
ues.snap.com/privacy/ads-privacy.

name, image, likeness, or voice of anyone featured in it"[42]; (3) acknowledge that they "may be exposed to content that might be offensive, illegal, misleading, or otherwise inappropriate" and release Snap from all warranties and liability "to the extent permitted by law"[43]; (4) limit Snap's "aggregate liability" to "the greater of $100 USD or the amount [the user] [has] paid" Snap in the past twelve months[44]; (5) submit any disputes to "binding individual arbitration" and waive all rights to participate in a "class action" or "jury trial"[45]; and (6) "consent to . . . personal jurisdiction" in Los Angeles.[46]

That contractual transaction, not speech, is all the Act directly regulates. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 499 (1996) (distinguishing between "the State's power to regulate commercial transactions" and speech). Louisiana's Legislature determined that children younger than sixteen lack the capacity to weigh the risks and benefits

---

[42] *Snap Inc. Terms of Service*, Snap (Apr. 7, 2025), https://www.snap.com/terms.

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*

necessary to decide for themselves whether to enter a contract that not only exposes them to platforms' harmful business practices but also shields platforms from liability for the practices. That is a regulation of commercial activity, not speech. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 634 (1984) (O'Connor, J., concurring in part and in the judgment) ("[T]he State is free to impose any rational regulation on the commercial transaction itself.").

Contracts have been subject to State regulation—and even prohibition when deemed against public policy—throughout United States history. *See Ogden v. Saunders*, 25 U.S. 213, 347 (1827) (Marshall, C.J., dissenting) ("The [State's] right to regulate contracts, to prescribe rules by which they shall be evidenced, to prohibit such as may be deemed mischievous, is unquestionable, and has been universally exercised."). Corporations have never had a right to enter a "contract which the laws of th[e] community forbid, and the validity and effect of their contracts is what the existing laws give to them." *Id.* at 283 (opinion of Johnson, J.). That is especially true of contracts involving children, which have been heavily regulated and proscribed for centuries. *See* Holly Brewer, *By*

*Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority* 264–71 (2005).

Because the Act directly regulates only providing children accounts, this case is different from *Packingham v. North Carolina*, 582 U.S. 98 (2017). There, the Supreme Court applied heightened scrutiny to a law that made it a crime for a sex offender "to access" a social-media platform. *Packingham*, 582 U.S. at 101. Unlike the Act, that law was a direct regulation of speech—it made it a felony for a sex offender to post or read posts on social media. The Act does nothing of the sort. It does not directly regulate children at all, let alone what they may say or read on the internet. All the law does is limit platforms' ability to make them account holders without parental consent. Platforms may prefer requiring children to enter complex account-holder contracts as a condition of access so they can collect their data and maximize revenue, but the Free Speech Clause does not protect that preferred business model.

**2.** Nor does the Act's regulation of commercial activity impose a "disproportionate burden upon" expression. *TikTok*, 604 U.S. at 68 (quoting *Arcara*, 478 U.S. at 704). It at most only "incidental[ly] burdens" speech. *Sorrell v. IMS Health*, 564 U.S. 552, 566–67 (2011) (heightened

scrutiny applies to laws regulating commercial activity if their "purpose" is to "suppress speech"); *Ark. Times LP v. Univ. of Ark. Bd. of Trs.*, 37 F.4th 1386, 1394 (8th Cir. 2022) (en banc) (holding that heightened scrutiny did not apply because the law "target[ed] . . . unexpressive commercial choices," not speech); *see also Indigo Room v. City of Fort Myers*, 710 F.3d 1294, 1299–1300 (11th Cir. 2013); *Gary v. City of Warner Robins*, 311 F.3d 1334, 1340 (11th Cir. 2002). Any burden on speech results solely from a platform's business decision to force children to become account holders to use the platform's product.

