# In the United States Court of Appeals for the Fifth Circuit

---

NETCHOICE,

*Plaintiff-Appellee,*

*v.*

LIZ MURRILL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF LOUISIANA; MIKE DUPREE, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE PUBLIC PROTECTION DIVISION, LOUISIANA DEPARTMENT OF JUSTICE,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Middle District of Louisiana
Civil Action No. 3:25-cv-231-JWD-RLB

---

## BRIEF OF PLAINTIFF-APPELLEE NETCHOICE

---

Steven P. Lehotsky
Serena M. Orloff
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
  Suite 700
Washington, DC 20001

Scott A. Keller
  *Counsel of Record*
LEHOTSKY KELLER COHN LLP
7500 Rialto Blvd., Suite 1-250
Austin, TX 78735
(512) 693-8350
scott@lkcfirm.com

*Counsel for Plaintiff-Appellee NetChoice*

## Certificate of Interested Persons

No. 26-30016
NetChoice,
*Plaintiff-Appellee*,

*v.*

Liz Murrill, in her official capacity as Attorney General of Louisiana; Mike Dupree, in his official capacity as Director of the Public Protection Division, Louisiana Department of Justice,
*Defendants-Appellants*.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. Plaintiff-Appellee NetChoice has no parent corporation, and no publicly held corporation owns 10% or more of its stock. These representations are made so that the Judges of this Court may evaluate possible disqualification or recusal.

**Plaintiff-Appellee:**
NetChoice

> **Counsel:**
> | | |
> |---|---|
> | Scott A. Keller | Claire Elizabeth Juneau |
> | Steven P. Lehotsky | Jeffery J. Gelpi |
> | Shannon G. Denmark | J. Christopher Dippel, Jr. |
> | Jeremy Evan Maltz | KEAN MILLER LLP |
> | Jared B. Magnuson | |
> | Josh P. Morrow | |
> | LEHOTSKY KELLER COHN LLP | |

**Defendants-Appellants:**

Liz Murrill, in her official capacity as Attorney General of Louisiana;
Mike Dupree, in his official capacity as Director of the Public Protection Division, Louisiana Department of Justice

**Counsel:**

Jorge Benjamin Aguinaga
Zachary Faircloth
LOUISIANA DEPARTMENT OF
JUSTICE

Joshua Simon Force
James M. Garner
Jeffrey Darren Kessler
SHER GARNER CAHILL RICHTER
KLEIN & HILBERT, L.L.C.


_/s/ Scott A. Keller_
Scott A. Keller
_Counsel of Record for Plaintiff-Appellee_

ii

**STATEMENT REGARDING ORAL ARGUMENT**

Plaintiff-Appellee NetChoice agrees with Defendants-Appellants that oral argument would aid the Court in resolving the issues presented in this appeal.

## TABLE OF CONTENTS

Table of Authorities ................................................................................ vii

Introduction ............................................................................................. 1

Statement of Jurisdiction ........................................................................ 3

Issues Presented ...................................................................................... 3

Statement of the Case ............................................................................. 3

    A. Background ........................................................................................ 3

        1. NetChoice members' websites disseminate large amounts of fully protected speech. ............................................................ 3

        2. Parents have many tools to oversee how their children use the internet. ................................................................................. 4

        3. Many websites advertise to make their services available to all. ....................................................................................... 6

    B. Louisiana Act 456 .......................................................................... 6

        1. Covered actors and activities. ................................................. 6

        2. The Act's speech restrictions. ................................................. 8

    C. Procedural history. ........................................................................ 9

Summary of the Argument .................................................................... 10

Standard of Review ............................................................................... 13

Argument ............................................................................................... 13

  I. The district court correctly concluded that the Act's speech restrictions trigger and fail heightened First Amendment scrutiny. ... 13

    A. All of the Act's speech restrictions trigger and fail strict scrutiny, because they depend on the Act's content-based threshold "social media company" coverage definition. ................ 14

        1. The Act's "social media company" coverage definition is content based. ........................................................................ 14

2. Defendants' arguments misinterpret the district court's holding and erroneously assert the Act's coverage definition is content neutral. ..........................................16

B. The Act's parental-consent requirement triggers and fails any level of heightened scrutiny. ...............................................21

1. The parental-consent requirement triggers heightened First Amendment scrutiny because it restricts accessing and disseminating speech. ............................................21

2. The parental-consent requirement fails heightened First Amendment scrutiny. ...................................................26

C. The Act's age-verification requirement triggers and fails heightened First Amendment scrutiny. .............................................33

1. The age-verification requirement triggers heightened First Amendment scrutiny because it restricts minors' and adults' ability to access and disseminate fully protected speech. ...............................................................34

2. The age-verification requirement fails any form of heightened First Amendment scrutiny. .......................................35

D. The Act's advertising restrictions violate the First Amendment. ...................................................................37

1. The advertising restrictions trigger heightened First Amendment scrutiny. ...................................................37

2. The advertising restrictions fail any form of heightened First Amendment scrutiny. .........................................39

E. The Act's direct-messaging restrictions violate the First Amendment. ...............................................................43

II. The Act's central "social media company" coverage definition is unconstitutionally vague. ...........................................................45

III. NetChoice has standing. ..........................................................46

    A. NetChoice has Article III associational standing to challenge the Act's speech restrictions on behalf of its covered members.......................................................................47

    B. NetChoice has prudential standing to raise the First Amendment rights of social media website users when challenging laws restricting users' access to protected speech... ...............................................................53

    IV.    NetChoice is entitled to a permanent injunction. ...........................56

Conclusion...........................................................................................58

Certificate of Service ..........................................................................60

Certificate of Compliance ...................................................................60

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Acad. of Implant Dentistry v. Parker,*
860 F.3d 300 (5th Cir. 2017)....................................................................42

*Am. Amusement Mach. Ass'n v. Kendrick,*
244 F.3d 572 (7th Cir. 2001)....................................................................26

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
627 F.3d 547 (5th Cir. 2010)..............................................................50, 56

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
591 U.S. 610 (2020)..................................................................................15

*Book People, Inc. v. Wong,*
91 F.4th 318 (5th Cir. 2024)..............................................................39, 57

*Brown v. Ent. Merchs. Ass'n,*
564 U.S. 786 (2011)...............1, 11, 12, 14, 19-28, 32, 33, 36, 40, 43, 44, 54, 55

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.,*
98 F.4th 220 (5th Cir. 2024)....................................................................52

*Carl E. Woodward, L.L.C. v. Acceptance Indem. Ins. Co.,*
743 F.3d 91 (5th Cir. 2014)......................................................................21

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
447 U.S. 557 (1980)......................................................................39, 40, 41

*Chiles v. Salazar,*
146 S. Ct. 1010 (2026)..................................................................2, 23, 42, 47

*Citizens United v. FEC,*
558 U.S. 310 (2010)..................................................................................24

*City of Austin v. Reagan Nat'l Advert. of Austin,*
    596 U.S. 61 (2022)................................................................18

*City of Cincinnati v. Discovery Network, Inc.,*
    507 U.S. 410 (1993)..............................................................15

*Comput. & Commc'ns Indus. Ass'n v. Paxton,*
    747 F. Supp. 3d 1011 (W.D. Tex. 2024) ...................................2, 15

*Comput. & Commnc'ns Indus. Ass'n v. Uthmeier,*
    2025 WL 3458571 (11th Cir. Nov. 25, 2025) ...........................19, 32

*Crown Castle Fiber, L.L.C. v. City of Pasadena,*
    76 F.4th 425 (5th Cir. 2023)....................................................56

*Ctr. for Biological Diversity v. EPA,*
    937 F.3d 533 (5th Cir. 2019)....................................................49

*Deep S. Ctr. for Env't. Just. v. EPA,*
    138 F.4th 310 (5th Cir. 2025)....................................................49

*Erznoznik v. Jacksonville,*
    422 U.S. 205 (1975)................................................................40

*Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Pro. Eng'rs*
    *& Surveyors,*
    916 F.3d 483 (5th Cir. 2019)....................................................42

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012)................................................................45

*FEC v. Cruz,*
    596 U.S. 289 (2022)............................................................21, 25

*Free Speech Coal., Inc. v. Paxton,*
    606 U.S. 461 (2025)........................... 1, 11, 14, 18, 19, 25, 26, 27, 34, 35, 36, 54

*Hines v. Pardue,*
   117 F.4th 769 (5th Cir. 2024)........................................................27

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
   515 U.S. 557 (1995)..............................................................37, 38

*John Doe No. 1 v. Reed,*
   561 U.S. 186 (2010)....................................................................9

*JP Morgan Chase Bank, N.A. v. DataTreasury Corp.,*
   936 F.3d 251 (5th Cir. 2019).....................................................51

*Kowalski v. Tesmer,*
   543 U.S. 125 (2004)..................................................................55

*Louisiana v. Biden,*
   55 F.4th 1017 (5th Cir. 2022)...................................................57

*McCullen v. Coakley,*
   573 U.S. 464 (2014)..................................................................31

*McManaway v. KBR, Inc.,*
   852 F.3d 444 (5th Cir. 2017)...............................................29, 30

*Miami Herald Publ'g Co. v. Tornillo,*
   418 U.S. 241 (1974)..............................................................12, 37

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue,*
   460 U.S. 575 (1983)..............................................................17, 33

*Moody v. NetChoice, LLC,*
   603 U.S. 707 (2024)...................... 4, 7, 18, 22, 25, 26, 35, 36, 37, 38

*Nat'l Press Photographers Ass'n v. McCraw,*
   90 F.4th 770 (5th Cir. 2024).....................................................45

*Nat'l Rifle Ass'n of Am. v. Vullo,*
   602 U.S. 175 (2024)..................................................................17

*NetChoice v. Carr,*
789 F. Supp. 3d 1200 (N.D. Ga. 2025) ....................................................2, 22, 25

*NetChoice v. Griffin,*
2026 WL 1068565 (W.D. Ark. Apr. 20, 2026) ...................................................2

*NetChoice v. Griffin,*
812 F. Supp. 3d 905 (W.D. Ark. 2025)............................................................2

*NetChoice v. Jones,*
2026 WL 561099 (E.D. Va. Feb. 27, 2026) .................................................2, 22

*NetChoice, L.L.C. v. Fitch,*
134 F.4th 799 (5th Cir. 2025)............................... 12, 23, 47, 50, 51, 53, 55, 58

*NetChoice, LLC v. Bonta,*
113 F.4th 1101 (9th Cir. 2024)......................................................................31

*NetChoice, LLC v. Bonta,*
152 F.4th 1002 (9th Cir. 2025).......................................................................53

*NetChoice, LLC v. Bonta,*
170 F.4th 744 (9th Cir. 2026).........................................................................17

*NetChoice, LLC v. Fitch,*
145 S. Ct. 2658 (2025)...............................................................................23, 58

*NetChoice, LLC v. Griffin,*
2025 WL 978607 (W.D. Ark. Mar. 31, 2025)...........................2, 22, 45, 46, 56

