No. 26-30016

# In the United States Court of Appeals for the Fifth Circuit

NETCHOICE, LLC,

*Plaintiff-Appellee,*

v.

LIZ MURRILL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF LOUISIANA; MIKE DUPREE, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE PUBLIC PROTECTION DIVISION, LOUISIANA DEPARTMENT OF JUSTICE,

*Defendants-Appellants.*

On Appeal from the United States District Court for the Middle District of Louisiana

BRIEF OF AMICUS CURIAE TECHFREEDOM IN SUPPORT OF APPELLEE AND AFFIRMANCE

Corbin K. Barthold
TECHFREEDOM
1500 K Street NW
Washington, DC 20005
(771) 200-4997
cbarthold@techfreedom.org
*Attorney for Amicus Curiae
TechFreedom*

CORPORATE DISCLOSURE STATEMENT

TechFreedom has no parent corporation, it issues no stock, and no publicly held corporation owns a ten-percent or greater interest in it.

<u>/s/ Corbin K. Barthold</u>

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICUS CURIAE ...................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.......................2

ARGUMENT .................................................................................5

I.    Because Louisiana's Act Is Speaker- and Content-Based, Strict Scrutiny Applies. ..................................................5

II.    Intermediate-Scrutiny Precedents Are Irrelevant....................11

    A.    *Free Speech Coalition v. Paxton* .......................................11

    B.    *TikTok v. Garland* ..............................................................17

    C.    *CCIA v. Uthmeier* ...............................................................19

CONCLUSION..............................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Booksellers Ass'n v. Hudmut,*
771 F.2d 323 (7th Cir. 1985) ......................................................21

*Barr v. Am. Ass'n of Political Consultants, Inc.,*
591 U.S. 610 (2020) .......................................................................8

*Brown v. Entertainment Merchants Assoc.,*
564 U.S. 786 (2011) ........................................ 12, 13, 14, 15, 16, 19

*CCIA v. Uthmeier,*
2025 WL 3458571 (11th Cir., Nov. 25, 2025)....................... 4, 19, 20

*Chiles v. Salazar,*
146 S. Ct. 1010 (2026) ...................................................................9

*Citizens United v. FEC,*
558 U.S. 310 (2010) .......................................................................5

*Erznoznik v. Jacksonville,*
422 U.S. 205 (1975) .....................................................................13

*Free Speech Coal. v. Paxton,*
606 U.S. 461 (2025) ...................................................... 3, 11, 14, 15

*Ginsberg v. New York,*
390 U.S. 629 (1968) .....................................................................16

*Miami Herald Publ'g Co. v. Tornillo,*
418 U.S. 241 (1974) ....................................................................6, 7

*Minneapolis Star v. Minn. Comm'r of Revenue,*
460 U.S. 575 (1983) .......................................................................5

# TABLE OF AUTHORITIES
## (Cont.)

**Page(s)**

*NetChoice, LLC v. Att'y Gen., Fla.*,
34 F.4th 1196 (11th Cir. 2022) ...................................................... 7

*Packingham v. North Carolina*,
582 U.S. 98 (2017) ......................................................... 7, 12, 20

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ................................................................ 8, 19

*Reno v. ACLU*,
521 U.S. 844 (1997) ....................................................................... 6

*Smith v. California*,
361 U.S. 147 (1959) ..................................................................... 10

*TikTok v. Garland*,
145 S. Ct. 57 (2025) ............................................................ 3, 17, 18

*United States v. Stevens*,
559 U.S. 460 (2010) ................................................................ 18, 19

## Statutes

La. R.S. § 17:1751 .............................................................. 2, 5, 6, 8, 9

## Other Authorities

Sam Bowman, *Kids Are Struggling. Banning Social
Media Won't Fix That*, Wash. Post (Feb. 17, 2026) ....................... 17

Renée DiResta, "The New Media Goliaths," *Noema
Magazine* (June 1, 2023) ............................................................... 7

# TABLE OF AUTHORITIES
## (Cont.)

**Page(s)**

Christopher J. Ferguson, et al., *There Is No Evidence That Time Spent on Social Media Is Correlated With Adolescent Mental Health Problems: Findings From a Meta-Analysis*, 56 Prof. Psych.: Research & Pract. 73 (Feb. 2025) .............................................................. 4, 17

