**NO. 26-30016**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

NETCHOICE,

PLAINTIFF-APPELLEE,

v.

LIZ MURRILL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF
LOUISIANA; MIKE DUPRESS, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE
PUBLIC PROTECTION DIVISION, LOUISIANA DEPARTMENT OF JUSTICE,

DEFENDANTS-APPELLANTS,

On Appeal from the United States District Court
for the Middle District of Louisiana
Civil Action No. 3:25-cv-231-JWD-RLB

***BRIEF OF AMICI CURIAE* FLOOR64, INC. D/B/A THE COPIA
INSTITUTE IN SUPPORT OF PLAINTIFF-APPELLEE NETCHOICE**

June 2, 2026

Catherine R. Gellis, Esq.
3020 Bridgeway #247
Sausalito, CA 94965
Telephone: 202-642-2849
Email: cathy@cgcounsel.com

,

*Counsel for Amici Curiae*

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Amicus Curiae certifies that, in addition to those persons listed in the first filed brief's certificate of interested persons, and updated by amici curiae and plaintiff-appellee's brief, the following is a complete supplemental list of interested persons as required by Fifth Circuit Rule 28.2.1:

1.    Floor64, Inc., d/b/a The Copia Institute, *Amicus Curiae*

2.    Gellis, Catherine, *Attorney for Amicus Curiae*

3.    Masnick, Michael, *Founder and principal of Amicus Curiae*

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus curiae Floor64, Inc. d/b/a The Copia Institute states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more of its stock.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
        DISCLOSURE STATEMENT ................................................................. II

TABLE OF AUTHORITIES ............................................................... IV

STATEMENT OF INTEREST .............................................................. 8

SUMMARY OF ARGUMENT ............................................................. 10

ARGUMENT ................................................................................... 11

I.      THE ACT CAUSES HARM. ................................................... 11

        A.      THE ACT HARMS YOUNG PEOPLE. ........................... 11

        B.      THE ACT HARMS EVERYONE ELSE. .......................... 18

II.     IF THE ACT IS NOT ENJOINED, IT WILL OPEN THE FLOODGATES
        TO MORE SUCH LAWS AND THEIR HARM. ............................ 22

CONCLUSION ............................................................................... 28

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
        TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS
        PURSUANT TO FED. R. APP. P. 32(A)(7)(C) ........................... 29

CERTIFICATE OF SERVICE ............................................................. 30

## TABLE OF AUTHORITIES

**Cases**

*Brown v. Entertainment Merchants Ass'n*, 564 US 786 (2011) ..............................12

*Case v. Montana*, 146 S.Ct. 500 (2026)....................................................................15

*First Choice Women's Resource Centers, Inc. v. Davenport,* No. 24-781 (U.S. 29

   April 2026) ..........................................................................................................22

*Free Speech Coalition, Inc. v. Paxton*, 145 S. Ct. 2291 (2025) ........................ 12, 20

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ....................................22

*Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024)..................................................26

*NetChoice, LLC v. Fitch*, 145 S. Ct. 2658 (2025)....................................................27

*Packingham v. North Carolina*, 137 S.Ct. 1730 (2017) .................................... 12, 15

*Reno v. American Civil Liberties Union*, 521 US 844 (1997)................................22

*TikTok Inc. v. Garland*, 145 S. Ct. 57 (2025) ..................................................... 21, 24

*Winter v. Nat. Res. Council, Inc.*, 555 U.S. 7 (2008)...............................................27

**Statutes**

La. R.S. § 51:1751(11).................................................................................................23

La. R.S. § 51:1751(12)(b)(iv) ....................................................................................23

La. R.S. §51:1751(12)(b)(iv) .....................................................................................13

La. R.S. §51:1751(12)(b)(i-xxi).................................................................................13

**Other Authorities**

Colin Dixon, *By year's end, only about a third of US homes will have traditional pay TV*, NSCREENMEDIA (May 18, 2025)............................................................16

*DCFS Recruitment Campaign for Foster Parents for Teens*, Louisiana First Foundation (Mar. 2020)....................................................................................17

Eelemarni Close-Brown, *'I've lost my friends': advocacy groups warn Australia's social media ban risks isolating kids with disabilities*, THE GUARDIAN (Feb. 6, 2026) ..................................................................................................................13

Ellen Sirull, *Do You Know How to Protect Your Child from Identity Theft?*, Experian blog (Jan. 8, 2018)..................................................................................18

Jessica Kidd, Isobel Roe, and Jesse Hyland, *Cybercrime detectives arrest man following alleged data breach involving more than 1 million NSW clubs customer records*, ABC (May 2, 2024).............................................................20

Josh Taylor, *Social media ban explained: when does it start in Australia, how will it work and what apps are being banned for under-16s?*, THE GUARDIAN (Dec. 10, 2025) ..................................................................................................................13