Although the Supreme Court "has not articulated a clear framework for determining whether a regulation of non-expressive activity . . . disproportionately burdens" expression, it has identified some relevant factors. *TikTok*, 604 U.S. at 69. It matters whether the law's "focus" is preventing expression and whether there are "causal steps between the [law] and the alleged burden on protected speech." *See id*. If a law's focus is unrelated to expression, and any burden on speech arises only if other events occur—such as a business choosing to engage in "unlawful conduct"—then the law is not "directed at" expression and does not trigger heightened scrutiny. *Arcara*, 478 U.S. at 707; *TikTok*, 604 U.S. at 67–68.

*TikTok* and the Eleventh Circuit's decisions in *Indigo Room* and *Gary* are illustrative. In *TikTok*, TikTok and some of its users challenged a federal statute that required TikTok to either divest U.S. operations from Chinese control or effectively cease operating in the U.S. 604 U.S. at 62. Although the Supreme Court ultimately did not decide whether the statute imposed a disproportionate burden on expression, it declined to endorse the D.C. Circuit's conclusion that it did because the statute was "different in kind from the regulations of non-expressive activity that [the Supreme Court] ha[s] subjected to First Amendment scrutiny." *Id.* at 69. The law's "focus" was TikTok's corporate ownership, not users' speech. *Id.* And because TikTok would be banned only if it failed to divest, the failure to divest was a "causal step[]" between the law and the alleged burden on speech. *Id.*

In *Indigo Room* and *Gary*, the Eleventh Circuit held that laws prohibiting persons under 21 from entering alcohol-serving establishments do not disproportionately burden speech even if they end up preventing young people from engaging in nude dancing or attending political rallies. *Indigo Room*, 710 F.3d at 1299–1300; *Gary*, 311 F.3d at 1340. Those laws did not implicate the First Amendment because they were focused on

exposure to alcohol, not expression, and there were causal steps between the laws and the burden on expression—the speech forums' decisions to serve alcohol.

On the flip side, if a law regulating commercial activity on its face singles out speech and has the effect of burdening it with no intervening causal steps, it more likely imposes a disproportionate burden on expression. For example, in *Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue*, the Supreme Court held that a tax on the use of paper and ink that was crafted to apply to only newspapers triggered First Amendment scrutiny. *See* 460 U.S. 575, 592 (1983). Even though taxing paper and ink is not a direct regulation of expression, it was apparent that the regulation was focused on expression. *Id.* at 585. The gerrymandered nature of the tax, which was "without parallel in [Minnesota's] tax scheme," was not "justified by some special characteristic of the press" and thus applied to certain newspapers just because they were newspapers. *Id.* at 582, 585.

The Act, like the laws in *TikTok*, *Indigo Room*, and *Gary*, does not disproportionately burden expression. First, its focus is not speech but platforms' use of contracts that children lack the capacity to understand

and evaluate. If two social-media platforms were identical in all respects except that one required users to become account holders and the other did not, the Act would impose no restrictions on the latter even though both platforms provide the same speech to children. So just like the law in *TikTok* "focus[ed]" on TikTok's corporate control by "a foreign government," 604 U.S. at 69, and the laws in *Gary* and *Indigo Room* focused on exposure to alcohol, the Act focuses on a particular business practice.

Second, there are "causal steps between [the Act] and the alleged burden on protected speech." *Id.* The alleged burden here, as in *TikTok*, is that some users will not be able to speak and access speech on covered platforms. But in both cases, any limit on access results from the platforms' chosen business practices, not the law. Because the law in *TikTok* barred access only if TikTok chose not to divest from Chinese control, the failure to divest was a "causal step" between the law and the alleged burden on expression. *Id.* Similarly, a minor will be limited from accessing a platform under the Act only if the platform chooses to condition access on users' contracting for an account. Platforms are thus "punished" for their "nonexpressive *conduct*"—contracting with children for accounts—"not [their or their users'] speech." *Virginia v. Hicks*, 539 U.S. 113, 123 (2003).

All that makes the Act "different in kind from the regulations of non-expressive activity that [the Supreme Court] ha[s] subjected to First Amendment scrutiny." *TikTok*, 604 U.S. at 69. The Act is not "directed at" any expression. *Arcara*, 478 U.S. at 707. Instead, it is directed at a problem as old as time: Children, who "lack[] reason and judgment," being taken advantage of by sophisticated parties that seek to exploit them for financial gain. *NRA*, 133 F.4th at 1117.