*NetChoice, LLC v. Reyes,*
748 F. Supp. 3d 1105 (D. Utah 2024).............................................................2

*NetChoice, LLC v. Yost,*
778 F. Supp. 3d 923 (S.D. Ohio 2025).................................................2, 22, 26

*Netflix, Inc. v. Babin,*
88 F.4th 1080 (5th Cir. 2023).........................................................................57

*Nken v. Holder,*
  556 U.S. 418 (2009)......................................................................56

*Packingham v. North Carolina,*
  582 U.S. 98 (2017)................................... 1, 2, 7, 22, 24, 25, 26, 28, 33, 34, 44, 58

*Prison Legal News v. Livingston,*
  683 F.3d 201 (5th Cir. 2012)........................................................50

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015)..................................................11, 14, 15, 16, 18

*Sable Commc'ns of Cal., Inc. v. FCC,*
  492 U.S. 115 (1989)........................................................27, 43

*Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't. Quality,*
  968 F.3d 419 (5th Cir. 2020)........................................................49

*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011)..................................................12, 15, 38, 40

*Students Engaged in Advancing Tex. v. Paxton,*
  765 F. Supp. 3d 575 (W.D. Tex. 2025) ........................................12, 38, 39, 40

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014)........................................................48

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n,*
  989 F.3d 368 (5th Cir. 2021)........................................................47

*Tex. Democratic Party v. Benkiser,*
  459 F.3d 582 (5th Cir. 2006)........................................................50

*Tex. Ent. Ass'n, Inc. v. Hegar,*
  10 F.4th 495 (5th Cir. 2021)........................................................51

*Texas v. EEOC,*
  933 F.3d 433 (5th Cir. 2019)........................................................48

*Texas v. Yellen,*
105 F.4th 755 (5th Cir. 2024)..............................................................13

*Trump v. Boyle,*
145 S. Ct. 2653 (2025).........................................................................58

*Trump v. CASA, Inc.,*
606 U.S. 831 (2025)......................................................................55, 57

*United States v. Playboy Ent. Grp., Inc.,*
529 U.S. 803 (2000).............................................................................31

*US Inventor, Inc. v. Vidal,*
2022 WL 4595001 (5th Cir. Sept. 30, 2022) .....................................49

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,*
425 U.S. 748 (1976).............................................................................54

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
455 U.S. 489 (1982).............................................................................45

*Virginia v. Am. Booksellers Ass'n, Inc.,*
484 U.S. 383 (1988)..................................................................47, 54, 55

*Virginia v. Hicks,*
539 U.S. 113 (2003).............................................................................25

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989).............................................................................29

*Winter v. Nat. Res. Def. Council,*
555 U.S. 7 (2008).................................................................................56

## Statutes and Rules

28 U.S.C. § 1291 ...................................................................................3

28 U.S.C. § 1292 ...................................................................................3

28 U.S.C. § 1331 ...................................................................................3

28 U.S.C. § 1343 ...................................................................................3

Cal. Civ. Code § 1798.140 ..........................................................40, 41

Fed. R. Civ. P. 30 ................................................................................10

La. R.S. § 17:1751 ........................... 6, 7, 11, 15, 18, 27, 32, 40, 45, 46, 48

La. R.S. § 17:1752 ...........................................................8, 11, 21, 33, 34

La. R.S. § 17:1753 ........................... 8, 9, 11, 12, 14, 37, 38, 41, 43

La. R.S. § 17:1754 ........................................................................8, 14

La. R.S. § 17:1755 .................................................................................9

La. R.S. § 17:1756 .................................................................................9

La. R.S. § 17:1762 .................................................................................8

The district court correctly held that Louisiana Act 456 ("Act") violates the U.S. Constitution as applied to 12 NetChoice-member websites. So it correctly enjoined enforcement of the Act's speech restrictions: (1) parental consent for minors to access a content-based and vaguely defined set of "social media" websites and applications; (2) age verification for both minors and adults to access those services; (3) restrictions on certain advertising practices; and (4) data-collection-and-use and direct-messaging restrictions.

"Minors are entitled to a significant measure of First Amendment protection," and the State's power to protect minors "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (cleaned up). The State thus lacks "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* at 795 n.3. Nor can Louisiana age-gate access to fully protected speech, because "submitting to age verification is a burden on the exercise of" the First Amendment "right to access speech." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 482-83 (2025) ("*FSC*"). These principles apply forcefully online. Restricting "access to social media . . . prevent[s] the user from engaging in the legitimate exercise of First Amendment rights." *Packingham v. North Carolina*, 582 U.S. 98, 108 (2017).

There is no "doubt that the question 'how best to help minors' . . . is presently a subject of 'fierce public debate,'" and Louisiana "may regard [this Act] as essential," just as "censorious governments throughout history have

believed the same." *Chiles v. Salazar*, 146 S. Ct. 1010, 1029 (2026). But Louisiana cannot further these interests by unconstitutional methods.

By permanently enjoining the Act's enforcement against NetChoice members' 12 covered services, the district court protected minors' and adults' access to "what for many are the principal sources for knowing current events." *Packingham*, 582 U.S. at 107. Courts across the Nation have enjoined enforcement of similar laws. *NetChoice v. Griffin*, 2026 WL 1068565 (W.D. Ark. Apr. 20, 2026); *NetChoice v. Jones*, 2026 WL 561099 (E.D. Va. Feb. 27, 2026); *NetChoice v. Griffin*, 812 F. Supp. 3d 905 (W.D. Ark. 2025); *NetChoice v. Carr*, 789 F. Supp. 3d 1200 (N.D. Ga. 2025); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923 (S.D. Ohio 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ("*Griffin II*"); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024).

This Court should affirm.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292.

## ISSUES PRESENTED

1. Whether the district court properly preserved Louisianans' access to billions of pieces of fully protected online speech by permanently enjoining the Act's parental-consent, age-verification, advertising, data-collection-and-use, and direct-messaging restrictions under the First Amendment.

2. Whether the Act's central "social media company" coverage definition is unconstitutionally vague.

3. Whether NetChoice has Article III associational standing to challenge the Act and has prudential standing to assert the interests of its members' users.

## STATEMENT OF THE CASE

### A. Background.

#### 1. NetChoice members' websites disseminate large amounts of fully protected speech.

NetChoice is an internet trade association. ROA.1527. The district court found the following websites belonging to NetChoice members are regulated by the Act: (1) Automattic (Tumblr); (2) Meta (Facebook, Instagram,

WhatsApp);  (3) Nextdoor;  (4) Pinterest;  (5) Reddit;  (6) Snapchat;  (7) X;  (8) YouTube; (9) Discord; and (10) Amazon (Twitch). ROA.6511.[1]

These 12 websites—and other covered websites—are targeted for regulation because they "allow users to upload content . . . to share [it] with others," where those "viewing the content can" "react to it, comment on it, or share it themselves." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024); ROA.6515. Consequently, covered websites disseminate "billions of posts or videos," providing users an important means of sharing a "staggering" amount of their own protected expression. *Moody*, 603 U.S. at 719, 734. For example, Defendant-Appellant Murrill "uses her social media accounts on Facebook, Instagram, X, [and] YouTube, . . . to discuss the policies, priorities, and actions of [her] office." ROA.1534. Similarly, these websites "engage[]" in expression" themselves by "displaying," "compiling, and curating" protected speech. *Moody*, 603 U.S. at 716-17, 728, 731; ROA.1529. This curation results in "distinctive expressive offering[s]." *Moody*, 603 U.S. at 738.

### 2. Parents have many tools to oversee how their children use the internet.

The district court found that parents have many tools to oversee their children's use of social media. ROA.6515-6516.

---

[1] This brief uses "websites" or "services" to refer to all digital services. Unless otherwise noted, statutory citations refer to the Louisiana Revised Statutes.

To start, parents control what *devices* minors can access—and when. ROA.1530-1531. As the district court found, not all devices are internet-enabled. ROA.6515. Devices that *are* internet-enabled come with many parental-control options, including the ability to lock or limit specific apps and features, restrict the device settings to limit content and downloads, limit access to approved websites, and set overall or time-of-day usage limits. ROA.1531; ROA.6515-6516.

Parents also control the *networks* that minors use. Wireless routers allow parents to manage which network a minor connects to and to set up rules defining which websites minors can use (and at what times). ROA.1531. Many internet service providers offer similar controls. ROA.1531.

Parents control *software* as well. Web browsers offer parental controls. ROA.1531. And third-party parental control software is available for many devices. ROA.1531.

In addition, covered NetChoice members have developed their own suite of parental controls and other protections for minors on their services. *E.g.,* ROA.1531-1532; ROA.6515. These controls supplement the resources that members spend crafting and enforcing "content moderation" policies aiming to prevent objectionable speech from reaching users. *E.g.,* ROA.1532; *see* ROA.6515. These members' efforts have been successful. ROA.1532.

The district court also found that members' services do not permit minors younger than 13 to create accounts on the services regulated by the Act. ROA.6516; *see* ROA.1531.

### 3. Many websites advertise to make their services available to all.

Most covered websites depend on ads for revenue. ROA.1533. Internet ads often draw insight from a website's or webpage's content. ROA.1533. For example, a user who visits a National Park's social media account might see ads for lodging near the park or camping equipment. Individuals who use the services also advertise everything from fundraisers to babysitting services in their user-generated content. ROA.1533.

### B. Louisiana Act 456.

### 1. Covered actors and activities.

The Act's speech restrictions apply to a content-based collection of "[s]ocial media compan[ies]" providing "[s]ocial media platform[s]." § 1751(11)-(12).

The Act defines "[s]ocial media company" as an "entity that provides a social media platform that has at least five million account holders worldwide." § 1751(11). In turn, a "[s]ocial media platform" is any "public or semi-ipublic internet-based service or application that has users in Louisiana and":

> (i) The service or application connects users in order to allow users to interact socially with each other within the service or application. . . .
> (ii) The service or application allows users to do all of the following:
> > (aa) Construct a public or semipublic profile for purposes of signing into and using the service or application.

> (bb) Populate a list of other users with whom an individual shares a social or virtual connection within the system, including subscribing to content . . .
>
> (cc) Create or post content viewable by other users, including but not limited to on message boards, in chat rooms, on video channels, or through a landing page or main feed that presents the user with content generated by other users.

§ 1751(12)(a).

Accordingly, the Act regulates only "social media" websites that "allow users to upload content . . . to share with others." *Moody*, 603 U.S. at 719. These are the kinds of "social media" websites that people have a First Amendment right to access. *Packingham*, 582 U.S. at 108.

The district court recognized that "[c]lassification of websites under the Act [] requires consideration of their content." ROA.6565. Specifically, the Act excludes websites with the following "predominant or exclusive function[s]": "streaming service[s]"; "[n]ews, sports, entertainment"; "[o]nline shopping"; "[i]nteractive gaming, virtual gaming"; "[p]hotograph editing" and "associated photograph hosting"; "[s]ingle purpose community groups for public safety" (where "the interaction with other users or account holders is limited to that single purpose"); "[c]areer development opportunities, including professional networking"; "data visualization"; "digital news"; "technical support"; "[a]cademic, scholarly, or genealogical research"; and "classified advertising service[s]." § 1751(12)(b).