Eric Goldman, *The "Segregate-and-Suppress" Approach to Regulating Child Safety Online*, 28 Stan. Tech. L. Rev. 173 (2025) ....................................................................... 9

*Health Advisory on Social Media Use in Adolescence*, Am. Psych. Assoc. (May 2023) .......................................... 4, 17

Mike Masnick, *Two Major Studies, 125,000 Kids: The Social Media Panic Doesn't Hold Up*, Techdirt (Jan. 21, 2026) ................................................................. 4, 17

Jacob Mchangama, *Free Speech: A History From Socrates to Social Media* (2022) ............................................. 20, 21

Dan Williams, *Is Social Media Destroying Democracy—Or Giving It to Us Good and Hard?*, Conspicuous Cognition (Oct. 7, 2025) ............................................ 8, 21

## INTEREST OF AMICUS CURIAE*

TechFreedom is a nonprofit, nonpartisan think tank based in Washington, D.C. It is dedicated to promoting technological progress that improves the human condition. It opposes ever-evolving government efforts to meddle in online speech. See, e.g., Br. of TechFreedom, *NetChoice v. Jones*, No. 26-1252 (4th Cir., May 22, 2026) (opposing Virginia social media screentime cap); Br. of TechFreedom, *NetChoice, LLC v. Griffin*, No. 25-1889 (8th Cir., Jan. 27, 2026) (opposing Arkansas social media age-verification law); Br. of TechFreedom, *Bonta v. NetChoice, LLC*, No. 23-2969 (9th Cir., Feb. 14, 2024) (opposing California social media "design" code); Br. of TechFreedom, *Moody v. NetChoice, LLC*, No. 22-277 (U.S., Dec. 7, 2023) (opposing Florida and Texas social media speech codes); Br. of TechFreedom & Prof. Eric Goldman, *Volokh v. James*, No. 23-356 (2d Cir., Sept. 25, 2023) (opposing New York social media "transparency" law).

---

\* No party's counsel authored any part of this brief. No one, apart from TechFreedom and its counsel, contributed money intended to fund the brief's preparation or submission. All parties have consented to the brief's being filed.

## INTRODUCTION AND SUMMARY OF ARGUMENT

> In short, he became so absorbed in his books that he spent his nights from sunset to sunrise, and his days from dawn to dark, poring over them; and what with little sleep and much reading his brains got so dry that he lost his wits.

Miguel de Cervantes, *Don Quixote* (1605)

Humans are fascinated by stories and ideas. Perhaps that is why each new medium of communication provokes anxiety about its supposed power to unmoor impressionable minds. Before long, though, the fears about each new medium come to look quaint. Books drive men mad. Pamphlets promote disobedience to authority. Novels seduce the young into idleness. Comic books breed violence. Television breeds violence. Video games breed violence. Every time, we are told that *this* time is different. *This* new medium, unlike the last, is *uniquely* dangerous and corrupting. *This* new medium will rob other people—it's always *other* people, usually children—of reason and virtue.

Now it is social media's turn.

Louisiana's Act 456, La. R.S. § 17:1751 et seq., requires covered social media companies to verify the age of every Louisiana user who seeks to create an account. It bars minors under 16 from creating an account without parental consent. And it layers on restrictions covering adult-to-minor messaging, targeted advertising, and data collection. The

Act thus picks winners and losers in the marketplace of ideas. It spares powerful institutional speakers—newspapers, television stations, streaming services—while burdening the powerless: ordinary people for whom social media is the best, and sometimes only, outlet to spread a message. The district court correctly held the Act unconstitutional as applied to twelve of NetChoice's member platforms. ROA.6596.

This brief focuses on why strict scrutiny applies. The Act is a textbook speaker- and content-based regulation. It singles out platforms where ordinary people speak to one another, disfavoring peer-to-peer conversation—and the distinctive subjects such conversation raises—while favoring legacy media's curated product and message. And however loudly Louisiana insists otherwise, online age-verification and parental-consent requirements plainly burden speech. Imposing that burden with speaker- and content-based favoritism triggers strict scrutiny.