Lisa Femia, *Why Isn't Online Age Verification Just Like Showing Your ID In Person?*, TECHDIRT (Jan. 06, 2026)......................................................................19

Madison Howard Churchman, *A Clean Slate for Texas Foster Youth: Policy Recommendations on Preventing and Resolving Identity Theft for Youth in Foster Care*, 4 TEX. A&M J. PROP. L. 297 (2018) ...............................................18

Megan Farokhmanesh, *Bluesky Goes Dark in Mississippi Over Age Verification Law*, WIRED (Aug. 22, 2025).................................................................24

Michael Dezuanni, Simon Chambers and Tanya Notley, *Australian teens impacted by the social media ban are getting less news: new research*, THE CONVERSATION (May 17, 2026) ..........................................................14

Mike Masnick, *438 Experts Said Age Verification Is Dangerous. Legislators Are Moving Forward With It Anyway*, TECHDIRT (Apr. 14, 2026)..............................8

Mike Masnick, *Announcing Ctrl-Alt-Speech: A New Podcast About Online Speech*, TECHDIRT (Mar. 7, 2024)....................................................................9

Mike Masnick, *Another Day, Another Age Verification Data Breach: Discord's Third-Party Partner Leaked Government IDs*, TECHDIRT (Oct. 7, 2025)............21

Mike Masnick, *Our New Report Explores How Existing Internet Regulations Around The Globe Have Fared. Short Answer? Not Well*, TECHDIRT (Apr. 12, 2023) ...................................................................................9

Mike Masnick, *Protocols, Not Platforms: A Technological Approach to Free Speech*, TECHDIRT (Aug. 28, 2019) ............................................27

Mike Masnick, *Success! One Billion Users Will Go Into Production (Late Backers Welcome)*, TECHDIRT (Dec. 20, 2024)...................................................9

Mike Masnick, *The Kids Are (Mostly) Alright: New Pew Study Deflates The Social Media Panic*, TECHDIRT (Apr. 21, 2026)...........................................17

Mike Masnick, *Yet Another ID Verification Service Breached, Exposing Private Info Collected On Behalf Of Uber, TikTok & More*, TECHDIRT (Jun. 28, 2024) .20

*Newspapers Fact Sheet*, PEW RESEARCH CENTER (Nov. 10, 2023).........................16

Shoshana Weissmann, *Kids Don't Have IDs And Age-Estimation Tech Is Frequently Very Wrong*, TECHDIRT (May 23, 2025).............................................22

Shoshana Weissmann, *Social Media Was Useful For Me, As An Ill, Nerdy Teenager*, TECHDIRT (Jun. 28, 2023).......................................................................12

Stephen J. Blumberg and Julian V. Luke, *Wireless Substitution: Early Release of Estimates from the National Health Interview Survey, July-December 2024*, National Center for Health Statistics (Jun. 2025) .................................................16

**Other URLs**

https://en.wikipedia.org/wiki/AOL ...............................................................................27

https://en.wikipedia.org/wiki/Bulletin_board_system...............................................27

https://en.wikipedia.org/wiki/CompuServe .............................................................27

https://en.wikipedia.org/wiki/Prodigy_(online_service) .........................................27

https://en.wikipedia.org/wiki/Streisand_effect .......................................................23

https://en.wikipedia.org/wiki/Usenet .......................................................................27

https://www.forumrankings.net/software/phpbb .....................................................27

https://www.phpbb.com/...........................................................................................27

## STATEMENT OF INTEREST[1]

Amicus Copia Institute is the think tank arm of Floor64, Inc., the privately-held small business behind Techdirt.com ("Techdirt"). Techdirt is an online publication that has chronicled technology law and policy for nearly 30 years. As a media outlet regularly approaching a million page views a month Techdirt has published more than 85,000 articles regarding subjects such as freedom of expression and platform liability, issues at the heart of this case, as well as other topics relating to law, innovation, and their impact on civil liberties—including, in particular, how laws like Louisiana Act 456 ("the Act") affect speech rights protected by the First Amendment.[2]

Techdirt also itself functions as a platform facilitating user discourse in the comment sections appearing on its articles, where it has attracted over two million reader posts advancing discussion and discovery about the topics found on its pages. Plus it is a user of other platforms run by other companies, including social media

---

[1] Pursuant to FRAP 29(a), amicus curiae certifies that appellees have consented to the filing of this brief and that appellant does not oppose. Pursuant to FRAP 29(c)(5), amicus curiae further certifies that no party or party's counsel authored this brief in whole or in part, that no party or party's counsel provided any money that was intended to fund the preparation or submission of this brief, and no party or person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund the preparation or submission of this brief.
[2] *See*, *e.g.*, Mike Masnick, *438 Experts Said Age Verification Is Dangerous. Legislators Are Moving Forward With It Anyway*, TECHDIRT (Apr. 14, 2026), https://www.techdirt.com/2026/04/14/438-experts-said-age-verification-is-dangerous-legislators-are-moving-forward-with-it-anyway/.

platforms, where it engages in conversation with readers or uses them to share and promote its expression with wider audiences.