**B.     Even if heightened scrutiny applied, NetChoice has not established that the Act is facially unconstitutional.**

Regardless whether First Amendment scrutiny applies, NetChoice has not shown that the Act's "constitutional applications" are "substantially outweigh[ed]" by "unconstitutional applications." *Moody*, 603 U.S. at 723–24. The Act—which protects all children under age 16—has a broad sweep of constitutional applications because it can be validly enforced against a platform when it provides accounts to children of "tender years." *Prince*, 321 U.S. at 169–70. The First Amendment does not strip States of the power to protect those children from platforms. They have more limited First Amendment interests than older children, and States have an even greater interest in protecting them because they are more vulnerable to the harms posed by platforms. *See Erznoznik v. City of*

23

*Jacksonville*, 422 U.S. 205, 214 n.11 (1975) ("[T]he age of the minor is a significant factor" in determining the First Amendment interests at stake.).

"The [Supreme] Court long has recognized that the status of minors under the law is unique in many respects." *Bellotti v. Baird*, 443 U.S. 622, 633 (1979) (plurality op.); *Prince*, 321 U.S. at 169–70. "[A]lthough children generally are protected by the same constitutional guarantees against governmental deprivations as are adults, the State is entitled to adjust its legal system to account for children's vulnerability." *Bellotti*, 443 U.S. at 635. "[E]ven where there is an invasion of protected freedoms[,] the power of the [S]tate to control the conduct of children reaches beyond the scope of its authority over adults." *Id.* at 636. "It is well settled that a State . . . can adopt more stringent controls on communicative materials available to youths than on those available to adults" because "[t]he First Amendment rights of minors are not coextensive with those of adults." *Erznoznik*, 422 U.S. at 212, 214 n.11. States can impose "restraints on minors which would be unconstitutional [under the First Amendment] if placed on adults" when the restraints are "based on" the

"peculiar vulnerability of children." *Johnson v. City of Opelousas*, 658 F.2d 1065, 1073 (5th Cir. 1981).

That precedent accords with history and tradition. *See Free Speech Coal. v. Paxton*, 606 U.S. 461, 472 (2025) (considering "[h]istory, tradition, and precedent" in determining the scope of children's First Amendment rights). States have always had more power to regulate children's activities. At the Founding, children were viewed as "lack[ing] the reason and judgment necessary to be trusted with legal rights." *NRA*, 133 F.4th at 1117. So the Founding generation "imposed age limits on all manner of activities." *Id.* at 1123. Children could not enlist in the military without parental consent. *Id.* at 1117. States "set age limits restricting marriage without parental consent." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 834 (2011) (Thomas, J., dissenting). And children did not have access to the same speech as adults. "Parents controlled children's access to information, including books," *NRA*, 133 F.4th at 1117, and States prohibited "[e]ntertaining . . . [c]hildren" without parental consent. Juries verdict agst Alice Thomas, Volume 29: Records of the Suffolk Cnty. Ct. 1671-1680 Part 1, pp. 82–83, available at https://tinyurl.com/3r8hw435; *see also* Book of the Gen. Laws and Liberties of Mass. 137 (1649) (penalizing

"entertain[ing]" children "to the dishonour of God and grief of their parents"). The Founding generation also "targeted for special regulation works manifestly tending to the corruption of the morals of youth." *Free Speech Coal.*, 606 U.S. at 473.

This longstanding "power" to regulate "children's activities" is at its zenith for children of "tender years." *Prince*, 321 U.S. at 168–70. The State has a greater interest in protecting those children because they are more vulnerable to "emotional excitement and psychological or physical injury." *Id.* at 170; *see also Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683–84 (1986) (Some "speech could well be seriously damaging to" young children but not high-school students.); *Mahmoud v. Taylor*, 606 U.S. 522, 555 n.8 (2025) (similar). Young children also have narrower First Amendment interests because they "are at a stage in which learning how to develop relationships and behave in society is as or even more important than their forming particular views on controversial topics." *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 417 (3d Cir. 2003); *see also C.S. v. McCrumb*, 135 F.4th 1056, 1065–66 (6th Cir. 2025) (recognizing that the "immaturity" of "elementary-aged children" bears on the scope of their First Amendment interests); *Morgan v. Swanson*,

659 F.3d 359, 386–87 (5th Cir. 2011) (en banc) ("elementary students" are still learning "the most basic social and behavioral tasks").