### 2. The Act's speech restrictions.

*Parental consent. § 1752(B).* Covered websites "shall not permit" a minor "to be an account holder . . . unless the minor has the express consent of a parent." § 1752(B). On NetChoice members' covered services, users must have an account to access either some or all of the fully protected speech and speech-facilitating functions on the service. ROA.1530. For minors who have parental consent, the Act requires covered websites to provide parents with supervision tools. § 1754.

*Age verification. § 1752(A).* Covered websites "shall make commercially reasonable efforts to verify the age of Louisiana account holders with a level of certainty appropriate to the risks that arise from the information management practices of the" service. § 1752(A). Otherwise, services must treat *all users* the same way that the Act requires covered websites to treat minors. § 1752(A).

*Advertising on minors' accounts. § 1753(2).* Covered websites "shall prohibit . . . [t]he display of any advertising in the account based on the Louisiana minor account holder's personal information, except age and location." § 1753(2). This provision may prohibit contextual advertising, because "[t]argeted advertising" is separately regulated by another provision of Louisiana law. § 1762(A)(10)(a), (B)(1).

*Restrictions on messaging. § 1753(1).* Covered websites "shall prohibit . . . [a]dults from direct messaging a Louisiana minor account holder unless the minor is already connected to the adult on the service." § 1753(1).

*Limitation on information collection and use. § 1753(3).* The Act also imposes a restriction on the "collection or use of personal information from . . . activities of the account other than information beyond what is adequate, relevant, and reasonably necessary in relation to the purposes for which the information is collected, as disclosed." § 1753(3).

*Enforcement and penalties. §§ 1755-56.* The Act grants Defendants "exclusive" enforcement authority. §§ 1755-56. The Division Director "may impose an administrative fine of up to two thousand five hundred dollars for each violation." § 1756(B). And the Division Director may seek declaratory and injunctive relief, disgorgement, damages, fees, and costs. § 1756(C), (D)(4).

## C. Procedural history.

**1.** NetChoice sued on March 18, 2025. ROA.6. NetChoice raised: (1) a facial First Amendment challenge; (2) as-applied First Amendment challenges, that the Act is unconstitutional "to the extent" it restricts speech from NetChoice's regulated members and their users, *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010); and (3) a facial vagueness challenge. ROA.40-41. NetChoice moved for preliminary injunctive relief the same day, requesting a decision on or before July 1, 2025. ROA.6.

Under Defendants' proposed alternative, the parties agreed to conduct discovery and proceed quickly to summary judgment, with Defendants promising to "delay implementation" of the Act until December 19, 2025. *See* ROA.249.

**2.** The parties conducted 100 days of fact discovery. During discovery, Defendants sought information about NetChoice's members from only NetChoice itself. Defendants served their only set of written discovery requests on NetChoice on April 23, 2025. ROA.1296. They never issued any follow-up requests to NetChoice or its members.

NetChoice produced thousands of pages of documents and 65 pages of detailed responses and objections to interrogatories, requests for production, and requests for admission. ROA.1296-1297. NetChoice also put forth its General Counsel as a Rule 30(b)(6) witness. *See* ROA.1301.

**3.** After discovery, the parties cross-moved for summary judgment. NetChoice supported its summary judgment briefing with hundreds of pages of material, including declarations from NetChoice and two members, prior written discovery responses and deposition transcripts, a variety of articles and sources with NetChoice members' policies and parental tools, and other documents.

In an exhaustive 94-page decision, the district court granted summary judgment to NetChoice and permanently enjoined Defendants' enforcement of the challenged speech restrictions against NetChoice's covered members. ROA.6504-6598.

## SUMMARY OF THE ARGUMENT

**I.A.** Under the Act's central "social media platform" coverage definition, "[c]lassification of websites under the Act [] requires consideration of their

content." ROA.6565. That includes both what the Act covers—websites with the "predominant or exclusive function" of "allow[ing] users to interact socially with each other"—and what the Act excludes, *e.g.*, "community groups for public safety" and "professional networking." Accordingly, all of the Act's speech restrictions are content-based too, making them "presumptively unconstitutional" because they trigger "strict scrutiny." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015). Yet Defendants do not even attempt to argue the Act's speech restrictions meet that demanding standard.

**B.** The Act's parental-consent requirement for minors aged 13-16 to create accounts on covered websites is unconstitutional as applied to NetChoice members' 12 covered services. § 1751(11)-(12). The Supreme Court has squarely held that governments *cannot* require minors to obtain their "*parents' prior consent*" to engage in or receive protected speech. *Brown*, 564 U.S. at 795 n.3. The Act here violates that principle and cannot satisfy even intermediate scrutiny.

**C.** The Act impedes *all* users' access—minors and adults—to fully protected speech on covered websites by requiring those websites to verify all users' ages. § 1752(A). Here too, binding Supreme Court precedent holds that "submitting to age verification is a burden on the exercise of" the "right to access speech." *FSC*, 606 U.S. at 482-83. And this Act's age-verification requirements cannot satisfy even intermediate scrutiny.

**D.** The Act's prohibitions on advertisements based on most "personal information" on minors' accounts, § 1753(2), impermissibly restrict websites'

use of information in disseminating fully protected speech. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). The prohibitions on websites' editorial control over the arrangement and presentation of third-party speech likewise violate the First Amendment. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *see, e.g., Students Engaged in Advancing Tex. v. Paxton*, 765 F. Supp. 3d 575, 593-95 (W.D. Tex. 2025) ("*SEAT*").

**E.** The "direct-messaging restrictions independently trigger and fail heightened scrutiny" because, "[l]ike adults, minors have a 'constitutional right to speak or be spoken to.'" ROA.6582 (quoting *Brown*, 564 U.S. at 795 n.3). The Act's "direct-messaging limitations," § 1753(1), "limit communication between individuals," thus violating that commonsense principle. ROA.6583.

**II.** The district court correctly concluded that the Act's central "social media company" coverage definition is unconstitutionally vague because "the scope of the term 'social media platform' is unclear." ROA.6589. Whether the Act applies turns on a service's "predominant or exclusive function," but the Act never defines that term. That leaves websites uncertain as to whether they must shoulder the Act's burdens.

**III.** This Court has already held that NetChoice has both Article III associational standing to raise its member websites' rights *and* prudential standing to raise the interests of members' users. *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 805-07 (5th Cir. 2025). That is especially true when the district court

found that multiple NetChoice members are covered by the Act and face a credible threat of prosecution. ROA.6536-6539.

**IV.** The Act violates the Constitution many times over. So the district court correctly permanently enjoined the Act's enforcement against NetChoice members' 12 covered services.

## STANDARD OF REVIEW

This Court reviews "rulings on standing de novo," "the district court's grant of a permanent injunction for abuse of discretion, and the legal issues underlying the grant of the injunction de novo." *Texas v. Yellen*, 105 F.4th 755, 763 (5th Cir. 2024) (citation omitted). The court "may affirm for any reason supported by the record, even if not relied on by the district court." *Id.* (citation omitted).

## ARGUMENT

## I. The district court correctly concluded that the Act's speech restrictions trigger and fail heightened First Amendment scrutiny.

The Act's speech restrictions all trigger and fail strict First Amendment scrutiny. But Defendants do not attempt to argue that the Act can meet that demanding standard. So if this Court determines that strict scrutiny applies, NetChoice necessarily prevails. Nevertheless, all of the Act's speech restrictions fail intermediate scrutiny—as the district court correctly concluded.

**A. All of the Act's speech restrictions trigger and fail strict scrutiny, because they depend on the Act's content-based threshold "social media company" coverage definition.**

**1. The Act's "social media company" coverage definition is content based.**

The district court correctly concluded that the Act's central "social media platform" coverage definition is content-based. This definition determines whether a company is subject to the Act's speech restrictions. And "[b]ecause the Act's coverage definition is content-based, strict scrutiny applies to all provisions" of the Act. ROA.6567-6568.[2]

The First Amendment's "most basic" principle dictates that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91 (quotation omitted). "Content-based laws . . . are presumptively unconstitutional" and trigger "strict scrutiny." *Reed*, 576 U.S. at 163-64. "Strict scrutiny is unforgiving . . . [and] fatal in fact absent truly extraordinary circumstances." *FSC*, 606 U.S. at 484-85.

Here, the Act defines "[s]ocial media platform[s]," in part, based on the "subject matter" of expression they disseminate—and thus their "content."

---

[2] That includes the Act's data-collection and use limitations, § 1753(3), and parental-supervision provisions, § 1754. All these provisions are "[g]overnment regulation[s] of speech" because they impose legal duties on websites if they disseminate speech of a certain type of "content." *Reed*, 576 U.S. at 163.

*Reed*, 576 U.S. at 163; § 1751(11)-(12). The Act *includes* websites based on whether they "allow users to interact socially." § 1751(12)(a)(i). "Classification of websites under the Act . . . requires consideration of their content—that is, whether their content is 'predominantly or exclusively' socially interactive." ROA.6566-6567 (cleaned up). So "[n]on-social interactions, such as professional interactions, are not covered, while social interactions are." *Paxton*, 747 F. Supp. 3d at 1032.

The Act also *excludes* websites based on the content they disseminate. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (plurality opinion) (content-based exceptions render law content-based); *Sorrell*, 564 U.S. at 563-64 (similar). The Act excludes websites with "predominant or exclusive function[s]" defined in terms of subject matter of content: "[i]nteractive gaming, virtual gaming"; "community groups for public safety"; "professional networking"; "digital news"; and "[a]cademic, scholarly, or genealogical research," to name a few. § 1751(12)(b). These are all content-based speech categories. *E.g.*, *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993) ("'news[]'" is a "'content based'" category).

Because the Act is "content based on its face," it is "subject to strict scrutiny regardless of" the government's assertion of a "benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165-66 (citation omitted). Defendants wrongly suggest that the Act is not content based simply because it has purportedly "lawful end[s]." AG.Br.44. A content-neutral purpose cannot

15

transform a facially content-based law into a content-neutral one. *Reed*, 576 U.S. at 165-66.

But "a content-based [governmental] purpose may be sufficient in certain circumstances to show that a regulation is content based." *Id.* at 165 (citation omitted). Here, Defendants repeatedly attempt to justify the Act's speech restrictions by reference to "harmful *content*." AG.Br.7 (emphasis added); *see* AG.Br.44 ("Act 456 targets the platforms" where minors are "likely to find" certain content). This is an independent reason to conclude that the Act is content based.

### 2. Defendants' arguments misinterpret the district court's holding and erroneously assert the Act's coverage definition is content neutral.

**a.** At the outset, Defendants misconstrue what the district court held about the Act's content-based coverage definition.