The Supreme Court's intermediate-scrutiny precedents do not help Louisiana. *Free Speech Coalition v. Paxton*, 606 U.S. 461 (2025), concerned pornography obscene to minors—a category historically unprotected for children and now only partially protected for adults. And *TikTok v. Garland*, 604 U.S. 56 (2025), was a national-security case, addressed in an emergency posture, that the Court itself stressed was "narrow" and limited to a foreign-adversary-controlled platform. Nor

does *CCIA v. Uthmeier*, 2025 WL 3458571 (11th Cir., Nov. 25, 2025), on which Louisiana heavily relies—but which misreads *Free Speech Coalition*—change anything.

Make no mistake: Louisiana's alarmism about the perils of social media is overwrought. Louisiana joins the latest episode in a long line of tech-driven moral panics. As before, the rhetoric has run far ahead of the evidence. See, e.g., Mike Masnick, *Two Major Studies, 125,000 Kids: The Social Media Panic Doesn't Hold Up*, Techdirt (Jan. 21, 2026), tinyurl.com/47jtmew7 (summarizing two large recent cohort studies, one finding that social-media use and well-being isn't linear—i.e., *moderate* social-media use, among minors, is better than either heavy use *or* no use—and another finding *no* correlation between social-media use and teen mental health); Christopher J. Ferguson, et al., *There Is No Evidence That Time Spent on Social Media Is Correlated With Adolescent Mental Health Problems: Findings From a Meta-Analysis*, 56 Prof. Psych.: Research & Pract. 73 (Feb. 2025), tinyurl.com/u59d766v ("[O]ur findings indicate that the current research literature is unable to provide strong evidence for a clinically relevant link between time spent on social media and mental health issues in youth."); *Health Advisory on Social Media Use in Adolescence,* Am. Psych. Assoc. (May 2023), tinyurl.com/

mwea7a84 ("Using social media is not inherently beneficial or harmful to young people.").

But even if social media were as risky as Louisiana claims, Louisiana would still have to comply with the First Amendment. The Act does not do so.

## ARGUMENT

### I.   Because Louisiana's Act Is Speaker- and Content-Based, Strict Scrutiny Applies.

The Act targets speech based on speaker and subject. It therefore must withstand strict scrutiny—which it cannot do. (Louisiana does not even try to argue otherwise. Appellee's Br. 13.)

The First Amendment "prohibit[s] . . . restrictions distinguishing among different speakers." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). Such distinctions "are all too often"—as here—"simply a means to control content." *Id*. See also *Minneapolis Star v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591-92 (1983).

The Act homes in on social media—platforms that "connect[] users . . . to interact socially." La. R.S. § 17:1751(12)(a). The Act spares establishment speakers, such as television shows or newspaper articles that lecture the average viewer or reader, who cannot respond. Indeed,

the Act explicitly excludes services whose "predominant or exclusive function" is to deliver things like "streaming" or "news, sports, [or] entertainment." La. R.S. § 17:1751(12)(b). It governs only havens for user-generated speech—"vast democratic forums" where everyday people can post content, view others' posts, and connect with each other. *Reno v. ACLU*, 521 U.S. 844, 868 (1997).

The distinction matters. Social media is not popular because it replicates newspapers or cable television. It is popular because users themselves get to speak—about politics, culture, religion, local affairs, family, friends, and more. Louisiana's objection is to that distinctive peer-to-peer speech. The district court understood as much, correctly concluding that the Act privileges curated, provider-selected content over the user speech that defines social media. ROA.6565-67 (declaring that the Act's coverage definition is content-based and subject to strict scrutiny).

Before social media, large corporate newspapers and broadcasters dominated public discourse. Many worried about "the concentration of control of media." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 249 (1974). "The power to inform the American people and shape public opinion" rested "in a few hands." *Id.* at 250. Many believed that corporate media, influenced by government and business interests, offered only a

narrow "homogeneity" of acceptable views. *Id*. News and opinion were filtered and sanitized, and "the public ha[d] lost an ability to respond." *Id*. See Renée DiResta, "The New Media Goliaths," *Noema Magazine*, tinyurl.com/yrwbsavk (June 1, 2023) (discussing Noam Chomsky's theory of "manufactured consent"—the notion that "throughout the 20th century, . . . a hegemonic media . . . presented a filtered picture of reality").

Social media disrupted that paradigm. It enables ordinary people to reach one another directly, opening public debate to a far wider range of viewpoints. The Supreme Court has acknowledged that "social media" is now among the most important places "for the exchange of views" by "private citizen[s]." *Packingham v. North Carolina*, 582 U.S. 98, 103, 105 (2017). Social media "is different from traditional media outlets" in that "every user . . . can be both speaker and listener." *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1204 (11th Cir. 2022), vacated on other grounds, 603 U.S. 707 (2024). Social media platforms foster "different sorts of online communities" with diverse "values and viewpoints." *Id*. at 1205.