As a think tank the Copia Institute also produces evidence-driven white papers examining the nuance and assumptions underpinning tech policy,[3] as well as other media like games[4] and podcasts.[5]  Armed with its insights it then produces advocacy instruments including amicus briefs such as this one.  All of these efforts are designed to fulfill the overall expressive goal of educating lawmakers, courts, and other regulators—as well as innovators, entrepreneurs, and the public—and influencing policy that promotes and sustains innovation and expression.

The impact of a law like the Act upon amicus Copia Institute would be profound because it is an enterprise whose central business purpose is producing expression aimed at broad audiences, which laws like these inhibit.  The Copia

---

[3] *See, e.g.*, Mike Masnick, *Our New Report Explores How Existing Internet Regulations Around The Globe Have Fared. Short Answer? Not Well*, TECHDIRT (Apr. 12, 2023), https://www.techdirt.com/2023/04/12/our-new-report-explores-how-existing-internet-regulations-around-the-globe-have-fared-short-answer-not-well/.

[4] *See, e.g.*, Mike Masnick, *Success! One Billion Users Will Go Into Production (Late Backers Welcome)*, TECHDIRT (Dec. 20, 2024), https://www.techdirt.com/2024/12/20/success-one-billion-users-will-go-into-production-late-backers-welcome/ (adding "One Billion Users" to "Trust and Safety Tycoon" and "Moderator Mayhem" in its game catalog, funded by its outreach on other Internet platforms including Bluesky and Kickstarter).

[5] *See, e.g.*, Mike Masnick, *Announcing Ctrl-Alt-Speech: A New Podcast About Online Speech*, TECHDIRT (Mar. 7, 2024), https://www.techdirt.com/2024/03/07/announcing-ctrl-alt-speech-a-new-podcast-about-online-speech/.

Institute therefore submits this brief *amicus curiae* wearing two hats: as a longtime commenter on the issues at the heart of the underlying litigation, and as an example of the many whose own First Amendment rights are threatened by this law and all similar ones that would follow if this one were permitted.

## SUMMARY OF ARGUMENT

Louisiana insists its Act has "nothing to do with speech or even expressive activity" and therefore should not be subject to constitutional scrutiny. AG.Br.55. But in actuality it has *everything* to do with expression. As the district court found, the Act, both as a whole, ROA.6568, and via its constituent provisions, ROA.6571, attacks the speech rights of both adults and even minors themselves, as well as platforms and their users, threatening the expression of countless, including expressive enterprises like amicus Copia Institute.

And it does so because these sorts of "age-gating" laws, in whatever regulatory detail they are drawn, are inherently suspect. While the specific provisions of Louisiana's Act give rise to their own particular constitutional injuries, in whatever form these laws appear they nearly all suffer from the same constitutional infirmity: being laws that are fundamentally state action designed to interfere with people's access to online expression. All of these statutory attempts to limit access to the Internet therefore require heightened scrutiny and generally

strict scrutiny. And when they fail it, as Louisiana's law does, an injunction must follow, lest speakers and speech, and the First Amendment itself, be silenced.

## ARGUMENT

### I. The Act causes harm.

The Act is not, as Louisiana insists, constitutionally benign. *See, e.g.,* AG.Br.55. Instead it imposes all sorts of constitutional, as well as practical, harms, including to minors themselves, inhibiting everyone's ability to engage with online expression, whether as a speaker, reader, or facilitator of the exchange of expression between the two.

#### A. The Act harms young people.

One issue with the Louisiana law is that, whether intentionally or not, it has the effect of separating people from the ideas they could encounter online. Such purposeful censorship would be unconstitutional. *See Free Speech Coalition, Inc. v. Paxton*, 145 S. Ct. 2291, 2309 (2025) (referencing the "right to access" lawful speech); *Packingham v. North Carolina*, 137 S.Ct. 1730, 1737 (2017) ("[T]o foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights."). It would even be unconstitutional for young people. *Brown v. Entertainment Merchants Ass'n*, 564 US 786, 795 (2011) (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 213-14 (1975)) ("No doubt a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children

may be exposed. 'Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.'"). But even taking on face value that the state of Louisiana is genuinely motivated to protect young people from some of the negative externalities of Internet communications, AG.Br.9, the law is still censorial in its design, purposefully separating them from the ideas that may be exchanged via what the state describes as "social media."