NetChoice, however, seems to believe that the First Amendment operates the same for all children—from birth to age 18—as it does for adults. *See* Discovery Resp. at 43, *CCIA v. Uthmeier*, No. 4:24-cv-438 (N.D. Fla. Jan. 13, 2025), ECF No. 51-8 (denying that "one year olds" lack a First Amendment interest in social-media accounts); *but see* PI Reply at 13 n.10, *NetChoice v. Skrmetti*, No. 3:24-cv-1191 (M.D. Tenn. Nov. 19, 2024), ECF No. 35 (suggesting that "privacy" laws protecting "younger minors" are constitutional). As NetChoice would have it, multibillion-dollar corporations have a First Amendment right to contract with 6-year-olds, entice them to engage in "Blackout Challenge[s]," and expose them to sexual predators, as long as adults would have a right to that commercial activity. *Anderson*, 116 F.4th at 181. That extreme position contravenes centuries of history, tradition, and precedent.

The Act thus has a broad sweep of valid applications. Louisiana can at minimum enforce it against covered platforms when they provide accounts to young children. That is a valid exercise of Louisiana's longstanding "power" to regulate the "activities" of children of "tender

years" to protect them from "danger[.]" *Prince*, 321 U.S. at 168–70. Even if those children have a First Amendment interest in social-media accounts that expose them to harm, the State is "justif[ied]" in protecting them because of their unique "vulnerability." *Johnson*, 658 F.2d at 1073.

Yet NetChoice has made no showing that the Act's supposedly unconstitutional applications to older children substantially "outweigh" its constitutional applications to younger children. *Moody*, 603 U.S. at 723–24. That alone forecloses injunctive relief. *See NetChoice v. Fitch*, 134 F.4th 799, 809 (5th Cir. 2025) (vacating a preliminary injunction that NetChoice obtained because it did not meet its burden under *Moody*); *Project Veritas v. Schmidt*, 125 F.4th 929, 961 (9th Cir. 2025) (en banc) (The plaintiff "fail[ed] to meet its burden" under *Moody* "because it ma[de] little effort to identify and weigh the . . . statute's lawful and unlawful applications.").

III. **IN ANY EVENT, NETCHOICE LACKS PRUDENTIAL STANDING TO ASSERT THE RIGHTS OF SOCIAL-MEDIA USERS.**

Merits aside, the district court erred in granting NetChoice a permanent injunction because NetChoice lacks prudential standing to assert the rights of social-media users. *See* District Court Order, R. Doc. 78, at 39–41 (relying on the rights of users). NetChoice has no relationship

whatsoever with its members' users. In asserting users' rights, NetChoice asks this Court to bless what the Third Circuit has dubbed "derivative standing," where an association uses associational standing to satisfy Article III and then invokes third-party standing to assert the rights of nonmembers with whom only its members have a relationship. *See Pa. Psychiatric Soc'y v. Green Spring Health Servs.*, 280 F.3d 278, 291–93 (3d Cir. 2002). But there is no derivative-standing exception to the bar on asserting others' rights. If NetChoice wishes to assert the rights of nonmember third parties, NetChoice itself must satisfy an exception that allows it to do so.