Defendants incorrectly argue that the district court "erred in holding the Act's definition of 'social media platform'" itself unconstitutional. AG.Br.42. The Act's coverage provisions determine *who* must comply with the Act's operative speech restrictions. ROA.6565. And the Act uses the "subject matter" on websites to determine whether those websites are regulated. *Reed*, 576 U.S. at 170. Thus, the Act's content-based coverage distinctions affect all the Act's operative provisions. *See supra* p.14.

Defendants likewise confuse NetChoice's argument when they say that NetChoice "tried to 'argue that the coverage definition raises the same First

Amendment issues in every application because it compels every covered business to comply with the law's substantive provisions.'" AG.Br.45 (cleaned up) (quoting *NetChoice, LLC v. Bonta*, 170 F.4th 744, 753 n.3 (9th Cir. 2026)). The Act's coverage definition applies in every application of the Act, so it "raises the same First Amendment issue[] in every application," *id.*, to the extent it subjects all of the Act's "substantive provisions" to strict First Amendment scrutiny. And these operative provisions all fail strict (or intermediate) scrutiny. To be sure, there is some analysis common to each provision. Some tailoring flaws, for instance, apply equally to all provisions, such as the Act's overbroad scope of coverage. ROA.6560-6571. Regardless, the district court held that each of the Act's individual provisions independently fails even intermediate First Amendment scrutiny. ROA.6571-6584.

In addition, Defendants attack a strawman by claiming "the State's decision to regulate a particular industry does not itself implicate the First Amendment." AG.Br.43 (collecting cases). Rather, the district court concluded that Louisiana has used content-based criteria to directly target accessing and disseminating fully protected speech. ROA.6565-6568.

More generally, governments cannot exercise their otherwise-valid authority to specifically target speech. The State "cannot do indirectly what [it] is barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). For instance, governments have unquestioned power to tax. But the government could not single out sports magazines for special taxation. *See Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591

(1983) (rejecting tax law that "target[ed] a small group of newspapers"). That is akin to the law here.

**b.** When addressing the coverage definition itself, Defendants argue that the Act distinguishes based upon only the "*functions*" that websites offer. AG.Br.22. But Defendants do not address most of the coverage definition's language. So they do not explain how the Act's exclusions for, *e.g.*, "groups for public safety," "professional networking," and "digital news" are mere functional distinctions. § 1751(12)(b). Those exemptions require Defendants and courts to analyze the subject matter of the content on websites to determine whether they are regulated. *Reed*, 576 U.S. at 163. Regardless, "a regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61, 74 (2022).

Defendants also contend that *FSC* and *Moody* allow this Court to ignore the Act's content-based coverage criteria and apply intermediate scrutiny instead. AG.Br.44-45. But as Defendants "themselves admit, *Moody* did not reach the question of which level of scrutiny to apply" in that case because the law failed even intermediate scrutiny. ROA.6567 (citation omitted).

In addition, the coverage provisions in *FSC* targeted "pornography," which is a unique "content-based restriction [that] does not require strict scrutiny." 606 U.S. at 492. Pornography, or "obscen[ity] for minors," is simultaneously protected for adults and *un*protected for minors. *Id.* at 469,

472-74. So any coverage provision targeting pornography "is content based in the same way that prohibitions of [unprotected] 'defamation,' 'fraud,' and 'incitement' are." *Id.* at 492 (citation omitted). These are "well-defined and narrowly limited classes of speech." *Brown*, 564 U.S. at 791 (citation omitted). But the Act here uses content-based categories of fully protected speech (*e.g.*, news) to restrict billions of posts of "fully protected speech." *FSC*, 606 U.S. at 484. And "for *fully protected speech*, the distinction between bans and burdens makes no difference to the level of scrutiny." *Id.* at 493 n.12 (citation modified). So the Act here requires "strict scrutiny." *Id.* at 484.

For similar reasons, Defendants mistakenly rely on the stay-posture order from *Computer & Communications Industry Ass'n v. Uthmeier*, 2025 WL 3458571 (11th Cir. Nov. 25, 2025); AG.Br.3, 23, 46-48. The Florida law in *Uthmeier* had a coverage definition "unlike" Louisiana's—which "affect[ed] the level of scrutiny and the [Eleventh Circuit's] initial assessment of tailoring." ROA.6510 n.3 (citing *Uthmeier*, 2025 WL 3458571, at *6-7). For instance, the *Uthmeier* stay panel concluded that Florida's law did not "include exemptions based on a platform's content." 2025 WL 3458571, at *1. Here, however, the Act unmistakably has multiple such exemptions. *See supra* p.15. So even assuming *Uthmeier* was correct, there are "meaningful" distinctions between the laws. *Contra* AG.Br.47. Likewise, *Uthmeier*'s tailoring analysis is inapposite. *Uthmeier* distinguished its own conclusion from laws where "the broad restrictions in question were *content based*." 2025 WL 3458571, at *9 n.12 (emphasis added).

**c.** Nor does intermediate (rather than strict) scrutiny apply because some covered websites purportedly "host[] both protected expression and unprotected conduct." *Contra* AG.Br.57.[3]

Whenever a government indiscriminately regulates broad swaths of speech, it can capture some instances of unprotected speech. But that does not mean the law triggers only intermediate scrutiny. Any bookstore, video game, or website could potentially have unprotected expression—like defamation, for example. Allowing the government to restrict speech access because there *might* be an unprotected needle in the haystack would erase the settled rule that States may only suppress minors' access to protected expression in clearly defined circumstances. *See Brown*, 564 U.S. at 802. And it would invert the First Amendment presumption that speech is protected unless the government can demonstrate otherwise.

*  *  *

Defendants do not argue that the Act's speech restrictions satisfy strict scrutiny. Instead, they assert the restrictions "satisfy *intermediate scrutiny*." AG.Br.43 (emphasis added). Defendants have therefore forfeited any

---

[3] If Defendants contend that this Act is necessary to address pornography online, separate Louisiana law already requires age verification for websites where more than one-third of the content is obscene for minors. § 9:2800.29. That Louisiana law demonstrates both that this Act would be surplusage to regulate access to pornographic websites *and* that the State has much more tailored means available.

argument that this Act's speech restrictions satisfy strict scrutiny. *E.g.*, *Carl E. Woodward, L.L.C. v. Acceptance Indem. Ins. Co.*, 743 F.3d 91, 96 (5th Cir. 2014).

In any event, the Act's requirements fail any level of heightened scrutiny. "[G]iven either standard—strict or intermediate scrutiny—the Act fails." ROA.6568.

## B. The Act's parental-consent requirement triggers and fails any level of heightened scrutiny.

The First Amendment prohibits the Act's parental-consent requirement for minors to create accounts on covered websites, as applied to the 12 services at issue. § 1752(B). Such laws limit both websites' dissemination of speech and minors' ability to engage in and receive speech. And "[w]hen[ever] the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted).

### 1. The parental-consent requirement triggers heightened First Amendment scrutiny because it restricts accessing and disseminating speech.

**a.** The Act's parental-consent requirement implicates the First Amendment's protections because it limits both websites' dissemination of speech and minors' ability to engage in and receive speech.

*Brown* held that minors have the "right to speak or be spoken to," and governments lack "the power to prevent children from hearing or saying

anything *without their parents' prior consent*." 564 U.S. at 795 n.3. "[M]inors are entitled to a significant measure of First Amendment protection." *Id.* at 794 (cleaned up). So "only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors]." *Id.* (citation modified). Conditioning minors' ability to receive protected speech on securing parental consent is impermissible, whether that speech is "political," "religious," or content the State disfavors. *Id.* at 795 n.3. Such laws impose "state control . . . over a child's speech" and are therefore subject to, and fail, strict scrutiny. *Id.*

These First Amendment rights apply online; "the First Amendment . . . does not go on leave when social media are involved." *Moody*, 603 U.S. at 719. Restricting "access to social media . . . prevent[s] the user from engaging in the legitimate exercise of First Amendment rights." *Packingham*, 582 U.S. at 108. Since *Brown*, courts across the country have applied its reasoning to enjoin laws similar to Louisiana's. *E.g.*, *Jones*, 2026 WL 561099, at *13; *Carr*, 789 F. Supp. 3d at 1234; *Yost*, 778 F. Supp. 3d at 959; *Griffin II*, 2025 WL 978607, at *17.

Here, the Act's parental-consent requirement poses the same constitutional injury. By default, it bars minors' access to "a staggering amount of" fully protected speech on NetChoice members' 12 websites. *Moody*, 603 U.S. at 719; *see* ROA.6573-6574. Or, in Defendants' words, the Act restricts "social media companies' speaking to children" without parental consent. AG.Br.54. That concession places this case within *Brown*'s recognition that

minors have the "right to . . . be spoken to . . . *without their parents' prior consent*." 564 U.S. at 795 n.3. In fact, Justice Kavanaugh recognized that another State's similar requirement "would likely violate [NetChoice] members' First Amendment rights." *NetChoice, LLC v. Fitch*, 145 S. Ct. 2658, 2658 (2025) (Kavanaugh, J., concurring in denial of application to vacate stay).

**b.** Defendants incorrectly claim that the Act's parental-consent requirement does not implicate the First Amendment at all because it regulates mere "conduct, not speech." AG.Br.42. That argument is foreclosed by this Court's previous holding that NetChoice "members seek to disseminate protected speech to minors and adults, which would be prohibited (at least in part) by" parental-consent requirements. *Fitch*, 134 F.4th at 804. The Supreme Court just reiterated that the government cannot "reclassify" speech activities as "conduct" to evade First Amendment review. *Chiles*, 146 S. Ct. at 1025. Defendants' arguments fail on their own terms anyway.

Defendants first try to distinguish *Brown*'s on-point holding. They say that "*Brown* struck down a law that . . . directly targeted and banned access to protected speech," whereas Louisiana's Act purportedly regulates the "upstream, non-expressive conduct" of online account creation. AG.Br.57. This argument both misconstrues the law in *Brown* and unduly limits the First Amendment's protections. *Brown* invalidated a law prohibiting the "sale or rental" of "violent video games" to minors. 564 U.S. at 789. That law was not an outright ban: It allowed minors to possess and play violent video games *with parental consent*. *Id.* at 795 n.3, 802. In other words, it did not

prohibit minors' access to the speech content in the video games themselves. So the law in *Brown* could have easily been construed as "an 'upstream' regulation [of sales and rentals] akin to the restrictions here." ROA.6574 (citing *Brown*, 564 U.S. at 789-90, 802). Nonetheless, *Brown* itself rejected the idea that States can "punish[] the sale or rental" of protected speech, any more than they can restrict "the writing" of protected speech. 564 U.S. at 792 n.1. The same is true here: The Act restricts minors' threshold access to protected speech.