The Act singles out platforms that empower ordinary people to speak to their peers. That is a speaker-based distinction on its face. And it is a content-based distinction as well, because ordinary people want to

discuss a wider range of topics than do corporate media outlets. In short, the Act disfavors the distinct speakers, topics, and ideas that find an audience on social media. See, e.g., Dan Williams, *Is Social Media Destroying Democracy—Or Giving It to Us Good and Hard?*, Conspicuous Cognition (Oct. 7, 2025), tinyurl.com/4vax24wc ("If people want to hear perspectives that elites reject, they are unlikely to find them within elite-controlled media. Social media changes that . . . [It] amplifies ideas that elites previously excluded from mainstream discourse.").

Although our focus is the content-based nature of the Act's "social interaction" coverage definition, the Act's exceptions are of course content-based as well. The Act excuses from regulation services that focus on things like "streaming" or "news." La. R.S. § 17:1751(12)(b). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The Act's explicit carveouts are "as content-based as it gets." *Barr v. Am. Ass'n of Political Consultants, Inc.*, 591 U.S. 610, 619 (2020).

Even within the subcategory of social speech, Louisiana cannot help but play favorites. A carveout for "interactive gaming" shows that Louisiana is focused not on social interaction as such, but on social interaction that facilitates specific types of conversation. La. R.S.

§ 17:1751(12)(b). What the Act disfavors, at bottom, is social interaction that dares to touch on the *wrong topics*. It leaves frivolous gaming banter unregulated while walling off the forums where ordinary users discuss news, politics, culture, and other matters of public concern.

Louisiana tries to shoot the moon, arguing that it may duck First Amendment scrutiny altogether. It argues that it is regulating not free expression, but "non-expressive conduct" in the form of age-verification and parental-consent requirements. Appellants' Br. 51-53. But "speech does not become conduct just because the State may call it that." *Chiles v. Salazar*, 146 S. Ct. 1010, 1023 (2026). "[S]ubmitting to age verification is a burden on the exercise of" users' First Amendment rights. *Free Speech Coal.*, 606 U.S. at 484; see Eric Goldman, *The "Segregate-and-Suppress" Approach to Regulating Child Safety Online*, 28 Stan. Tech. L. Rev. 173 (2025). So is complying with a parental-consent requirement. See Appellee's Br. 21-22. The whole point of the Act, as Louisiana admits throughout its brief, is to limit what minors can *read*, *watch*, and *say*.

The State contends that the Act draws a content-neutral, "function-based" line between social media and other modes of communication. Appellants' Br. 46-48. But *how* speech is presented—through a static institutional page or an interactive social-media feed—is integral to the content of the speech itself. It is as if a state declared that all stories may

be told, but that plays in a theater must be capped at one hour a night because live performances are too powerful, harmful, or addictive. The elocution of the stage performers, their exaggerated movements, their dramatic gestures, their eye-contact with the audience—these are themselves expressive choices. Similarly, a news story conveyed through a person's commentary in a short-form video differs from a news story conveyed through a legacy-media article precisely *because of the form*. Louisiana singles out the form whose substantive content it disfavors.

Finally, as NetChoice observes (Appellee's Br. 20), a State's fear that *some* unlawful speech might appear *somewhere* on a platform is not a valid basis for closing off that platform entirely. This is the lesson of *Smith v. California*, 361 U.S. 147 (1959). A city ordinance held a bookstore owner liable for any obscene book found on his shelves. *Smith* declares the law an "unconstitutional limitation on the public's access to constitutionally protected matter." *Id*. at 153. The draconian ordinance would have forced the store to engage in sweeping "self-censorship, compelled by the State," and thus restricted "the public's access to reading matter." *Id*. at 153-54. Like the ordinance, Louisiana's "needle in the haystack" approach (Appellee's Br. 20), if allowed, would permit the State to set up a regime of prior restraint around any large speech platform—a tactic the First Amendment plainly forbids.

Because it targets speech using speaker- and content-based distinctions, the Act is subject to strict scrutiny.