Its selectivity in what constitutes "social media" highlights the constitutional problem, because the state is deciding that, for instance, expression about sports is acceptable for young people to readily encounter, La. R.S. §51:1751(12)(b)(iv), but any expression that does not fall into one of the statutory categories exempted from the law's requirements is not. La. R.S. §51:1751(12)(b)(i-xxi) (listing exemptions). As a result, no young person can independently choose to engage with platforms conveying non-exempted expression, no matter how valuable it would be for their health and well-being to interact with that speech and the speakers behind it.[6]

---

[6] *See, e.g.*, Shoshana Weissmann, *Social Media Was Useful For Me, As An Ill, Nerdy Teenager*, TECHDIRT (Jun. 28, 2023), https://www.techdirt.com/2023/06/28/social-media-was-useful-for-me-as-an-ill-nerdy-teenager/ (describing her struggles as a teenager to find applicable medical information and community support for her condition). Laws like Louisiana's also hobble young people's ability to participate in governance, even though they are only a few years away from voting age and already have a direct stake in policy choices, such as related to their education.

Instead the state imposes unconstitutional obstacles—such as the obtaining of parental permission—that many will not be able to overcome. Indeed, the state expects that it will not be overcome for at least some younger Internet users, because if parental consent could be presupposed, then there would be no reason to require it. And although the state insists that its Act is less severe in its effect than an outright ban on certain ideas would be, AG.Br.57, for those young people unable to overcome the state's regulatory obstacles, the effect of the law's coercive force functions as a ban, ultimately depriving them access to the lawful expression they are entitled to.

Such bans themselves cause harm. In Australia a similar law to Louisiana's went into effect at the end of December, prohibiting people under 16 from using certain platforms that the Australian government has deemed unsuitable.[7] But the consequences of such deprivation are already starting to become clear. For one thing, it is isolating young people with disabilities who cannot easily overcome physical distance between themselves and their friends, especially when school is not in session.[8] Additionally, studies are now showing that young people now cut

---

[7] Josh Taylor, *Social media ban explained: when does it start in Australia, how will it work and what apps are being banned for under-16s?*, THE GUARDIAN (Dec. 10, 2025), https://www.theguardian.com/media/2025/dec/10/social-media-ban-australia-explained-banned-apps-list-guide

[8] Eelemarni Close-Brown, *'I've lost my friends': advocacy groups warn Australia's social media ban risks isolating kids with disabilities*, THE GUARDIAN (Feb. 6, 2026), https://www.theguardian.com/australia-news/2026/feb/06/ive-lost-my-friends-advocacy-groups-warn-australias-social-media-ban-risks-isolating-kids-with-disabilities.

off from social media are simply getting less access to news altogether and thus ending up less informed about events bearing on their lives than they were when they used to have access to the social media that delivered this information to them.[9]

As Australia's example evinces, laws like the Act, which seek to "age-gate" the Internet as a means of deprive young people of access to the breadth of lawful, constitutionally protected information and ideas conveyed through the medium, are harmful, even to young people, and on their face, because, as Australia is painfully learning, that deprivation has a cost. But Australia is not America; unlike Australia here in America there is a First Amendment preventing the government from making similar mistakes affecting the expressive rights of any of its people, of any age. As Justice Gorsuch recently put it in the context of the Fourth Amendment, our constitutional rights in America are made of "sturdier stuff." *Case v. Montana*, 146 S.Ct. 500, 513 (2026) (Gorsuch, J., concurring). The district court in this case was thus correct: we don't allow that sort of censorship here. ROA.6561; *Packingham*, 137 S.Ct. at 1732 ("A fundamental First Amendment principle is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more.").

---

[9] Michael Dezuanni, Simon Chambers and Tanya Notley, *Australian teens impacted by the social media ban are getting less news: new research*, THE CONVERSATION (May 17, 2026), https://theconversation.com/australian-teens-impacted-by-the-social-media-ban-are-getting-less-news-new-research-281988.

Because laws like the Act serve to affect how young people can speak and receive information, they implicate the First Amendment and must survive heightened scrutiny in order to be permitted to come into force. As the lower court found, the impingement on speech rights is so significant as to prompt strict scrutiny, ROA.6568, but there should at minimum be intermediate scrutiny. *Id.* And, as the district court also correctly found, the Act cannot survive it. *Id.* Because no matter how well intentioned the state is, how genuinely motivated it might have been in passing this law to protect young people, the impact the law has on those same young people's constitutional rights outweighs any intended benefit and thus is something the First Amendment prohibits.

In fact, not only does the supposed benefit of the social media prohibition not outweigh the harm to young people's speech rights, but the prohibition itself is its own discrete source of harm, not just with respect to how it burdens young people's rights in abstract terms but in direct, damaging effects on young people's lives. If the Act goes into effect, it will be American young people experiencing isolation and being cut off from news. It will not return their lives to how things were before the Internet became commonplace: their homes probably do not get a printed

newspaper,[10] and may not even have cable with which to watch television news.[11] They also may not have a landline with which to stay in touch with people.[12] Louisiana's law does leave open the possibility of using email, and it does not foreclose other cell phone use, but if the Constitution could allow a law such as Louisiana's to impose on young people's connections to people and information, then it could allow any other law to similarly burden them, including one even more prohibiting than Louisiana's that could forbid that technology use too.  Furthermore, that Louisiana's law may be less prohibitive of young people's Internet use than it could have been still cannot redeem it constitutionally, because, as NetChoice correctly points out, NC.Br.15, the less the state prohibits then the more of an arbitrary content-based burden on speech it is when it chooses to.