Associations cannot string together associational and third-party standing (two different prudential-standing exceptions) to assert the rights of parties who are multiple "steps removed" from the association. *Id.* at 294–95 (Nygaard, J., dissenting); *see also Swanson v. Hilgers*, 151 F.4th 992, 996 (8th Cir. 2025) (denying prudential standing because the plaintiff had no "*existing* relationship[]" with the third party). Associational standing is a vehicle only for enforcing the "rights of . . . members." *See Christian Lab. Ass'n v. City of Duluth*, 142 F.4th 1107, 1114 (8th Cir. 2025). It is a "strand" of "representational standing" that allows an

association to enforce the rights of members—even though they are "absent third parties"—because the association has a "particular," "recognized" "relationship[]" with them. *United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 557 (1996). Given the close relationship between an association and its members, the "concrete adverseness" that federal courts require is presumed when an association brings a claim "on behalf of its directly affected members." *UAW v. Brock*, 477 U.S. 274, 289 (1986) (citation omitted). That presumption stretches to its breaking point when an association seeks to represent members who would, in turn, be representing the interests of nonmembers—here, social-media users—if they sued.

If NetChoice can chain together two prudential-standing exceptions to assert the rights of persons with whom it concededly has no relationship, there would be no logical stopping point. A plaintiff could assert the rights of persons three, four, or five steps removed if it could stack enough prudential-standing exceptions to get there. Allowing plaintiffs to game prudential standing like that would gut the doctrine.

## CONCLUSION

This Court should reverse.

30

April 1, 2026

Respectfully submitted,

*/s/ Christine K. Pratt*

JAMES UTHMEIER
  *Attorney General of Florida*

DAVID M.S. DEWHIRST
  *Solicitor General*

JASON J. MUEHLHOFF
  *Chief Deputy Solicitor General*
CHRISTINE K. PRATT
*Assistant Solicitor General*
THOMAS F. KELLY
  *Solicitor General Fellow*
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
Christine.pratt@myfloridalegal.com

*Counsel for Amici Curiae*

# ADDITIONAL SIGNATORIES

STEVE MARSHALL
*Attorney General of Alabama*

STEPHEN J. COX
*Attorney General of Alaska*

KRIS MAYES
*Attorney General of Arizona*

TIM GRIFFIN
*Attorney General of Arkansas*

PHILIP J. WEISER
*Attorney General of Colorado*

WILLIAM TONG
*Attorney General of Connecticut*

CHRIS CARR
*Attorney General of Georgia*

ANNE E. LOPEZ
*Attorney General of Hawaii*

RAÚL R. LABRADOR
*Attorney General of Idaho*

THEODORE E. ROKITA
*Attorney General of Indiana*

BRIAN L. SCHWALB
*Attorney General for the District of Columbia*

BRENNA BIRD
*Attorney General of Iowa*

RUSSELL COLEMAN
*Attorney General of Kentucky*

DANA NESSEL
*Attorney General of Michigan*

KEITH ELLISON
*Attorney General of Minnesota*

CATHERINE L. HANAWAY
*Attorney General of Missouri*

MICHAEL T. HILGERS
*Attorney General of Nebraska*

AARON D. FORD
*Attorney General of Nevada*

DREW H. WRIGLEY
*Attorney General of North Dakota*

DAVE YOST
*Attorney General of Ohio*

DAN RAYFIELD
*Attorney General of Oregon*

ALAN WILSON
*Attorney General of South Carolina*

MARTY JACKLEY
*Attorney General of South Dakota*

JONATHAN SKRMETTI
*Attorney General of Tennessee*

KEN PAXTON
*Attorney General of Texas*

KATHY JENNINGS
*Delaware Attorney General*

STANFORD PURSER
*Solicitor General of Utah*

CHARITY R. CLARK
*Attorney General of Vermont*

JOHN B. MCCUSKEY
*Attorney General of West Virginia*

KEITH G. KAUTZ
*Attorney General of Wyoming*

33

# CERTIFICATE OF COMPLIANCE

1.    This amicus brief complies with Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f), it contains 5,889 words.

2.    The brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 29 and 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface in 14-point Garamond font using Microsoft Word.

3.    Last, the brief complies with the electronic-filing requirements of Local Rule 28A(h)(2) because it was scanned for viruses with Windows Defender and no virus was detected.

*/s/ Christine K. Pratt*
Counsel for *Amici Curiae*

# CERTIFICATE OF SERVICE

I certify that on April 1, 2026, I electronically filed this amicus brief with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Christine K. Pratt*
Counsel for *Amici Curiae*