Beyond *Brown*, the Supreme Court has recognized that "[l]aws enacted to control or suppress speech may operate at different points in the speech process." *Citizens United v. FEC*, 558 U.S. 310, 336 (2010). Here, much like the law in *Brown*, Louisiana's parental-consent requirement operates "at the outset" of the expressive process online—account creation. *Id.* (citation omitted). Louisiana cannot impose threshold barriers to access speech without necessarily restricting the "downstream expressive content." *Contra* AG.Br.54, 57. *Packingham* made that clear, holding that laws restricting "access to social media" trigger heightened First Amendment scrutiny. 582 U.S. at 108. Users must create accounts to access some or all of the fully protected speech and speech-enabling functions on covered websites. And "what Louisiana's law plainly targets, if indirectly, is access to speech on covered social

24

media platforms, not access to accounts themselves." ROA.6574.[4] So even under Defendants' view, the Act's parental-consent requirement is "specifically addressed to speech or to conduct necessarily associated with speech." AG.Br.53 (quoting *Virginia v. Hicks*, 539 U.S. 113, 124 (2003)). Defendants further misstate the inquiry as whether "collecting parental consent (or not) are not 'expressive choices.'" AG.Br.53 (quoting *Moody*, 603 U.S. at 740). The question is whether the government can impede accessing fully protected speech. *Packingham* and *Brown* hold the State cannot.

Arguing that the Act's parental-consent requirement does not outright ban speech for all users also fails. "[F]or *fully protected speech*, the distinction between bans and burdens makes no difference to the level of scrutiny." *FSC*, 606 U.S. at 493 n.12 (cleaned up). Restricting access to such speech triggers heightened First Amendment scrutiny. And "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *Cruz*, 596 U.S. at 305 (citation omitted).

Defendants' contrary theories would allow the government to restrict access to all sorts of speech by purporting to regulate some "upstream" conduct. AG.Br.57. "No doubt the [State] would concede this point if the question were whether to forbid children to read without the presence of an adult

---

[4] Nor would anyone be better off if these services dispensed with account creation altogether. *See Carr*, 789 F. Supp. 3d at 1229 n.16.

the *Odyssey*." *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001). The principles here are no different. *Moody*, 603 U.S. at 719.

Even if the Act's parental-consent requirement were (erroneously) construed as a conduct regulation, its "incidental effect on protected speech[] mak[es it] subject to intermediate scrutiny." *FSC*, 606 U.S. at 478 (citation modified).

### 2. The parental-consent requirement fails heightened First Amendment scrutiny.

Because the Act's parental-consent requirement "direct[ly] target[s] . . . fully protected speech," it triggers and fails "[s]trict scrutiny." *Id.* at 484; *e.g.*, *Yost*, 778 F. Supp. 3d at 955 ("[L]aws that require parental consent for children to access constitutionally protected, non-obscene content are subject to strict scrutiny."). But Defendants have implicitly conceded the Act's speech restrictions would fail strict scrutiny. *See supra* p.21.

The parental-consent requirement fails intermediate scrutiny too. "[T]o survive intermediate scrutiny, a law must be narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06 (citation omitted). Under this standard, a "law must not burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* (citation omitted). Defendants incorrectly claim that "intermediate scrutiny . . . is not a demanding test." AG.Br.48. This Court disagrees: The "'burden of justification'" under intermediate scrutiny "'is *demanding* and it rests

entirely on the State.'" *Hines v. Pardue*, 117 F.4th 769, 779 (5th Cir. 2024) (citation modified; emphasis added).

**a.** Defendants' asserted governmental interests are "undermined" by the Act's underinclusivity. *Brown*, 564 U.S. at 802; *contra* AG.Br.50-51.

Defendants argue the State has a "compelling interest in protecting the physical and psychological well-being of minors." AG.Br.49 (quoting *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989)). Stated at that level of generality, the State plainly has such an interest. But Defendants assert that interest in the context of the Act's *speech* restrictions. Although "a State possesses legitimate power to protect children from harm . . . that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (citation omitted). So cases like *Sable* do not hold that *any* measure taken in service of promoting "children's safety" necessarily satisfies heightened scrutiny. In fact, *Sable* recognized an interest in protecting minors while simultaneously holding that the government there failed to pursue that interest "without unnecessarily interfering with First Amendment freedoms." 492 U.S. at 126.

The asserted interest in minors' well-being is undermined by the Act's many carve-outs. The Act exempts websites whose "predominant or exclusive function" is "[i]nteractive gaming, virtual gaming," "streaming service[s]," "online shopping," among others. § 1751(12)(b). But minors face the same "potentially harmful content on unregulated websites" that they face on covered ones. ROA.6570. Minors can browse all manner of allegedly

27

harmful content and view allegedly "addictive" platform features on myriad unregulated platforms. If anything, the 12 websites at issue in this case are more likely to provide parental tools and engage in content moderation of potentially harmful content. *See supra* pp.4-5.

In addition, once a minor has parental consent, the Act does nothing to prevent her from encountering whatever content the State worries about on that service. ROA.6570. *Brown* explained that California's regime allowed minors to play violent video games "so long as one parent . . . sa[id] it's OK." 564 U.S. at 802; *see* ROA.6569.

Finally, to the extent Defendants also assert a governmental interest "in aid of parental authority," the Supreme Court has held that such an interest cannot support restricting minors' access to protected speech unless parents first consent. *Brown*, 564 U.S. at 802. Parental-consent laws like this Act do "not enforce parental authority over children's speech" at all; they instead "impose governmental authority, subject only to a parental veto." *Id.* at 795 n.3.

**b.** Beyond the Act's significant underinclusivity, the Act's parental-consent requirement fails intermediate scrutiny because it "burden[s] substantially more speech than is necessary." *Packingham*, 582 U.S. at 106 (citation omitted). It therefore necessarily would fail strict scrutiny. ROA.6575 ("The Act's . . . parental-consent requirements fail strict *and* intermediate scrutiny.").

Under intermediate scrutiny, the "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). That is precisely what this Act does. Louisiana has restricted access to enormous amounts of protected speech on many websites based on a concern that *some* uses of *some* websites *sometimes* may harm *some* minors.

The district court found that the record lacks evidence that even a sizeable fraction of the websites regulated by the Act are purportedly harmful. ROA.6575. Absent even a correlative link between the full range of covered websites and the harms alleged, the State has no interest in burdening speech on those websites or making users prove their age to access that fully protected speech.

Defendants respond that this Court should nevertheless credit their expert's broad and unsupported conclusions. AG.Br.60. But "in reviewing expert opinion evidence," this Court "look[s] to the basis of the expert's opinion, and not the bare opinion alone. A claim cannot stand or fall on the mere ipse dixit of a credentialed witness." *McManaway v. KBR, Inc.*, 852 F.3d 444, 449 (5th Cir. 2017) (citation modified).

Here, the Act's scope does not match up with the websites that Dr. Jean Twenge claims cause harm to minors. Dr. Twenge admitted that she did not know the scope of "social media" websites regulated by the Act and thus did not "determine how the [studies] match[] up with the potential scope of the" Act. ROA.6137-6138. And she acknowledged there is no consensus

definition of "social media" in the field of social psychology. ROA.6138. Nor does her testimony rely on a single definition of "social media," instead relying on the disparate definitions in varying studies. ROA.6133. So neither *her* conclusions about "social media" nor the underlying studies she cites address the set of "social media" websites regulated by the Act, or even a readily identifiable subset of such websites.

For the (uncertain) subset of websites her report analyzes, Dr. Twenge did not rely on any single definition or measure of mental health or "psychological well-being," as those vary across different studies. ROA.6139-6140. Her findings cannot purport to find a relationship between social media use and particular harms, because her cherry-picked studies vary in the harms they purport to find. A party "cannot prove causation by presenting different types of unreliable evidence." *McManaway*, 852 F.3d at 454 (citation omitted). And to overcome the fact that the sources Dr. Twenge relied on do not demonstrate that "social media" *causes* harms to users, she engaged in an analysis that largely repeats another academic's blog post. ROA.6186-6190.

Although the district court found that it did not need to address Dr. Twenge's flawed approach, it did find "troubling" that she "(1) could not supply consensus definitions of 'social media' or 'mental health,' (2) did not have any 'formal criteria' for including studies in her expert report, and (3) included only studies showing a correlative, not a causal, relationship between social media use and harms to minors." ROA.6575.

These are not mere technicalities. When any government attempts to restrict access to speech, it must do so carefully by identifying specific harms and tailoring its regulation to those harms. The State has done the opposite. It has imposed a blunderbuss regulation of many "social media" websites and now attempts to justify that broad regulation with evidence about some undefined subset of regulated websites. The First Amendment demands more.

In any event, Defendants also have not "demonstrate[d] that alternative measures that burden substantially less speech would fail to achieve the government's interests." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014) (applying intermediate scrutiny). The district court here found that "parents already have several ways to control and oversee their children's access to—and to monitor their children's use of—social media platforms." ROA.6576; *e.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024). Louisiana could "provide parents the information needed to engage in active supervision" over their children's internet access. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826 (2000). The State could publicize the parental-control tools that already exist. The State could fund media-literacy programs. The State could prosecute predators directly. It chose none of those options. Instead, it chose a regime that conditions minors' access to all manner of protected speech on parental approval.

**c.** Defendants' tailoring responses are unpersuasive.

*First*, Defendants say the Act "'simply prevents [minors under 16] from creating accounts on *platforms that employ addictive features*.'" AG.Br.49-50 (emphasis added) (quoting *Uthmeier*, 2025 WL 3458571, at *6). But it is not clear what "features" Defendants contend are "addictive." The main "features" regulated by Louisiana are enabling communications among users: "connects users in order to allow users to interact socially"; "[c]reate or post content viewable by other users." § 1751(12)(a). To the extent that Defendants consider "interactive[ness]" itself the problem, the Supreme Court has rejected that idea. *Brown*, 564 U.S. at 798. Nor does the record support the idea that interactivity by itself is somehow "addictive" or harmful.

*Second*, the Act's parental-consent requirement is not properly tailored simply because it applies only to minors younger than 16. *Contra* AG.Br.16. For these minors, the Act restricts an overbroad collection of highly valuable speech on an overbroad collection of websites. That is all protected speech to which "minors are entitled." *Brown*, 564 U.S. at 794 (cleaned up).

*Third*, nor is the parental-consent requirement properly tailored because "covered minors 'have full access' to platforms with parental consent and may view social media 'without an account' or with 'a parent's account.'" AG.Br.50 (quoting *Uthmeier*, 2025 WL 3458571, at *6). The parental-consent requirement itself creates the constitutional injury. *See supra* pp.22-23. And the district court found that account creation is necessary to access all of the speech and speech-facilitating services on covered websites. ROA.6574.

*Finally*, the Act's statutory qualifier requiring "commercially reasonable" parental consent makes no constitutional difference. Speech restrictions do not become constitutional just because they might be "inexpensive." AG.Br.50, 59-60. First Amendment rights do not hinge on whether websites are able to "bear the burden" of complying with the regulation. *E.g.*, *Minneapolis Star*, 460 U.S. at 591-92. Brick-and-mortar retailers could have cheaply requested identification proving age for people to buy "violent video games." *Brown*, 564 U.S. at 788. Parental-consent requirements for violent video games are unconstitutional all the same. *Id.* at 802-04. Besides, the Act unconstitutionally infringes *users'* "access" to protected speech, even if a website could implement these speech restrictions. *Packingham*, 582 U.S. at 107.