## II.    Intermediate-Scrutiny Precedents Are Irrelevant.

Louisiana invokes two Supreme Court decisions—*Free Speech Coalition* and *TikTok*—that applied intermediate scrutiny. But neither helps the State. Each involved circumstances far removed from the Act's broad regulation of fully protected social-media speech. The State doubles down by invoking a recent Eleventh Circuit stay order, *Uthmeier*, but that ruling extends *Free Speech Coalition* beyond its premises and should not be followed.

### A.    *Free Speech Coalition v. Paxton*

Louisiana relies heavily on *Free Speech Coalition*, 606 U.S. 461, to argue for intermediate scrutiny. But that decision concerned age-gating only for content obscene to minors. It has nothing to say about the Act, which attempts to age-gate vast quantities of fully protected speech on social media.

To understand *Free Speech Coalition*'s limits, consider two other Supreme Court rulings—one about social media, the other about the rights of minors.

- 11 -

*Packingham v. North Carolina* involved a North Carolina law that made it a crime for a registered sex offender "to access a commercial social networking Web site." 582 U.S. 98, 101 (2017). The Court held that this law violated the First Amendment.

In the modern world, the Court explained, among "the most important places . . . for the exchange of views" are the "vast democratic forums of the Internet"—and of "social media in particular." *Id.* at 103 (cleaned up). Social media "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Id.* at 105. And everyone—"even convicted criminals"—can benefit from "access to the world of ideas" that exists online. *Id.* To "foreclose access to social media altogether," therefore, is "to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id.* The Court concluded that, even under intermediate scrutiny (which the Court assumed, without deciding, applied), the North Carolina law impermissibly burdened adult sex offenders' right to send and receive speech.

At issue in *Brown v. Entertainment Merchants Assoc.*, 564 U.S. 786 (2011), was a California law that restricted the sale or rental of violent video games to minors. While it did "not mean to demean or disparage the concerns" behind the State's effort to protect children, the Court

readily struck down the law as a violation of the First Amendment. *Id*. at 802.

At the heart of California's statute was an assumption that minors are second-class citizens under the First Amendment. But this, the Court held, is incorrect. "[M]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id*. at 793 (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212-13 (1975)). Although a state may protect minors from material that is obscene as to them, the Court observed, "that does not" mean the state has "a free-floating power to restrict the ideas to which children may be exposed." *Id*. at 794-95. "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id*. at 795. This remains true even if the speech is interactive ("the player [of a video game] participates in the violent action on screen") or disgusting (there exists, in the game, "a racial or ethnic motive for [the] violence"). *Id*. at 799. Nor may the censorship be laundered through a parental-consent mandate—which is just a government mandate "subject only to parental veto." *Id*. at 795 n.3.

- 13 -

The Court concluded that California's law was subject to, yet miserably failed, strict scrutiny.

Louisiana claims that *Brown* involved a "direct ban" on speech, whereas the Act bans nothing, because parents can consent. Appellants' Br. 57-58. As Louisiana surely knows, however, *Brown* anticipated this precise move. A government mandate "subject only to parental veto," it holds, enforces not "*parental* authority," but "*governmental* authority." *Brown*, 564 U.S. at 795 n.3.

Back to *Free Speech Coalition*. A Texas law, H.B. 1181, requires age verification on any commercial website more than one-third of which is speech obscene to minors. The Court upheld this law under intermediate scrutiny.

*Free Speech Coalition* addressed precisely the category of speech— material obscene to minors—that *Brown* noted is amenable to special treatment. Minors have no right to view such material. And such material, *Free Speech Coalition* concluded, is "only partially" protected for adults. 606 U.S. at 485.

How does the analysis differ? *Free Speech Coalition* revealed two key distinctions. *First*, for content obscene to minors, age-verification laws are now treated as akin to regulations on expressive conduct. *Id.* at 482. When content obscene to minors is at issue, the state's regulatory

power "*necessarily includes* the power to require proof of age." *Id.* at 478 (emphasis added). In the context of adult content, in other words, an age-verification "statute can readily be understood as an effort to restrict minors' access" to speech unprotected as to them. *Id.* at 484. In the context of social media, by contrast, *no such assumption applies*. Restrictions in that realm remain, as they have always been, presumptively unconstitutional direct regulations on speech. See *Brown*, 564 U.S. 786.