Ultimately what Louisiana is trying to accomplish is the Constitution-defying project of cutting young people off from the connections to people and information, no matter how lawful or how much they benefit from them, which fails any level of heightened scrutiny.  The espoused government interest behind the law presupposes

---

[10] *See, e.g.*, *Newspapers Fact Sheet*, PEW RESEARCH CENTER (Nov. 10, 2023), https://www.pewresearch.org/journalism/fact-sheet/newspapers/.

[11] *See, e.g.*, Colin Dixon, *By year's end, only about a third of US homes will have traditional pay TV*, NSCREENMEDIA (May 18, 2025), https://nscreenmedia.com/q1-2025-traditional-pay-tv-subscribers/.

[12] *See, e.g.*, Stephen J. Blumberg and Julian V. Luke, *Wireless Substitution: Early Release of Estimates from the National Health Interview Survey, July-December 2024*, National Center for Health Statistics (Jun. 2025), https://www.cdc.gov/nchs/data/nhis/earlyrelease/wireless202506.pdf.

that those connections are predominantly negative, regardless of whether such a supposition is truly valid or not outweighed by the actual benefit young people derive from their online experience.[13] It also ignores that there are similar dangers to young people in the offline world—including that of an unsafe homelife, with abusive or neglectful parents—that cutting young people off from their online connections may make them even more vulnerable to by making it that much more difficult for them to seek help when they need it.[14] Worse, the state would make these young people dependent on the permission of the very same people at home who may be harming them in order to find help defending themselves from them.[15]

There is also some irony in tying the need for users to identify themselves with parental consent, because one way that young people may be harmed is through

---

[13] *See*, *e.g.*, Mike Masnick, *The Kids Are (Mostly) Alright: New Pew Study Deflates The Social Media Panic*, TECHDIRT (Apr. 21, 2026), https://www.techdirt.com/2026/04/21/the-kids-are-mostly-alright-new-pew-study-deflates-the-social-media-panic/ (citing Pew Research).

[14] Harm can also occur in schools and churches, but by the state's reasoning it would also be able to impose similarly onerous regulatory rules on those environments as well, no matter how such rules would chill protected behavior by adults and young people. AG.Br.22-24. Heightened scrutiny ensures that the freedom the Constitution promises cannot be unduly trampled, not even by a reasonably-motivated state, and applies equally in any context, even online.

[15] It is estimated that there are over 1000 teens in the Louisiana foster care system, including those younger than 16, which suggests there are at least that many young people unable to count on the qualified guardianship of their parent. *DCFS Recruitment Campaign for Foster Parents for Teens*, Louisiana First Foundation (Mar. 2020), https://louisianafirstfoundation.com/louisiana-fosters-march2020/.

the mishandling of their personal information by their guardian.[16]  It has also been previously estimated that 25% of young people would become the victims of identity theft by the time they turned 18,[17] and that number was calculated before laws like Louisiana started requiring young people to upload sensitive documents and personal information to use the Internet, which will only exacerbate the problem. *See* discussion *infra* Section I.B.

In sum, wanting to protect young people is a good thing, but it does not follow that interfering with their First Amendment rights is itself good for them, especially not when in so many ways it is instead actually harmful.  To the extent that the state's goal with this law is sincerely to protect young people and not just try to exert censorial control over the ideas they are exposed to, to choose as the means to protect them a law that will on its own terms abjectly hurt them is not even a rational way to pretend to be helping.

**B. The Act harms everyone else.**

---

[16] This is a particularly known problem for youth in foster care but could be an issue in any situation with suboptimal parenting.  Madison Howard Churchman, *A Clean Slate for Texas Foster Youth: Policy Recommendations on Preventing and Resolving Identity Theft for Youth in Foster Care*, 4 TEX. A&M J. PROP. L. 297 (2018), https://doi.org/10.37419/JPL.V4.I4.2.

[17] Ellen Sirull, *Do You Know How to Protect Your Child from Identity Theft?*, Experian blog (Jan. 8, 2018), https://web.archive.org/web/20190805094052/https://www.experian.com/blogs/ask-experian/know-protect-child-identity-theft/.