## C. The Act's age-verification requirement triggers and fails heightened First Amendment scrutiny.

The First Amendment prohibits the Act's age-verification requirement as applied to NetChoice members' 12 covered services. § 1752(B). Such laws limit both websites' dissemination of speech and minors' and *adults'* ability to engage in and receive speech.

### 1. The age-verification requirement triggers heightened First Amendment scrutiny because it restricts minors' and adults' ability to access and disseminate fully protected speech.

The Act implicates the First Amendment's protections by requiring websites to "verify the age of Louisiana account holders." § 1752(A). This burdens threshold access to "what for many are the principal sources for knowing current events." *Packingham*, 582 U.S. at 107.

The Supreme Court has squarely held that "submitting to age verification is a burden on the exercise of" the First Amendment "right to access speech." *FSC*, 606 U.S. at 482-83. Here, Louisiana's Act forces users to surrender personally identifying information—documentation, biometric data, or both—as the price of access to discuss the gubernatorial election or LSU football on a covered website. The intended effect is to reduce access to fully protected speech. "Defendants' own expert has opined" that "age-verification will reduce the number of users of covered platforms (mostly minors)," thus limiting speech. ROA.6571.

The fact that the Act's age-verification requirements restrict access to billions of pieces of fully protected speech makes them unlike age-assurance requirements for conduct lacking the First Amendment's protections, such as "alcohol" and "firearms." *Contra* AG.Br.53, 55. And whatever authority the government has to restrict minors' ability to get physical procedures for obtaining "tattoos," AG.Br.53, this case concerns no such regulation—it

directly restricts minors' and adults' access to a "staggering" amount of fully protected online speech. *Moody*, 603 U.S. at 719.

Nor does *FSC* stand for the proposition that the Act's age-verification requirements should trigger only intermediate scrutiny. *Contra* AG.Br.22-23. As explained above at pp.19-20, only "where the speech in question is un-protected," such as "speech that is obscene for minors" like pornography, "may [States] impose 'restrictions' based on 'content' without triggering strict scrutiny." *FSC*, 606 U.S. at 492 (citation omitted). Where fully protected speech is at issue, however, "burden[s] on the exercise" of the "right to ac-cess speech," like "submitting to age verification," are subject to strict scru-tiny. *Id.* at 482-83; *see id.* at 481 n.7.

## 2. The age-verification requirement fails any form of heightened First Amendment scrutiny.

Defendants do not attempt to argue the Act's age-verification require-ment satisfies strict scrutiny, so they have forfeited that argument. *See supra* p.21. Even under intermediate scrutiny, the age-verification requirement suffers from the same tailoring flaws as the parental-consent requirement. *See supra* pp.27-32.

Furthermore, the tailoring analysis here is not controlled by *FSC*, because *FSC* did not concern age-verification requirements to access *fully protected* speech for both minors and adults. *Contra* AG.Br.55-58. As explained above, *FSC* concerned a law targeting the unique speech category of "pornogra-phy." 606 U.S. at 466. *FSC* reflects only how intermediate scrutiny applies to

distinct age-verification requirements to access "pornography," which is *un-protected* speech for minors. *Id.* at 482, 487, 493 n.12.[5] Even there, *FSC* recognized that age verification "necessarily" burdens the "right to access" that speech. *Id.* at 495. But because "pornography" is "unprotected *to the extent the State seeks only to verify age*," age verification for "pornography" will often satisfy heightened First Amendment scrutiny. *Id.* at 482 (emphasis added). When people must prove their age to determine whether speech is protected for them, then the age-verification process can be a "modest burden." *Id.* at 496. That is consistent with how access to pornography works "in the case of in-person access." *Id.*

By contrast, this Act's age-verification requirement restricts access to "billion[s]" of pieces of *fully protected* speech. *Moody*, 603 U.S. at 719. Accordingly, the Act impedes minors' and adults' ability to access speech they have a constitutional right to access. These burdens are not necessary to determine whether the speech is constitutionally protected as to individual users. No historical tradition or established practice supports restricting fully protected speech in this way because no comparable "in-person" restrictions exist. *FSC*, 606 U.S. at 496. The government cannot require people to prove their

---

[5] Amici States are wrong to suggest (States.Br.24-27) that *FSC* allows the government to restrict minors' access to fully protected speech that lacks a "tradition of proscription." *Brown*, 564 U.S. at 792. The government cannot "create new categories of unprotected speech." *Id.*

ages before reading books or listening to music. The same applies to websites.

**D. The Act's advertising restrictions violate the First Amendment.**

The Act further violates the First Amendment as applied to NetChoice members' 12 covered services by prohibiting the "display of any advertising" on minors' accounts based on "personal information, except age and location." § 1753(2).

**1. The advertising restrictions trigger heightened First Amendment scrutiny.**

The Act's advertising provisions implicate the First Amendment because they directly regulate covered websites' editorial control over what content they display, to whom, and on what basis.

**a.** The First Amendment prohibits States from dictating how private entities choose which lawful ads to publish—and what lawfully obtained information they use to make that choice. So the Act's advertising restrictions do not regulate mere "conduct," as Defendants claim. AG.Br.63.

The "choice of material to go into" a publication "constitute[s] the exercise of editorial control and judgment." *Miami Herald Publ'g Co.*, 418 U.S. at 258. And the "selection of" an "*advertisement* for inclusion" in a "compilation of speech" "fall[s] squarely within the core of First Amendment security." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995) (emphasis added); *see Moody*, 603 U.S. at 728.

The Act unconstitutionally restricts the use of lawfully obtained information for protected expression. The "right to speak is implicated when information [one] possesses is subjected to restraints on the way in which the information might be used." *Sorrell*, 564 U.S. at 568 (citation omitted). *Sorrell* invalidated a law prohibiting the use of "prescriber-identifying information" for purposes of pharmaceutical marketing. *Id.* at 564. The Court rejected the idea that "use of . . . information [is] conduct" unprotected by the First Amendment. *Id.* at 570.

Like the law in *Sorrell*, this Act restricts the use of lawfully obtained information—here, "personal information" beyond "age and location"—for protected expressive activities. § 1753(2). Federal courts have recognized the constitutional infirmities in nearly identical provisions. *E.g.*, *SEAT*, 765 F. Supp. 3d at 598-99.

**b.** Strict scrutiny should apply because the Act targets websites' editorial control. *Hurley*, 515 U.S. at 570. And it does so based on the content of "personal information" used to display advertisements, by "except[ing] *age and location*" information, § 1753(2) (emphasis added).

Defendants argue the advertising restrictions regulate merely commercial speech. *See* AG.Br.62-65. But the Act regulates services' "selection" of advertisements to show their users in "compilation[s] of speech." *Hurley*, 515 U.S. at 570. Put another way, the Act regulates how websites apply their "[c]ommunity [g]uideline[s]" and other policies to the advertisements in the "distinctive expressive offering[s]" they display to users. *Moody*, 603 U.S. at

738. That is not a regulation of the "commercial advertisements" them-selves—which is when commercial-speech intermediate scrutiny applies.

In any event, the Act does not limit its prohibitions to only *commercial* advertisements. This provision could reach all manner of "advertisements" that do not "propose a commercial transaction," so "strict scrutiny applies." *SEAT*, 765 F. Supp. 3d at 594-95. In general, commercial speech is "[e]xpression related solely to the economic interests of the speaker and its audience . . . which does no more than propose a commercial transaction." *Book People, Inc. v. Wong*, 91 F.4th 318, 339 (5th Cir. 2024) (quotations omitted). But the Act does not confine its "advertising" prohibition to speech proposing "commercial transaction[s]." *Id.* It instead covers all "advertising" that is based on a minor's data outside of age and location. The Act thus sweeps in plenty of protected, non-commercial speech that could qualify as an "advertisement" (*e.g.*, "advertisements" for the local school play or charity 5k runs).

### 2. The advertising restrictions fail any form of heightened First Amendment scrutiny.

Even applying *Central Hudson* commercial-speech analysis, the advertising restrictions violate the First Amendment. Louisiana must show that the "governmental interest is substantial," that "the regulation directly advances" that interest, and that it "is not more extensive than is necessary to serve that interest." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980).

**a.** The Act's "purpose to suppress speech and its unjustified burdens on expression would render it unconstitutional." *Sorrell*, 564 U.S. at 566. Ads that "accurately inform the public about lawful activity" are protected. *Cent. Hudson*, 447 U.S. at 563. This Act does not attempt to regulate false or misleading commercial speech, and Defendants do not claim otherwise. The State has no legitimate interest in "'protect[ing] the young from ideas or images that [it] thinks unsuitable.'" *Brown*, 564 U.S. at 795 (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 213-14 (1975)). That includes lawful ads. Nor may the State prohibit certain ads because they are considered "persuasive." *Sorrell*, 564 U.S. at 578.

Instead, Defendants assert an interest in protecting minors' privacy. AG.Br.66. But Louisiana did not enact comprehensive data-privacy requirements, like other States. *E.g.*, Cal. Civ. Code § 1798.140. Instead, under the Act, a minor's data may be used for targeted advertising on all sorts of services not covered by this Act—such as every gaming platform, every streaming service, every shopping site, and every "professional networking" site. § 1751(12)(b). The Act thus "allows the information to be . . . used" for advertising "by all but a narrow class of disfavored speakers." *Sorrell*, 564 U.S. at 573; *id.* at 574-75. "Why . . . can a teenager view a targeted advertisement on a sports or shopping website but not on a social platform?" *SEAT*, 765 F. Supp. 3d at 599. That underinclusiveness severely undermines any assertion of a valid governmental interest. *See Brown*, 564 U.S. at 802.

40

The advertising restrictions are also "more extensive than is necessary to serve" any legitimate governmental interest. *Cent. Hudson*, 447 U.S. at 566. Leaving "personal data" undefined restricts a broad range of ads. For instance, the Act is not limited to things like "sensitive personal information," regulated by other States. Cal. Civ. Code § 1798.140(ae). It does not serve any governmental interest to prohibit websites from publishing ads based on, *e.g.*, a user's search for tutoring services or college admissions. The Act is not limited to paid advertisements. And it could extend to any number of user-created promotions—*e.g.*, for pet-sitting, sports camps, or concerts—if that content is presented to users based on personal information.

Nothing in Defendants' brief justifies the Act's regulation of *all* advertisements, regardless of content. Nor do Defendants address why personalized advertisements based on "age and location" are permissible, § 1753(2), but not advertisements based on a user's interest in historical fiction or a search for college admissions. To the extent that the State thinks advertisements based on age and location ensure that minors receive appropriate and useful advertisements, the same is true of advertisements based on other information.