*Second*, for content obscene to minors, a "burden" on speech is now qualitatively distinct, under the First Amendment, from a "ban" on speech. "When the First Amendment *partially* protects speech"—as is henceforth the case with, and only with, content obscene to minors—"the distinction between a ban and lesser burdens is" now "meaningful." *Free Speech Coal.*, 606 U.S. at 493 n.12. *But* "for *fully protected speech*," now as ever, "the distinction between bans and burdens makes no difference to the level of [First Amendment] scrutiny." *Id.* Even after *Free Speech Coalition*, therefore, restrictions on *fully protected* social-media speech amount to a *burden* that triggers *strict scrutiny*.

In short, *Free Speech Coalition* has nothing to say about a *social media* regulation such as Louisiana's Act. In fact, *Free Speech Coalition* aligns perfectly with *Brown*. Only categories of historically unprotected

speech—such as fraud, incitement, or obscenity—are outside the First Amendment. And "the obscenity exception does not," *Brown* said, "cover whatever a legislature finds shocking, but only depictions of 'sexual conduct.'" 564 U.S. at 793. So unlike in *Ginsberg v. New York*, 390 U.S. 629 (1968)—a precedent, relied on heavily by *Free Speech Coalition*, involving material obscene to minors sold at brick-and-mortar stores—California's video-game law tried "to create a wholly new category" of unprotected speech (violent speech directed at children). 564 U.S. at 794. Allowing a legislature to do this—even for minors—would, *Brown* concluded, contravene "the judgment of the American people, embodied in the First Amendment, that the benefits of its restrictions on the Government outweigh the costs." *Id.* at 792 (cleaned up). *Free Speech Coalition*—which dealt with a category of speech that *is* historically unprotected—changes nothing.

Like H.B. 1181, Louisiana's Act requires age verification. But there the resemblance ends. Louisiana does not target a category of speech unprotected for minors. It targets the vast universe of fully protected speech available on social media. Extending *Free Speech Coalition*'s framework to social media would do what *Brown* forbade: create "a wholly new category" of speech unprotected as to minors, one based not on history and tradition (the only proper source of such

categories) but on legislative anxiety (a category that, once indulged, knows no bounds).

## B.    *TikTok v. Garland*

Louisiana also relies on *TikTok v. Garland*, 604 U.S. 56. The State draws from that decision two (erroneous) principles. First, a state supposedly enjoys broad "latitude" to design regulatory solutions to address "content-neutral interests," such as protecting minors. Second, a law is purportedly subject to intermediate scrutiny when the regulated medium poses special "risks," such as a danger to minors.

Both premises fail. *TikTok*'s "latitude" language applies only *after* a court has determined that intermediate scrutiny applies. It doesn't set the level of scrutiny in the first instance. (As we have explained, moreover, the State's interests are not "content neutral.") And the notion that social media poses extreme "dangers" is a moral-panic talking point not borne out by the evidence. "Multiple studies have shown that smartphone and social media use among teens has either minimal effects on their mental health or none." Sam Bowman, *Kids Are Struggling. Banning Social Media Won't Fix That*, Wash. Post (Feb. 17, 2026), tinyurl.com/9b5mxbk9. See also Masnick, supra; Ferguson, et al., supra; *Health Advisory on Social Media Use*, supra.

In any event, Louisiana's reading of *TikTok* is far too broad. The Court did not let the government simply invoke "latitude" to address its "interests," as an excuse for regulating speech. *TikTok* was about far more. In explaining its decision to apply intermediate, rather than strict, scrutiny, the Court invoked not only TikTok's "susceptibility to foreign [adversary] control," but also TikTok's "scale," the "vast swaths of sensitive data" it collects, the "Government's national security concerns," and the "expedited time allowed" for the Court's "consideration" of the case. *TikTok*, 604 U.S. at 62, 73. Small wonder the Court repeatedly "emphasize[d] the inherent narrowness" of its "holding." *Id.* at 73. To drive the point home, the Court wrote: "A law targeting *any other speaker* would by necessity entail a distinct inquiry and separate considerations." *Id.* (emphasis added).