Louisiana has argued that the Act is "nothing new, nothing costly, and nothing that compromises privacy." AG.Br.56. In actuality, it is all three. First, while age verification is not new to the offline world, it is very new to the online one and problematic in ways it was not offline. For one thing, as NetChoice highlights, NC.Br.34-35, age verification in the online world is not analogous to the offline.[18] In the offline world it can be illegal for a store to sell a young person cigarettes, but the young person can still be allowed in the store to buy other things, and verifying age for the cigarettes poses no obstacle to the rest of the shopping trip, for either young people or any adult shoppers. Whereas in the online world age verification, particularly like the Act requires, acts to keep the young person out of the proverbial store entirely and even if they would be legally allowed to have access to what's on offer: namely, lawful, protected speech.[19] And it is not just young people kept out if they can't or won't be able to satisfy proof of age, but adults as well.

---

[18] *See also* Lisa Femia, *Why Isn't Online Age Verification Just Like Showing Your ID In Person?*, TECHDIRT (Jan. 06, 2026) (republished from eff.org), https://www.techdirt.com/2026/01/06/why-isnt-online-age-verification-just-like-showing-your-id-in-person/.

[19] To the extent the Supreme Court said otherwise in *Free Speech Coalition v. Paxton* a new problem with age verification arises, because in this analogy once a young person is refused cigarettes, they can't be in the store for anything else either, even if they would ordinarily be entitled to access it. As NetChoice points out, however, *Free Speech Coalition* only allowed age verification for speech that would not be First Amendment-protected for those whose access the law was attempting to obstruct. NC.Br.18-19, 35; *Free Speech Coalition*, 145 S. Ct. at 2309.

Second, age verification in the offline world poses negligible costs: for all intents and purposes ID just needs to be shown and in most instances nothing is retained.[20]  Whereas for online age verification an entire infrastructure and labor force needs to be built to collect identifying documents or biometric information, verify them, and, at least for some period, retain them.  Additionally all such systems need to be able to secure whatever identifying personal information they have collected, be it documents, biometrics, or both.  All of which, whether built in-house or outsourced to a vendor, is extremely expensive for a platform to furnish.  But it is additionally expensive for the user to supply so much sensitive personal information to a platform—just so they can speak online—because it comes at the very real, omnipresent risk of falling into the wrong hands and creating all sorts of costs for the user, including identity theft.[21]  This danger is not a hypothetical concern but rather something that has happened to user information on multiple occasions.[22]

---

[20] Australia, however, requires bar patrons' identifications to be maintained in a database that has now been hacked.  Jessica Kidd, Isobel Roe, and Jesse Hyland, *Cybercrime detectives arrest man following alleged data breach involving more than 1 million NSW clubs customer records*, ABC (May 2, 2024), https://www.abc.net.au/news/2024-05-02/clubs-nsw-cybersecurity-potential-data-breach-venues/103793584.

[21] Indeed, data collection, and the fear of too much personal data being amassed in the wrong hands, has been an animating policy concern that Congress has attempted to regulate.  *TikTok Inc. v. Garland*, 145 S. Ct. 57, 63-64 (2025).

[22] *See, e.g.*, Mike Masnick, *Yet Another ID Verification Service Breached, Exposing Private Info Collected On Behalf Of Uber, TikTok & More*, TECHDIRT (Jun. 28, 2024), https://www.techdirt.com/2024/06/28/yet-another-id-verification-service-breached-exposing-private-info-collected-on-behalf-of-uber-tiktok-more/;

Having to verify age also inherently means that an Internet user has to identify themselves, which comes at the additional cost of their privacy,[23] and, relatedly, their anonymity. The Supreme Court has long recognized that the right to speak anonymously is part and parcel of the right to speak at all. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995). Just this year it even reiterated how the First Amendment also protects associative rights, and how the right to associate includes the right to associate anonymously. *First Choice Women's Resource Centers, Inc. v. Davenport,* No. 24-781, slip op. at 8 (U.S. 29 April 2026). Which would necessarily include online, because First Amendment rights exist online as well as off. *Reno v. American Civil Liberties Union*, 521 US 844, 870 (1997). In other words, people have the right to speak and convene online anonymously as much as they have the right to offline. But age verification jeopardizes that right, because there is no way to ask, "How old are you?" without also inherently asking,

---

Mike Masnick, *Another Day, Another Age Verification Data Breach: Discord's Third-Party Partner Leaked Government IDs*, TECHDIRT (Oct. 7, 2025), https://www.techdirt.com/2025/10/07/another-day-another-age-verification-data-breach-discords-third-party-partner-leaked-government-ids/.

[23] And not just their privacy with respect to the expression on the site that they are verifying for, but potentially the greater details of their lives, now available to third parties the user never authorized. *See*, *e.g.*, Mike Masnick, *Hackers Expose The Massive Surveillance Stack Hiding Inside Your "Age Verification" Check*, TECHDIRT (Feb. 25, 2026), https://www.techdirt.com/2026/02/25/hackers-expose-the-massive-surveillance-stack-hiding-inside-your-age-verification-check/.