**b.** Rather than defend the Act's breadth, Defendants argue that "[b]y definition, any extra-targeted advertising to a minor facilitates an unlawful activity. That is not protected commercial speech." AG.Br.65. But Defendants cannot avoid commercial-speech intermediate scrutiny by declaring certain means of presenting advertisements illegal—and then circularly

41

claiming that the speech restriction does not "concern[] lawful activity." *Am. Acad. of Implant Dentistry v. Parker*, 860 F.3d 300, 306 (5th Cir. 2017). That "argument would grant" Louisiana "the ability to limit" speech "simply by virtue of having created a regime that defines" away First Amendment rights. *Id.* at 308. But the "First Amendment is no word game. And the rights it protects cannot be renamed away or their protections nullified by mere labels." *Chiles*, 146 S. Ct. at 1023 (citation omitted).

In addition, commercial-speech intermediate scrutiny analyzes whether the *speech in the advertisements themselves* "concerns lawful activity." *Dentistry*, 860 F.3d at 307. Here, Defendants do not contend that this law regulates only advertisements with speech concerning unlawful activity.[6] Nor could they, because the Act covers all sorts of advertisements concerning plainly lawful activity. And NetChoice members already have advertising policies prohibiting advertisements about unlawful activities. ROA.1556, ROA.1562-1563, ROA.1576. Moreover, it is *Defendants' burden* to demonstrate that the advertisements are *un*protected; "th[at] burden is a heavy one." *Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 487 (5th Cir. 2019) (citation omitted).

---

[6] Separate Louisiana law already regulates false advertising. *E.g.*, § 51:411.

**E. The Act's direct-messaging restrictions violate the First Amendment.**

As applied to NetChoice members' 12 covered services, the First Amendment prohibits the Act's restrictions on "[a]dults from direct messaging a Louisiana minor account holder unless the minor is already connected to the adult on the service." § 1753(1).

**1.** The Act's direct-messaging restrictions trigger heightened First Amendment scrutiny. Minors have a "constitutional right to speak or be spoken to." *Brown*, 564 U.S. at 795 n.3. The First Amendment protects private communications as strongly as it protects public speech. *Sable*, 492 U.S. at 126-31 (telephone messages). "By burdening this right, the Act's direct-messaging restrictions trigger heightened scrutiny." ROA.6582 (citing *Brown*, 564 U.S. at 795 n.3).

So the Act's direct-messaging restrictions do not regulate mere "conduct," as Defendants claim. AG.Br.63. Nor did Louisiana draft these messaging restrictions to regulate mere "commercial speech" in private messages. This Court can therefore reject Defendants' suggestion that the direct-messaging restrictions regulate "commercial speech." AG.Br.63.

**2.** The Act's direct-messaging prohibition cannot satisfy any form of heightened First Amendment scrutiny for the reasons discussed above at pp.27-32.

Although the government ostensibly aims to prevent potential bad actors from communicating with minors, it is not properly tailored to do so.

For one, the Act's coverage is "seriously underinclusive" to further that interest. *Brown*, 564 U.S. at 805. If the State is attempting to regulate specific, harmful interactions by minors, that will be ineffective. The Act limits communication only on covered websites while leaving minors free to communicate with unconnected users on many other speech services, such as exempted websites, email, and text messaging services.

The Act "burden[s] substantially more speech than is necessary to further" any governmental interest for purposes of intermediate scrutiny. *Packingham*, 582 U.S. at 106 (citation omitted). The Act indiscriminately regulates all kinds of interactions without any attempt to isolate the harmful ones. These restrictions are "over-inclusive in that they burden, if not thwart, many innocuous—even productive—forms of communication." ROA.6582. The district court's example is illustrative: Under the Act, a Louisiana minor who messages her local politician cannot receive a response, because adult politicians cannot direct-message minors with whom they are not already connected. ROA.6582. That is core political speech that the Act cuts off without any justification.

Moreover, the Act imposes government regulation on top of existing "voluntary" self-regulatory efforts. *Brown*, 564 U.S. at 803. For instance, many NetChoice members have developed their own means to address potentially harmful communications. And parents too have many means to oversee their minor children online and monitor their communications. *See supra* pp.4-5.

## II. The Act's central "social media company" coverage definition is unconstitutionally vague.

The district court also correctly concluded that the Act is unconstitutional because its central "[s]ocial media company" coverage definition is vague. § 1751(11)-(12).

Vagueness is "grounds for a pre-enforcement challenge" where a law "chills protected speech under the First Amendment." *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 n.32 (5th Cir. 2024). That is so even if the law is not vague in every application. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). The chilling effect itself justifies broader relief. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012). That is true even in civil cases, as compared to criminal cases. *Id.*; *contra* AG.Br.40. Defendants thus wrongly argue the vagueness question is whether the law is "vague in all of its applications." AG.Br.40 (citation omitted).

Determining whether the Act applies requires identifying a website's "predominant or exclusive function." § 1751(12)(b). *Griffin II* enjoined as unconstitutionally vague a law relying on similar terms that similarly lacked definition. 2025 WL 978607, at *15. Here too, a website's "predominant or exclusive function" is undefined, even though it is "critical to determining which entities fall within [the Act]'s scope." *Id.* at *15-16. For example, many people use LinkedIn for "professional networking," § 1751(12)(b)(ix), but others use it for social interaction. In addition, many people use Discord and

45

Twitch for "[i]nteractive gaming" and "virtual gaming," § 1751(12)(b)(vi), but others could use them for social interaction. For these examples and others, "[c]ompanies must choose between risking unpredictable and arbitrary enforcement . . . and implementing the Act's costly . . . requirements." *Griffin II*, 2025 WL 978607, at *16.

The district court correctly held that such mixed-use services that combine, *e.g.*, streaming, gaming, and social features, face genuine uncertainty. It observed that the term "predominant . . . is inherently comparative," meaning that which companies are covered may change over time and across users. ROA.6590 (collecting dictionary definitions of "predominant"). The Act offers no principle for resolving that uncertainty. Faced with these questions, websites must either censor vast amounts of speech or risk unpredictable fines. *Griffin II*, 2025 WL 978607, at *16. This is the chilling effect that "renders a law unconstitutional." *Id.*

Defendants made short shrift of the district court's actual reasoning, taking issue almost exclusively with the court's discussion of Twitch, which Defendants dismiss as an "edge case." AG.Br.3. But the district court used Twitch to *exemplify* its concerns; Twitch was not the sole basis for the court's holding. *See* ROA.6590-6592.

## III. NetChoice has standing.

This Court already held that NetChoice has both Article III associational standing to assert its regulated members' rights and prudential standing to

raise the interests of those members' users in an analogous challenge. *Fitch*, 134 F.4th at 804-07.

## A. NetChoice has Article III associational standing to challenge the Act's speech restrictions on behalf of its covered members.

NetChoice has Article III associational standing to assert the rights of its regulated members. *See id.* at 804-05.

This Court has long held that "[a]ssociations may assert the standing of their own members." *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 377 (5th Cir. 2021) (citation omitted). Here, "(1) [NetChoice's] individual members would have standing to bring the suit; (2) [NetChoice] seeks to vindicate interests germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the individual members' participation." *Fitch*, 134 F.4th at 804. Defendants challenge only the first and third prongs. *See* AG.Br.30, 31.

**1.** "NetChoice easily meets the first" prong of associational standing because entities "have standing to bring preenforcement [] challenge[s] against a law . . . aimed directly at" its members. *Fitch*, 134 F.4th at 804 (citation modified). Unless Defendants "disavow enforcement against" all of NetChoice's regulated members, NetChoice satisfies this first prong. *Chiles*, 146 S. Ct. at 1019 n.*. Otherwise, regulated members have an "actual and well-founded fear that the law will be enforced against" them. *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988).

"[I]n a suit 'challenging the legality of government action,'" when an entity is "'an object of the action . . . there is ordinarily little question that the action . . . has caused [it] injury, and that a judgment preventing or requiring the action will redress it.'" *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) (citation omitted).

Defendants do not dispute that those NetChoice members are regulated. Instead, they argue that NetChoice put forth no "specific evidence" at the summary-judgment phase. AG.Br.31. The record disproves that claim.

Documents produced by Defendants conclusively establish both that: (1) NetChoice has multiple members regulated by the Act; and (2) "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (citation omitted). The district court found that Defendants sent "Notice[s] of Violations" to 12 NetChoice-member services. *See* ROA.6535-6538. Those Notices assert that particular NetChoice members are the objects of the Act's regulation: "We reviewed your company information and determined that *it is regulated by the Act. See La. R.S. 17:1751(11)-(12)*." ROA.6536-6538 (emphasis added). The Notices further state that those members have purportedly "fail[ed] to comply with several requirements of the Act," which "encompass all of the specifically-challenged provisions." ROA.6534-6538. Defendants do not even mention this evidence, even though it was crucial to the district court's decision. ROA.6535-6538.

The existence of these Notices here distinguishes the factual record in this case from the inapposite cases addressing different areas of law that Defendants cite. *E.g.*, *Deep S. Ctr. for Env't. Just. v. EPA*, 138 F.4th 310, 321 (5th Cir. 2025) (organization failed to show members would suffer higher energy costs, where such costs would be contingent on third parties); *US Inventor, Inc. v. Vidal*, 2022 WL 4595001, at *3 (5th Cir. Sept. 30, 2022) (per curiam) (plaintiffs failed to show that changes to procedures would result in patent invalidation, reliant on the actions of third parties); *Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't. Quality*, 968 F.3d 419, 425 (5th Cir. 2020) (organization failed to show members would suffer environmental harms); *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 538-39 (5th Cir. 2019) (organization failed to show that members had "specific plans" to visit waterways to challenge permits for discharges).

In addition to Defendants' undisputed Notices, NetChoice provided undisputed declarations from its General Counsel and two members (Reddit and Snap Inc.). ROA.1551-1564, ROA.1565-1569, ROA.1570-1579. These declarations likewise demonstrate that NetChoice members are regulated by the Act and would be required to alter their services to comply with the Act.

As regulated entities under the Act, NetChoice's members suffer two additional injuries that independently suffice for standing. First, "the Act will violate [NetChoice's] members' First and Fourteenth Amendment rights" because "NetChoice's members seek to disseminate protected speech to minors and adults, which would be prohibited (at least in part) by the Act."

*Fitch*, 134 F.4th at 804; *see Prison Legal News v. Livingston*, 683 F.3d 201, 212 (5th Cir. 2012) ("interfere[nce] with one's attempts to sell or distribute" protected speech).

Second, "economic injury is a quintessential injury upon which to base standing." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006). Here, "the statute would increase regulatory requirements of NetChoice's members, causing financial harm." *Fitch*, 134 F.4th at 804. Defendants have said at least some covered NetChoice members must make changes to their services: "[Y]our company fails to comply with several requirements of the Act." ROA.6536-6538. And NetChoice members have provided unrebutted evidence that they would need to expend funds to comply with the Act. *See* ROA.1563, ROA.1568, ROA.1577. So NetChoice has shown its members face "financial harm." *Cf. Fitch*, 134 F.4th at 804-05; *contra* AG.Br.31.