Louisiana's claim that the government can evade strict scrutiny by pointing to putative "risks" posed by certain speech is especially pernicious. "The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits." *United States v. Stevens*, 559 U.S. 460, 470 (2010). The First Amendment itself is a judgment that the dangers of government censorship outweigh the dangers of more speech. *Id.* "Our Constitution forecloses any attempt to revise that judgment simply on

the basis that some speech is not worth it." *Id*. Louisiana's asserted risks are not grounds for lowering the level of scrutiny. *Reed*, 576 U.S. at 165-66. They belong within strict-scrutiny analysis, where the State may raise them as a putative compelling interest.

*TikTok* is best understood as a one-off. It has nothing to say about whether strict scrutiny applies here (as it does).

## C.   *CCIA v. Uthmeier*

Louisiana also leans on *CCIA v. Uthmeier*, 2025 WL 3458571 (11th Cir. Nov. 25, 2025), a divided stay order allowing Florida's H.B. 3 to take effect pending appeal. *Uthmeier* is not controlling here—nor, as a mere stay order, is it binding even on the Eleventh Circuit's own merits panel. See 11th Cir. R. 27-1(g). More than that, it is not persuasive. The panel was right that Florida's law triggers First Amendment scrutiny because it regulates who may speak and receive speech on social media. *Id*. at *3. (Louisiana ignores that part.) But it went astray in treating Florida's focus on "social media platforms" as a regulation of a mere "form" of expression, rather than as a content-based choice to burden interactive, user-generated speech. *Id*. at *4. A State cannot make a speech restriction content neutral by redescribing the disfavored speech as a format, function, or delivery mechanism. *Brown*, 564 U.S. at 790–91

("[T]he basic principles of freedom of speech and the press . . . do not vary" when "a new and different medium for communication appears").

*Uthmeier* appears to take its cues from *Free Speech Coalition*. But as we have explained, that decision is confined to speech minors have no right to receive. Louisiana's Act covers vast spheres of speech on politics, religion, culture, news, friendship, and ordinary life. *Brown* and *Packingham* are the governing precedents here. *Free Speech Coalition* is the inapplicable exception. It must not be extended, lest legislatures be given the power to convert society's "democratic forums" into closed and licensed spaces. *Packingham*, 582 U.S. at 103.

Even on its own terms, *Uthmeier* rested heavily on features not present here. Florida's law focused on specific allegedly addictive features. Louisiana's Act is far broader; it burdens online social interaction writ large, regardless of any particular feature. Louisiana cannot invoke a stay order from another circuit, concerning another statute, to avoid strict scrutiny.

*    *    *

Thanks to social media, the "public" is "no longer a passive recipient" of information. Jacob Mchangama, *Free Speech: A History From Socrates to Social Media* 389 (2022). "Social media has democratised the public sphere," providing a platform "for brilliant,

heterodox thinkers who would never have achieved prominence through more traditional routes." Williams, supra. Under the First Amendment, a state may not use regulation to "jealously guard[] the crumbling pillars of privileged access" to public attention. Mchangama, supra, at 389. Rather, "media outlets and experts must find new and innovative ways to earn the trust of [the] public." *Id.*

In the end, Louisiana's problem is with the power of speech itself. Minors spend time on social media because, when they're there, they see speech they're *interested in seeing*. Louisiana is concerned that the speech is *too powerful*. The State thinks minors are like Don Quixote, transfixed by the power of stories and ideas. This problem—if it really is one—is not for Louisiana to fix. Under the First Amendment, the *strong effects* of speech are an *inherent part* of speech—not a ground for regulation. "Any other answer leaves the government in control of all of the institutions of culture, the great censor and director of which thoughts are good for us." *Am. Booksellers Assoc. v. Hudnut*, 771 F.2d 323, 330 (7th Cir. 1985) (Easterbrook, J.).

## CONCLUSION

The Court should affirm.

May 29, 2026

Respectfully submitted,

/s/ Corbin K. Barthold
Corbin K. Barthold
TECHFREEDOM
1500 K Street NW
Washington, DC 20005
(771) 200-4997
cbarthold@techfreedom.org
*Attorney for Amicus Curiae*
*TechFreedom*

## CERTIFICATE OF COMPLIANCE

I certify:

This brief complies with the type-volume limits of Fed. R. App. P. 29(a)(5) because it contains 4,352 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced serif typeface, in 14-point font, using Microsoft Office 365.

/s/ Corbin K. Barthold

CERTIFICATE OF SERVICE

On May 29, 2026, a copy of this brief was filed and served on all registered counsel through the Court's CM/ECF system.

/s/ Corbin K. Barthold