"Who are you?"[24] Per the Constitution the latter is a question no one should be obligated to answer to be able to speak, and yet with a law like Louisiana's, everyone, including adults, would have to.

As a result, despite Louisiana's contention that this law only impacts some young people, AG.Br.49, it is not just young people for whom the Act functions as a content ban; for those adults who do not want to pay the steep cost in privacy, anonymity, or security to access the websites they otherwise should be free to access, the Louisiana law is also effectively functioning as an unconstitutional content ban for them too.

## II.    If the Act is not enjoined, it will open the floodgates to more such laws and their harm.

Amicus Copia Institute is not currently covered by the Act's requirements. For example, it is an exempt news site, La. R.S. § 51:1751(12)(b)(iv), and it has fewer than 5,000,000 users. La. R.S. § 51:1751(11). But it can take little comfort in that assessment, because while today the law may not reach an entity like the Copia Institute, tomorrow it might. The company may, for instance, grow. While today it does not have 5,000,000 user accounts someday it could, and not necessarily

---

[24] Even simply taking a picture of someone's face for age-estimation purposes still captures their identity. *See* Shoshana Weissmann, *Kids Don't Have IDs And Age-Estimation Tech Is Frequently Very Wrong*, TECHDIRT (May 23, 2025), https://www.techdirt.com/2025/05/23/kids-dont-have-ids-and-age-estimation-tech-is-frequently-very-wrong/.

with a commensurate increase in revenue to fund the infrastructure needed to comply with the Act. *See* discussion *supra* Section I.b. And even small sites like Techdirt can still attract large audiences.[25] The very point of the Copia Institute enterprise is to reach and influence people. Every expressive business aspires to grow, yet laws like Louisiana's create policy pressure stifling growth. Especially because websites like Techdirt and others with relatively small revenue streams but potentially large userbases can end up on a collision course with the law as they grow more popular, where suddenly they find themselves taking on more and more regulatory obligations dictating how they may continue to engage with their readership—but without necessarily a commensurate increase in resources necessary to comply with them, or cope with the consequences if they cannot.

Furthermore, if it is up to the government to decide whether the Copia Institute's speech qualifies for an exemption, that is the exact sort of content-based determination the First Amendment forbids state actors to make. *TikTok Inc.*, 145 S. Ct. at 66-67. And if it were to be subject to it, it would both need to somehow fund the costs of compliance—and not only to verify age but also parental consent, which would require somehow knowing who is legitimately a custodial parent able

---

[25] For instance, in 2005 Copia Institute founder and Techdirt editor Michael Masnick coined the term, "the Streisand Effect," as part of his commentary. It is a term that has had significant staying power, remaining in common parlance as a term for discussing the unwanted attention ill-considered attempts at censorship might unleash. *See* https://en.wikipedia.org/wiki/Streisand_effect.

to give it—but its ability to raise revenue would be hobbled by the overbroad advertisement provision, which, as NetChoice notes, threatens more advertising and expression altogether than just any that might implicate a user privacy concern. NC.Br.41. Indeed, if Louisiana's arguments about the lack of constitutional protection for commercial speech were correct, AG.Br.64, taken to their logical extension no expressive business could count on its expression being protected by the First Amendment if it were monetized at all, which would wipe away two centuries of press protection, among other effects, by making expressive businesses impossible to financially sustain.

But even though it is not currently subject to its requirements directly, the Copia Institute is still impacted by the Act. It writes to be read, and this law makes sure that fewer can read it. After all, the Copia Institute doesn't speak in a vacuum; it avails itself of other platforms, including those Louisiana might deem "social media" platforms, to spread its message and connect with audiences. The cost of complying with the law may cause some of those platforms to become unavailable, either entirely, or to a shrinking universe of readers if the requirements of complying with the law leads to some of these platforms ceasing to serve users in Louisiana.[26]

---

[26] *See, e.g.*, Megan Farokhmanesh, *Bluesky Goes Dark in Mississippi Over Age Verification Law*, WIRED (Aug. 22, 2025), https://www.wired.com/story/bluesky-goes-dark-in-mississippi-age-verification/ (describing how a social media platform found itself having to refuse service to people in Mississippi after the age-related law challenged in *NetChoice v. Fitch* ceased to be enjoined).

But even if the platform complies with Louisiana's rules, the universe of readers will still shrink as a result of some users being unwilling or unable to maintain access to these platforms, which is a blow to the platforms' own expressive interest in fostering vibrant user communities, *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2401-2403 (2024), that this law will now depopulate.  ROA.6569.  And even the Copia Institute might itself lose access, rather than risk uploading sensitive personal documents to maintain access to these social media platforms.  The irony would be that while the Copia Institute is publishing coverage about this very law affecting so many people in Louisiana, if this law is allowed to go into effect it will come at the expense of its ability to tell them.