**2.** On the third prong of associational standing, neither the "claim asserted nor relief requested requires the participation of each member." *Fitch*, 134 F.4th at 805. This prong "is solely prudential," designed to promote "administrative convenience and efficiency." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550-51 (5th Cir. 2010) (citation omitted). The district court oversaw the fact development here. And it did not believe that "administrative convenience and efficiency" defeated NetChoice's associational standing. *Id.* Defendants give this Court no persuasive reason to second-guess that determination.

The "relief requested" by NetChoice does not require members' participation as parties. *Fitch*, 134 F.4th at 805. Defendants do not argue otherwise. NetChoice requests only declaratory and injunctive relief, which means that "the individual participation of each injured party" is "not . . . indispensable to proper resolution." *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 505 (5th Cir. 2021) (citation omitted).

Nor does the "claim asserted" require members' participation as parties. *Fitch*, 134 F.4th at 804. Defendants claim otherwise. But their arguments conflate the purported need for member-specific *information* with the need for member *participation*. This is an attempt to relitigate evidentiary disputes that Defendants lost in the district court, and Defendants have forfeited arguing they were an "abuse of discretion." *JP Morgan Chase Bank, N.A. v. DataTreasury Corp.*, 936 F.3d 251, 255 (5th Cir. 2019) (citation omitted).

First, *Fitch* did not prescribe the form of the evidence NetChoice would need to provide for its First Amendment claims. *Contra* AG.Br.35. *Fitch* said that "NetChoice's claims can be proven by evidence from representative injured members." 134 F.4th at 805 (citation omitted). NetChoice did that: It offered declarations from two members, a declaration from its General Counsel, and thousands of pages of information from regulated members. Defendants respond that this evidence is insufficient and that, in effect, NetChoice had an obligation to seek out more information from members than is publicly available. AG.Br.35. Defendants cite no authority for this proposition. ROA.6522-6524. Tellingly, Defendants do not explain what

specific, material evidence the record lacks. Nor can they fault NetChoice for supposed gaps Defendants chose not to pursue. If Defendants believed non-public information mattered, they had every opportunity to seek it. They did not. They took no member depositions nor requested documents from those members. NetChoice had no obligation to build Defendants' record for them.

*Second*, the purported "misalignment" among NetChoice members is not misalignment at all, and does not defeat associational standing. Defendants contend that certain NetChoice members' efforts to provide parents and teenage users with additional resources separate from what the Act requires mean that those members "implement Act-456-compliant measures." AG.Br.36. But private entities' voluntary decisions—or what they are forced to do in countries that lack our First Amendment—do not bear on what Louisiana additionally forces them to do under the Act. *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 234 (5th Cir. 2024) ("increased regulatory burden" (citation omitted)). If Defendants disavowed enforcement against these members, then that would be one thing. But Defendants have not disavowed enforcement. Those NetChoice members therefore still face the same credible threat of enforcement and would have standing. *See supra* pp.48-50.

*Third*, the Ninth Circuit's *Bonta II* decision helps NetChoice more than Defendants. For one, *Bonta II* held that NetChoice has associational standing to raise as-applied claims on its members' behalf in various circumstances—

even crediting one of those claims on the merits. *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1016-17 (9th Cir. 2025). The Ninth Circuit held that NetChoice lacked standing to raise as-applied challenges to only a provision of a California law that directly regulated personalized feeds and where the coverage definition regulated only websites with "personalized feeds." *Id.* at 1010-12. Louisiana's Act, by contrast, does not purport to regulate personalized feeds, nor is it limited to websites with such feeds. *See supra* pp.6-9. Instead, Louisiana has imposed broad restrictions on threshold access to regulated websites.

## B. NetChoice has prudential standing to raise the First Amendment rights of social media website users when challenging laws restricting users' access to protected speech.

This Court has also already held in an analogous case that NetChoice has prudential standing to assert the interests of its regulated members' *users*. *Fitch*, 134 F.4th at 805-07. Here too, "it is plain that an online platform is not barred by prudential standing when it asserts its users' First Amendment rights, at least when the violation of those rights adversely affects the platform." *Id.* at 807.

**1.** This Court need not reach whether NetChoice can assert users' rights to affirm the judgment. NetChoice's Article III associational standing is enough. But the Act's effects on those users are still highly relevant. In the First Amendment context, the rights of publishers and their audiences are intertwined. The constitutional "protection afforded is to the *communication*,

to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) (emphasis added). When the government restricts *disseminating* "communication" (affecting publishers) it simultaneously restricts *accessing* "communication" (affecting users). Defendants acknowledge as much, saying that the Act requires websites to "filter their audience in Louisiana." AG.Br.54.

When the State requires websites to, *e.g.*, obtain age verification or parental consent before a user can access speech, it simultaneously requires age verification or parental consent before websites can disseminate that speech. For example, *Brown* and *FSC* are often framed in terms of the *audience's* First Amendment rights, even though the claims were brought by trade associations representing publishers. *Brown* explained—in sustaining a challenge to a parental-consent requirement—that "government" generally cannot "bar public dissemination of protected materials." 564 U.S. at 802 (citation omitted). The same is true here.

**2.** Regardless, NetChoice has prudential standing to assert the rights of its members' users.

Under the First Amendment, "litigants are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Am. Booksellers*, 484 U.S. at 392-93 (cleaned up). In *American Booksellers*, booksellers and their trade associations could challenge

a law restricting the display of particular kinds of books to minors—while "alleg[ing] an infringement of the First Amendment rights of bookbuyers." *Id.* at 393; *see id.* at 387-88 & n.3, 393 & n.6. More generally, parties have "'standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights.'" *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (citation omitted). In the First Amendment context, this prudential-standing analysis is "quite forgiving." *Id.*

Defendants claim that the district court erred by relying on *Fitch* and other binding caselaw because NetChoice failed to identify a "specific, identifiable user" at summary judgment. AG.Br.31. But Defendants cite no caselaw holding that a publisher must identify a specific reader to be able to assert readers' First Amendment rights. Cases like *Brown* do not mention any specific customer. Nor would such a requirement be necessary: When the State seeks to restrict all of its citizens' access to protected speech, the injury to those citizens is plain on the law's face.

Taking users' rights into account would not create a "pseudo-class of members' users." AG.Br.31 (citing *Trump v. CASA, Inc.*, 606 U.S. 831, 867 (2025) (Alito, J., concurring)). The district court's permanent injunction applies only to NetChoice's regulated members, not those members' users. ROA.6596. Even though users would be an indirect beneficiary of that injunction, that does not implicate *CASA*'s concern about relief for non-parties.

If anything, NetChoice's ability to raise the rights and interests of members' users illustrates that this is a case where "minimal factual development" is necessary. *Ass'n of Am. Physicians*, 627 F.3d at 552. More facts "would [not] help illuminate the scope of users' First Amendment interest in accessing regulated platforms": The "Act imposes a platform-wide burden on users' right to engage in that speech, and" this burden "would [not] differ between the platforms regulated." *Griffin II*, 2025 WL 978607, at *7.

## IV. NetChoice is entitled to a permanent injunction.

The district court correctly permanently enjoined Defendants' enforcement of the Act against NetChoice's regulated members' 12 services. Defendants contend that the district court erred. But Defendants cite no authority for the proposition that it is error to permanently enjoin enforcement of a law found to be unconstitutional on a final judgment.

NetChoice has demonstrated: "(1) actual success on the merits; (2) that it is likely to suffer irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in [its] favor; and (4) that an injunction is in the public interest." *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 441 (5th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20, 32 (2008)). Defendants take issue with only the last two factors, which "merge" in lawsuits against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009); ROA.6554-6555. Those factors favor NetChoice.

This Court has held that "injunctions protecting First Amendment rights are always in the public interest." *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1100 (5th Cir. 2023) (cleaned up). The permanent injunction has ensured that covered websites can continue to disseminate fully protected speech to their Louisiana users. Otherwise, Defendants have made it clear that they would enforce the Act against NetChoice members. *Louisiana v. Biden*, 55 F.4th 1017, 1033 (5th Cir. 2022) (citation omitted); *see* ROA.6535-6539.

Defendants' arguments treat the district court's permanent injunction—issued on a full record and after extensive briefing—as if it were a preliminary injunction. And even the preliminary-injunction standard favors NetChoice more than Defendants. For instance, Defendants' assertions of irreparable harm run into this Court's recognition that "the State and the public won't be injured by an injunction of a statute that *likely* violates the First Amendment." *Book People*, 91 F.4th at 341 (emphasis added). If the State lacks an interest in enforcing a law that is only "likely" unconstitutional at the preliminary injunction stage, *id.*, it certainly does not suffer irreparable harm when enjoined from enforcing a law determined to be unconstitutional in a final judgment.[7]

---

[7] Appellants also rely on *CASA*. But that case did not deal with a party-specific permanent injunction of an unconstitutional state law, nor did any of the cases it cited. *See CASA*, 606 U.S. at 860.

The final judgment here is one reason why this Court's and the Supreme Court's orders in the *Fitch* litigation do not control here. *Contra* AG.Br.67. Both of those orders were rendered in the preliminary-injunction context. And the Supreme Court's order was rendered in an interim-phase, stay posture. This significantly different circumstance means this is not a "like case" to the posture *Fitch* was in last year. *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025).

Further distinguishing the *Fitch* decisions, circumstances have changed since Justice Kavanaugh's single-Justice concurrence stated that the "equities . . . *at this time*" did not warrant vacating a stay of a preliminary injunction. 145 S. Ct. at 2658 (emphasis added). At that point in that Mississippi case, no covered websites had stopped serving minors in Mississippi. But since that law took effect without an injunction, multiple websites—such as NetChoice members Dreamwidth and Nextdoor—have stopped disseminating speech to their users in States like Mississippi. ROA.1525.

Here, the district court's judgment has preserved Louisianans' access to some of "the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham*, 582 U.S. at 107. The equitable factors favor NetChoice, and NetChoice is entitled to a permanent injunction.

## Conclusion

This Court should affirm the district court's judgment.

Dated: May 26, 2026                  Respectfully submitted,

                                     /s/ *Scott A. Keller*

Steven P. Lehotsky                   Scott A. Keller
Serena M. Orloff                        *Counsel of Record*
Jeremy Evan Maltz                    LEHOTSKY KELLER COHN LLP
LEHOTSKY KELLER COHN LLP             7500 Rialto Blvd.
200 Massachusetts Avenue, NW         Suite 1-250
Suite 700                            Austin, TX 78735
Washington, DC 20001                 (512) 693-8350
                                     scott@lkcfirm.com

*Counsel for Plaintiff-Appellee NetChoice*

## CERTIFICATE OF SERVICE

I certify that on May 26, 2026, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. No paper copies were filed in accordance with the changes ordered in General Docket No. 2020-3.

*/s/ Scott A. Keller*
Scott A. Keller

## CERTIFICATE OF COMPLIANCE

I certify that this brief: (1) complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,973 words, excluding the parts of the brief exempted by Rule 32(f); and (2) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

I further certify that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Scott A. Keller*
Scott A. Keller