And then there is the problem that even if the Act in its current form did not reach the Copia Institute, if it were constitutionally permissible then Louisiana could someday change its terms to reach a company like the Copia Institute.  Furthermore, it is not just Louisiana making these sorts of demands of social media platforms and their users.  If Louisiana can enforce its law then so can 49 other states and a potentially unlimited number of local entities, each imposing their own potentially conflicting age rules on social media platforms.  Which is why *any* law that attempts to divide access to information technology by anything connected with a user's identity, including and especially age, is inherently suspect.  Each one should be

subject to heightened scrutiny—and, indeed, strict scrutiny—because their effects will inevitably be so deleterious to the speech rights of so many.

And no one should need to wait for those effects to be fully felt before bringing forth such a challenge. An as-applied challenge for how someone has been hurt describes the same constitutional injury that one fears when bringing a facial one, which the First Amendment is supposed to keep anyone from experiencing, especially not when, as here, such an injury is so easy to anticipate based on the coercive way the law is designed to function. Injunctive relief should be available immediately to forestall such harm because it satisfies the criteria. *See Winter v. Nat. Res. Council, Inc.*, 555 U.S. 7, 20 (2008). As Justice Kavanaugh predicted in a similar case, a constitutional challenge of an age-gating law is likely to succeed, *NetChoice, LLC v. Fitch*, 145 S. Ct. 2658, 2658 (2025) (Kavanaugh, J., concurring in denial of application to vacate stay), because laws like these are blunt instruments and not the delicate regulatory scalpels the First Amendment requires of state action intersecting with speech so that no more speech is burdened than satisfying the government interest would require.

Still, even if the likelihood of success on the merits were a closer call the likelihood of harm consideration would still compel such preliminary injunctive relief. After all, if a valid age-gating law were to be delayed for a bit while the challenge to it is adjudicated, no one is any worse off than they had been yesterday,

last year, or any previous decade.  Social media-like information technology systems have been in use for years, whether as independently-run bulletin board systems,[27] more corporately-run dial-up systems like Prodigy,[28] CompuServe,[29] and America Online,[30] which have their roots in the 1980s, Internet-based public-protocol[31] USENET newsgroups,[32] as frequently used in the 1990s, or bespoke, independently-run web-based forums, which may still be in use.[33]  While some of plaintiff NetChoice's members may be of more recent vintage than these other technologies, similar sorts of "social media" online interconnectivity as what they provide have been available for upwards of forty years, and generations of young people using them have grown up successfully without Louisiana interfering with their use.

But if these facially-unconstitutional laws are allowed to go into effect, the harm will be severe and sudden: everyone whose online expressive activities are

---

[27] See https://en.wikipedia.org/wiki/Bulletin_board_system.

[28] *See* https://en.wikipedia.org/wiki/Prodigy_(online_service).

[29] *See* https://en.wikipedia.org/wiki/CompuServe.

[30] *See* https://en.wikipedia.org/wiki/AOL.

[31] *See* Mike Masnick, *Protocols, Not Platforms: A Technological Approach to Free Speech*, TECHDIRT (Aug. 28, 2019), https://www.techdirt.com/2019/08/28/protocols-not-platforms-technological-approach-to-free-speech/.

[32] *See* https://en.wikipedia.org/wiki/Usenet.

[33] *See, e.g.*, https://www.phpbb.com/.  This software is one of several open-source solutions allowing people to self-host their own online forums on any topic they wish to build a community and discussion around.  *See also* https://www.forumrankings.net/software/phpbb (listing examples of forum sites running that software, with additional lists of examples running other types of forum software).

impinged will be denied the Constitution's protection. But the First Amendment does not have an off-switch; its text does not read that the government can make no law abridging the freedom of speech except during the pendency of litigation challenging its abridgement. The Constitution protects rights every hour of every day, and there is no constitutional mechanism that allows them to be unilaterally taken away from everyone, even temporarily.

## CONCLUSION

The injunction should be sustained.

Dated: June 2, 2026

By: /s/ Catherine R. Gellis
Catherine R. Gellis, Esq.
3020 Bridgeway #247
Sausalito, CA 94965
Telephone: 202-642-2849
Email: cathy@cgcounsel.com

*Counsel for Amicus Curiae*

28

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS
PURSUANT TO FED. R. APP. P. 32(a)(7)(C)**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1.     This Brief of Amicus Floor64, Inc. d/b/a The Copia Institute complies with the word limit of Fed. R. App. P. 29(c)(2) because this brief contains 5171 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: June 2, 2026                By:  /s/ Catherine R. Gellis__

                                    Catherine R. Gellis

                                    *Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on June 2, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: June 2, 2026                    By:  /s/ Catherine R. Gellis

                                       Catherine R. Gellis

                                       *Counsel for Amicus Curiae*