Case No. 26-30016

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

NETCHOICE,

*Plaintiff-Appellee,*

v.

LIZ MURRILL, in her official capacity as Attorney General of Louisiana, *et al.*,

*Defendants-Appellants.*

_____

On Appeal from the U.S. District Court for the Middle District of Louisiana
No. 3:25-cv-231

_____

## BRIEF OF AMICI CURIAE AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF LOUISIANA, CENTER FOR DEMOCRACY & TECHNOLOGY, ELECTRONIC FRONTIER FOUNDATION, FREEDOM TO READ FOUNDATION, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, LGBT TECH, AND WIKIMEDIA FOUNDATION IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE

_____

Cody Venzke
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
915 15th St. NW
Washington, DC 20005
Email: cvenzke@aclu.org
Tel.: (202) 457-0800
*Licensed only in California.*
*Application pending in the District of Columbia.*

Vera Eidelman
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
125 Broad Street, 18 Fl.
New York, NY 10004
Email: veidelman@aclu.org
Tel.: (212) 549-2500

Nora Ahmed
ACLU FOUNDATION OF LOUISIANA
1340 Poydras St., Suite 2160
New Orleans, Louisiana 70112
Tel: (504) 522-0628

Aaron Mackey
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, California 94109
Email: amackey@eff.org
Tel.: (415) 436-9333

*Counsel for Amici Curiae*

# CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 5th Cir. R. 29.2, the undersigned counsel of record submit the following certificate of interested parties as described in 5th Cir. R. 28.2.1.

Amici curiae American Civil Liberties Union, ACLU of Louisiana, Center for Democracy & Technology, Electronic Frontier Foundation, Freedom to Read Foundation, Foundation for Individual Rights and Expression, LGBT Tech, and Wikimedia Foundation state that they do not have a parent corporation and that no publicly held corporation owns 10 percent or more of their stock.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualifications or recusal.

| Person or Entity | Connection to Case |
| --- | --- |
| American Civil Liberties Union | Amicus curiae |
| American Civil Liberties Union of Louisiana | Amicus curiae |
| Center for Democracy & Technology | Amicus curiae |
| Electronic Frontier Foundation | Amicus curiae |
| Freedom to Read Foundation | Amicus curiae |

| | |
|---|---|
| Foundation for Individual Rights and Expression | Amicus curiae |
| LGBT Tech | Amicus curiae |
| Wikimedia Foundation | Amicus curiae |
| Cody Venzke | Counsel for amici |
| Vera Eidelman | Counsel for amici |
| Nora Ahmed | Counsel for amici |
| Aaron Mackey | Counsel for amici |
| NetChoice | Plaintiff-Appellee |
| Scott A. Keller | Counsel for Plaintiff-Appellee |
| Claire Elizabeth Juneau | Counsel for Plaintiff-Appellee |
| Jeremy Evan Maltz | Counsel for Plaintiff-Appellee |
| Liz Murrill | Defendant-Appellant |
| Mike Dupree | Defendant-Appellant |
| Jorge Benjamin Aguinaga | Counsel for Defendants-Appellants |
| Zachary Faircloth | Counsel for Defendants-Appellants |
| Joshua Simon Force | Counsel for Defendants-Appellants |
| James M. Garner, Esq. | Counsel for Defendants-Appellants |
| Jeffrey Darren Kessler | Counsel for Defendants-Appellants |

Dated: June 2, 2026                    By: */s/ Vera Eidelman*
                                            Vera Eidelman

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

STATEMENT OF INTEREST OF AMICI .......................................................... 1

INTRODUCTION ............................................................................................... 4

ARGUMENT ....................................................................................................... 7

    I.  THE ACT REGULATES PROTECTED SPEECH .................................... 7

        A. Minors and Adults Rely on Social Media to Engage in a
            Diverse Range of Protected Expression ............................................ 7

        B. The First Amendment Protects the Vast Majority of Social
            Media Activity for Minors and Adults Alike .................................. 11

    II.  THE ACT'S CONTENT-BASED RESTRICTIONS VIOLATE
        MINORS' AND ADULTS' FIRST AMENDMENT RIGHTS ............... 14

        A. The Act Impermissibly Prohibits Minors from Accessing
            and Engaging in Protected Speech on Certain Topics
            Without Parental Consent ............................................................... 15

        B. The Act Also Burdens the First Amendment Rights of
            Adults and Minors by Imposing Age Verification ........................ 17

            1. Many verification requirements will either chill or
               entirely block access to lawful speech ................................. 18

            2. Online age verification impermissibly burdens the
               right to speak and access information anonymously
               online .................................................................................. 20

            3. Many age verification systems put internet users'
               sensitive data at risk ............................................................ 22

CONCLUSION ................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Gonzales*,
478 F. Supp. 2d 775 (E.D. Pa. 2007)......................................................22

*ACLU v. Mukasey*,
534 F.3d 181 (3d Cir. 2008) ...................................................................22

*ACLU v. Reno,*
31 F. Supp. 2d 473 (E.D. Pa. 1999).........................................................2

*ACLU v. Reno*,
929 F. Supp. 824 (E.D. Pa. 1996).............................................................2

*American Amusement Machine Association v. Kendrick*,
244 F.3d 572 (7th Cir. 2001) ......................................................... 13, 14

*American Booksellers Foundation v. Dean*,
342 F.3d 96 (2d Cir. 2003) ........................................................... 19, 20

*Ashcroft v. ACLU*,
542 U.S. 656 (2004)................................................................................18

*Brown v. Entertainment Merchants Association*,
564 U.S. 786 (2011)................................................ 6, 7, 12, 13, 16, 17

*City of Austin v. Reagan National Advertising of Austin, LLC*,
596 U.S. 61 (2022).................................................................................14

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975)....................................................................... 13, 17

*Free Speech Coalition, Inc. v. Paxton*,
606 U.S. 461 (2025)................................................. 1, 5, 6, 12, 13, 18

*In re Anonymous Online Speakers*,
661 F.3d 1168 (9th Cir. 2011) ...............................................................21

ii

*Mahanoy Area School District v. B.L.*,
    594 U.S. 180 (2021)................................................................1, 7

*McIntyre v. Ohio Elections Commission*,
    514 U.S. 334 (1995)...................................................................21

*Moody v. NetChoice*,
    603 U.S. 707 (2024)............................................................ 15, 18

*NetChoice v. Carr*,
    789 F. Supp. 3d 1200 (N.D. Ga. 2025).....................................6

*NetChoice, LLC v. Bonta*,
    170 F.4th 744 (9th Cir. 2026) ......................................... 2, 6, 14

*NetChoice, LLC v. Bonta*,
    770 F. Supp. 3d 1164 (N.D. Cal. 2025)....................................6

*NetChoice, LLC v. Griffin*,
    No. 23-5105, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ..............6

*NetChoice, LLC v. Reyes*,
    748 F. Supp. 3d 1105 (D. Utah 2024)......................................6

*NetChoice, LLC v. Yost*,
    778 F. Supp. 3d 923 (S.D. Ohio 2025) ....................................6

*Packingham v. North Carolina*,
    582 U.S. 98 (2017)........................................................ 1, 4, 7

*PSINet, Inc. v. Chapman*,
    167 F. Supp. 2d 878 (W.D. Va. 2001)....................................22

*PSINet, Inc. v. Chapman*,
    362 F.3d 227 (4th Cir. 2004) ........................................ 19, 21, 22

*Reno v. ACLU*,
    521 U.S. 844 (1997)................................................ 1, 13, 16, 19, 21

*Snyder v. Phelps*,
    562 U.S. 443 (2011).....................................................................7

*State v. Weidner*,
    611 N.W.2d 684 (Wis. 2000)..............................................................22

*Tinker v. Des Moines Independent Community School District*,
    393 U.S. 503 (1969).........................................................................1

*Volokh v. James*,
    148 F.4th 71 (2d Cir. 2025) .............................................................2

*Volokh v. James*,
    267 N.E.3d 1245 (N.Y. 2025)...........................................................3

*West Virginia State Board of Education v. Barnette*,
    319 U.S. 624 (1943).......................................................................13

**Statutes**

Driver Privacy Protection Act, 18 U.S.C. §§ 2721–25............................................22

La. Stat. Ann. §§ 51:1751–1759 ........................................................ 5, 14, 17

Tex. Bus. & Com. Code Ann. § 120.001 ..............................................................15

**Other Authorities**

Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed,'*
    BBC (Nov. 28, 2020), https://www.bbc.com/news/av/uk-55079954 ................11

Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep
    Dive into the Technology of Corporate Surveillance*, EFF Deeplinks Blog
    (Dec. 2, 2019), https://perma.cc/7B5F-S376 .....................................................23

Brief for FIRE as Amicus Curiae Supporting Respondents,
    *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) (Nos. 22-277, 22-555).............3

Brief for FIRE et al. as Amici Curiae Supporting Petitioner,
    *Anthropic PBC v. U.S. Department of War* (D.C. Cir. filed Apr. 22, 2026)
    (No. 26-1049)..............................................................................3

Brief for FIRE et al. as Amici Curiae Supporting Petitioners,
    *TikTok Inc. v. Garland*, 604 U.S. 56 (2025) (No. 24-656)................................3

iv

Brooke Auxier, *Social Media Continue to Be Important Political Outlets for Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020), https://perma.cc/DT56-RGG5..................................................................10

Carrie Back, *How Indigenous Creators Are Using TikTok to Share Their Cultures*, Travel & Leisure (Oct. 21, 2022), https://perma.cc/N7PT-Z784 .......10

Christopher St. Aubin & Jacob Liedke, *News Platform Fact Sheet*, Pew Rsch. Ctr. (Sept. 17, 2024), https://perma.cc/Y8FW-FLVA ...............................8

Claire Cain Miller, *For One Group of Teenagers, Social Media Seems a Clear Net Benefit*, N.Y. Times (May 24, 2023), https://perma.cc/A4TK-ED3R......................................................................................................11

Dan Goodin, *Discord Says Hackers Stole Government IDs of 70,000 Users*, Ars Technica (Oct. 9, 2025), https://perma.cc/98KD-4YDX............................23

*Digital Advertising in the United States – Statistics & Facts*, Statista (May 20, 2025), https://perma.cc/Y9P9-VZB7............................................................23

Douglas A. Blackmon et al., *Birth of a Movement*, Wall St. J. (Oct. 29, 2010), https://perma.cc/DX44-R46A.........................................................8

Elizabeth Dias, *Facebook's Next Target: The Religious Experience*, N.Y. Times (July 25, 2021), https://perma.cc/8HEX-JJAY .........................................9

Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key Findings from Pew Research Center Surveys*, Pew Rsch. Ctr. (Apr. 24, 2023), https://perma.cc/6FC6-L3MA ................................................................9

Erica Chen et al., *Online Social Networking and Mental Health Among Older Adults: A Scoping Review*, 41 Canadian J. on Aging 26 (2022), https://perma.cc/J7NL-3UKZ ...............................................................11

Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the Reality of Being Sick*, Teen Vogue (Sept. 22, 2022), https://perma.cc/3SBJ-4K5R ...............................................................10

*France Opens Formal Probe Into Teenage Suspect in Massive ID Data Breach*, Reuters (Apr. 30, 2026), https://perma.cc/5DHR-A5F4......................24

v

J.L. Heinze, *Online Communities for Survivors: Websites and Resources Offering Support and Health*, Nat'l Sexual Violence Res. Ctr. (Mar. 1, 2022), https://perma.cc/7J6K-2HTW ................................................................10

Jason Kelley, *Thousands of Young People Told Us Why the Kids Online Safety Act Will Be Harmful to Minor*s, EFF Deeplinks Blog (Mar. 15, 2024), https://perma.cc/SGL7-3YY7......................................................9

Jessica L. Hamilton et al., *Re-Examining Adolescent Social Media Use and Socioemotional Well-Being Through the Lens of the COVID-19 Pandemic*, 17 Persps. Psych. Sci. 662 (2022), https://perma.cc/N8VQ-8A4N ................................................................................................11

Jillian Andres Rothschild et al., Univ. Md. Ctr. for Democracy & Civic Engagement, *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge* 2 (2024), https://perma.cc/DL9A-5T8L................................................................................................19

Joely Johnson Mork, *Teen's Online Church Draws Young People from Around the World*, Faith & Leadership (Aug. 23, 2016), https://perma.cc/63CJ-VCS3 ..................................................................9

Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, Verge (July 27, 2021), https://perma.cc/9AWZ-9QDA ........................10

Keith N. Hampton & Inyoung Shin, *Disconnection More Problematic for Adolescent Self-Esteem Than Heavy Social Media Use: Evidence from Access Inequalities and Restrictive Media Parenting in Rural America*, 41 Soc. Sci. Comput. Rev. 626 (2023), https://perma.cc/YHH8-VQC7............11

Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Rsch. Ctr. (Sept. 5, 2013), https://perma.cc/5BUP-J96F......................................................21

Mary Madden et al., Common Sense & Hopelab*, A Double-Edged Sword: How Diverse Communities of Young People Think About the Multifaceted Relationship Between Social Media and Mental Health* (2024), https://perma.cc/4FXU-664F ..................................................8

Matt Burgess, *When Face Recognition Doesn't Know Your Face Is a Face*, Wired (Oct. 15, 2025), https://perma.cc/9DEK-4HDW ....................................20

vi

Michael J. Hanmer & Samuel B. Novey, Univ. Md. Ctr. for Democracy & Civic Engagement, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies* (2023), https://perma.cc/X7JS-J7R7 .......................................................................................................19

Nick Evershed & Josh Nicholas, *Social Media Ban Trial Data Reveals Racial Bias in Age Checking Software: Just How Inaccurate Is It?*, The Guardian (Sept. 18, 2025), https://perma.cc/LX46-34S8 ..................................20

Pieter Arntz, *Age Verification Vendor Persona Left Frontend Exposed, Researchers Say*, Malwarebytes Labs (Feb. 20, 2026), https://perma.cc/94A9-7C82 ...............................................................................23

*Project: The Robloxian Christians*, Exponential, https://perma.cc/T3DH-HDFB .....................................................................................................................10

Rainier Harris, *How Young People Use Social Media to Engage Civically*, PBS (Nov. 5, 2020), https://perma.cc/C434-65F4 ...............................................11

Ramona Alaggia & Susan Wang, *"I Never Told Anyone Until the #MeToo Movement": What Can We Learn from Sexual Abuse and Sexual Assault Disclosures Made Through Social Media?*, 103 Child Abuse & Neglect 1 (2020), https://perma.cc/V2KA-JFF2 ..................................................................8

Rebecca Heilweil, *Religious Leaders Are Becoming Content Creators to Keep Their Followers Engaged*, Vox (Sept. 18, 2020), https://perma.cc/36HP-CVC3 ................................................................................9

Richard Power, Carnegie Mellon CyLab, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers* (2011), https://perma.cc/RR56-VE2H ..................................24

Rindala Alajaji, *Age Verification, Estimation, Assurance, Oh My! A Guide to the Terminology*, EFF Deeplinks Blog (Oct. 30, 2025), https://perma.cc/G644-WKZZ....................................................................20

Samuel Bestvater et al., *Americans' Views of and Experiences with Activism on Social Media*, Pew Rsch. Ctr. (June 29, 2023), https://perma.cc/CQF7-E6DE .......................................................................................................................9

Sarah Kendal et al., *How a Moderated Online Discussion Forum Facilitates Support for Young People with Eating Disorders*, 20 Health Expectations 98 (Feb. 2017), https://perma.cc/B9Q4-RRNR ...............................................22

Tracy Kitten, Javelin, *Child Identity Fraud: A Web of Deception and Loss* (2021), https://perma.cc/Z9P4-2U4B .................................................24

Tully O'Neill, *"Today I Speak": Exploring How Victim-Survivors Use Reddit*, 7 Int'l J. for Crime, Just. & Soc. Democracy 44 (2018), https://perma.cc/8ZS7-UV77 ...............................................10

Victoria Rideout et al., Common Sense, *The Common Sense Census: Media Use by Tweens and Teens* 41 (2021), https://perma.cc/2MUC-WT78 .................9

## **STATEMENT OF INTEREST OF AMICI**[1]

The American Civil Liberties Union ("ACLU") is a nationwide, nonpartisan, nonprofit organization. The American Civil Liberties Union of Louisiana is a state affiliate of the ACLU. Both organizations are dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws, including freedom of speech. They frequently advocate for First Amendment rights online, *see, e.g.*, *Reno v. ACLU*, 521 U.S. 844 (1997) (counsel); *Packingham v. North Carolina*, 582 U.S. 98 (2017) (amicus), *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461 (2025) (counsel), and the free speech rights of young people, *see, e.g.*, *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180 (2021) (counsel); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (counsel).

The Center for Democracy & Technology ("CDT") is a non-profit public interest organization. For thirty years, CDT has represented the public's interest in an open, decentralized Internet and worked to ensure that the constitutional and democratic values of free expression and privacy are protected in the digital age. CDT regularly advocates before legislatures, regulatory agencies, and courts in support of First Amendment rights on the Internet, including limits on governmental

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(a)(4)(E), amici certify that no person or entity, other than amici curiae, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties have consented to the filing.

authority to compel or silence speech, and in support of privacy protections for online users.

The Electronic Frontier Foundation ("EFF") is a non-profit civil liberties organization with more than 30,000 active members that has worked for 35 years to ensure that technology supports freedom, justice, and innovation for all people of the world. EFF is dedicated to protecting online users' free expression and privacy rights and has fought for both in courts and legislatures across the country. EFF has challenged laws that burden internet users' rights by requiring online services to verify users' ages. *See, e.g.*, *ACLU v. Reno*, 929 F. Supp. 824 (E.D. Pa. 1996) (serving as a plaintiff challenging the Communications Decency Act); *ACLU v. Reno,* 31 F. Supp. 2d 473 (E.D. Pa. 1999) (serving as a plaintiff challenging the Child Online Protection Act).

The Foundation for Individual Rights and Expression ("FIRE") is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended these rights nationwide without regard to speakers' views, through public advocacy, strategic litigation, and participation as amicus curiae in cases involving expressive rights, including in the digital realm. *See, e.g.*, *NetChoice, LLC v. Bonta*, 170 F.4th 744 (9th Cir. 2026); *Volokh v. James*, 148 F.4th 71 (2d Cir. 2025), *certifying questions to* N.Y. Ct. App., 267 N.E.3d 1245 (N.Y.

2025) *accepting certified question*; *see also* Br. for FIRE et al. as Amici Curiae Supp. Pet'r, *Anthropic PBC v. U.S. Dep't of War* (D.C. Cir. filed Apr. 22, 2026) (No. 26-1049); Br. for FIRE et al. as Amici Curiae Supp. Pet'rs, *TikTok Inc. v. Garland*, 604 U.S. 56 (2025) (No. 24-656); Br. for FIRE as Amicus Curiae Supp. Resp'ts, *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) (Nos. 22-277, 22-555).

The Freedom to Read Foundation ("FTRF") is a nonprofit organization established to foster libraries as institutions that fulfill the promise of the First Amendment; support the rights of libraries to include in their collections and make available to the public any work they may legally acquire, including a broad array of authors and viewpoints; establish legal precedent for the freedom to read of all persons; and protect the public against efforts to suppress or censor speech.

LGBT Tech is a nonprofit organization dedicated to promoting technology adoption and advocacy within the lesbian, gay, bisexual, transgender, queer, and questioning ("LGBTQ+") community. LGBT Tech encourages the adoption and use of cutting-edge, new and emerging technologies by providing information, education, and strategic outreach. An important function of LGBT Tech is to advocate for policies that benefit the LGBTQ+ community, including by filing amici curiae briefs. LGBT Tech has a significant interest in the outcome of this case and believes that LGBTQ+ individuals, including LGBTQ+ youth, should be able to engage in fully protected expression, free from governmental interference.

Specifically, LGBT Tech recognizes that online platforms are crucial for LGBTQ+ individuals, especially youth, to access vital information, community support, and resources that may not be available in their immediate physical environments.

The Wikimedia Foundation ("Wikimedia") is a non-profit organization based in San Francisco, California, USA, that operates fourteen free-knowledge projects on the Internet, including Wikipedia. Wikimedia's mission is to develop and maintain factual and educational content created and moderated by volunteer contributors, and to provide this content to people around the world. Wikimedia provides this content free of charge and is not funded by advertising and relies on donations and philanthropic grants to provide its services.

## INTRODUCTION

People rely on social media to keep up to date on the news, engage with elected officials and religious leaders, connect with friends, create art, and build movements. Social media allows minors and adults to discover new perspectives, discuss social and political issues, and develop a better understanding of others' beliefs. In the words of the Supreme Court, it holds "vast democratic forums" with the "potential to alter how we think, express ourselves, and define who we want to be." *Packingham v. North Carolina*, 582 U.S. 98, 104, 106 (2017) (first citation omitted). That social media also carries content that many find noxious, inaccurate, and offensive does not diminish its First Amendment protection.

Louisiana's Secure Online Child Interaction and Age Limitation Act ("the Act") violates the First Amendment rights of minors and adults to access and engage in protected speech online in two ways. First, it requires every "social media platform" to verify the age of all "Louisiana account holders," and second, it requires minors under the age of 16 to demonstrate that they have parental consent to access the platform. S.B. 162, Act No. 456, Reg. Sess. (La. 2024) (codified at La. Stat. Ann. §§ 51:1751–1759). It applies to platforms that allow social interaction—but not if "the predominant or exclusive function" is streaming "licensed media," offering "[n]ews, sports, entertainment" or other "preselected" content, "[o]nline shopping," or "[i]nteractive" or "virtual gaming." *Id*. § 51:1751(12)(b).

As a result of the Act, all minors under 16 who cannot obtain parental consent or are unable to prove it will have their access blocked. Anyone over 16 who cannot verify their age or is unwilling to do so will be similarly restricted. And all users will lose their ability to speak anonymously online and face increased risks of privacy invasions and data breaches.

Because the Act is a content-based law that applies to speech that is protected for both adults and minors, it is subject to strict scrutiny and the limited holding of *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461 (2025) does not control. Central to the Supreme Court's analysis in that case was its assessment that the law at issue targeted sexual material that is "harmful to minors," a category of speech that minors

5

have no First Amendment right to view. *Paxton*, 606 U.S. at 473–74, 481. Because Texas could lawfully restrict minors' access to that sexual material, any impact on adults was merely "incidental" and subject to intermediate scrutiny. *Id.* at 483. In contrast, the Act directly targets speech that is protected for both adults and minors, including the plethora of political, religious, artistic, and educational content available on social media. The burdens imposed by the Act are consequently in no way "incidental" and the analysis in *Paxton* is inapposite.

While Louisiana has a legitimate interest in protecting minors from harm, "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011). In part for this reason, courts, including the district court below, have struck down similar social media restrictions around the country.[2]

This Court should affirm.

---

[2] *See NetChoice, LLC v. Griffin*, No. 23-5105, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025), *appeal docketed*, No. 25-1889 (8th Cir. May 2, 2025); *NetChoice v. Carr*, 789 F. Supp. 3d 1200 (N.D. Ga. 2025), *appeal docketed*, No. 12436 (11th Cir. July 16, 2025); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923 (S.D. Ohio 2025), *appeal docketed*, No. 25-3371 (6th Cir. May 13, 2025); *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164 (N.D. Cal. 2025), *aff'd in part*, 170 F.4th 744 (9th Cir. 2026); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024), *appeal docketed sub nom. NetChoice, LLC v. Brown*, No. 24-4100 (10th Cir. Oct. 11, 2024).

## ARGUMENT

### I.  THE ACT REGULATES PROTECTED SPEECH.

#### A.  Minors and Adults Rely on Social Media to Engage in a Diverse Range of Protected Expression.

Social media plays a crucial role in the exercise of First Amendment rights today. Social media platforms are "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard," and creates "places where [people] can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104, 107.

Valuable, positive expression and connection regularly take place on social media. At the same time, people can share distressing information or engage in negative interactions—and that does not make the content any less protected. *See, e.g., Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (speech is protected even if deeply offensive to listeners); *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 190 (2021) (minors have a right to engage in profane speech on social media). The presence of upsetting content is not unique to social media and, just as the government could not ban minors from reading newspapers (which contain distressing news) or showing up at town hall meetings (which might have heated public debate), the government cannot ban minors from accessing protected expression online simply because of its communicative impact. *See Brown*, 564 U.S. at 790 (holding that the First Amendment applies to new forms of communication regardless of their aesthetic and

7

moral value).

Young people, like adults, use social media for speech that is plainly protected by the Constitution—gathering news, political expression and advocacy, artistic creation, religious worship, and cultivating life-saving connections.

Users routinely get their news online. For instance, 80% of Black young people, 69% of Latino young people, and 65% of white young people rely on social media to stay informed.[3] And 54% of American adults "at least sometimes" get their news from social media.[4]

Social media is also central to political movements, from the Tea Party[5] to #MeToo.[6] Nearly half of American social media users say they have been politically active on social media, whether by participating in a political group, encouraging others to act, looking up rallies or protests, or using hashtags to show support for a

---

[3] Mary Madden et al., Common Sense & Hopelab, *A Double-Edged Sword: How Diverse Communities of Young People Think About the Multifaceted Relationship Between Social Media and Mental Health* 17 (2024), https://perma.cc/4FXU-664F.

[4] Christopher St. Aubin & Jacob Liedke, *News Platform Fact Sheet*, Pew Rsch. Ctr. (Sept. 17, 2024), https://perma.cc/Y8FW-FLVA.

[5] Douglas A. Blackmon et al., *Birth of a Movement*, Wall St. J. (Oct. 29, 2010), https://perma.cc/DX44-R46A.

[6] Ramona Alaggia & Susan Wang, *"I Never Told Anyone Until the #MeToo Movement": What Can We Learn from Sexual Abuse and Sexual Assault Disclosures Made Through Social Media?*, 103 Child Abuse & Neglect 1, 4 (2020), https://perma.cc/V2KA-JFF2.

cause.[7]

Social media is also a site of artistic creation. In one study, 71% of teens reported that social media is "a place where they can show their creative side."[8] "In any given day, about one in 10 tweens and teens will use their digital devices to create some type of art or music."[9] In addition, minors and young adults report that the internet helps them learn about art and music.[10]

Places of worship use social media to share information about events, livestream services, and foster community, including with young people.[11] One young person even created "The Robloxian Christians," a place for kids on a gaming platform to pray for one another and talk about their faith.[12] It is now a "youth-led

---

[7] Samuel Bestvater et al., *Americans' Views of and Experiences with Activism on Social Media*, Pew Rsch. Ctr. (June 29, 2023), https://perma.cc/CQF7-E6DE.

[8] Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key Findings from Pew Research Center Surveys*, Pew Rsch. Ctr. (Apr. 24, 2023), https://perma.cc/6FC6-L3MA.

[9] Victoria Rideout et al., Common Sense, *The Common Sense Census: Media Use by Tweens and Teens* 41 (2021), https://perma.cc/2MUC-WT78.

[10] Jason Kelley, *Thousands of Young People Told Us Why the Kids Online Safety Act Will Be Harmful to Minor*s, EFF Deeplinks Blog (Mar. 15, 2024), https://perma.cc/SGL7-3YY7.

[11] Rebecca Heilweil, *Religious Leaders Are Becoming Content Creators to Keep Their Followers Engaged*, Vox (Sept. 18, 2020), https://perma.cc/36HP-CVC3; Elizabeth Dias, *Facebook's Next Target: The Religious Experience*, N.Y. Times (July 25, 2021), https://perma.cc/8HEX-JJAY.

[12] Joely Johnson Mork, *Teen's Online Church Draws Young People from Around the World*, Faith & Leadership (Aug. 23, 2016), https://perma.cc/63CJ-VCS3.

virtual church ministry serving upwards of 40,000 young people from over 85 countries."[13]

Finally, social media enables individuals whose voices might otherwise not be heard to make vital and even lifesaving connections, and to share their unique perspectives.[14] For example, people with disabilities use social media to build community, reduce isolation and stigma, and educate others.[15] Survivors of domestic violence rely on the accessibility and anonymity of online communities to seek advice and resources.[16] Social media use has been shown to reduce loneliness, social isolation, and depression in rural and elderly populations, both of which face limited

---

[13] *Project: The Robloxian Christians*, Exponential, https://perma.cc/T3DH-HDFB.

[14] *See*, *e.g.*, Brooke Auxier, *Social Media Continue to Be Important Political Outlets for Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020), https://perma.cc/DT56-RGG5; Carrie Back, *How Indigenous Creators Are Using TikTok to Share Their Cultures*, Travel & Leisure (Oct. 21, 2022), https://perma.cc/N7PT-Z784.

[15] Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the Reality of Being Sick*, Teen Vogue (Sept. 22, 2022), https://perma.cc/3SBJ-4K5R; Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, Verge (July 27, 2021), https://perma.cc/9AWZ-9QDA.

[16] Tully O'Neill, *"Today I Speak": Exploring How Victim-Survivors Use Reddit*, 7 Int'l J. for Crime, Just. & Soc. Democracy 44, 44–45 (2018), https://perma.cc/8ZS7-UV77; *see also*, *e.g.*, J.L. Heinze, *Online Communities for Survivors: Websites and Resources Offering Support and Health*, Nat'l Sexual Violence Res. Ctr. (Mar. 1, 2022), https://perma.cc/7J6K-2HTW.

mobility and decreased ability to socialize in person.[17] And many young LGBTQ+ people who face discrimination and judgment offline turn to social media for community and support.[18]

Social media thus helps adults and minors develop their own ideas, learn to express themselves, and engage productively with others.[19]

## B.    The First Amendment Protects the Vast Majority of Social Media Activity for Minors and Adults Alike.

Although Louisiana seeks to justify the Act through its concerns about the impact of social media on minors, outside of the narrow category of sexually explicit content that is "harmful to minors," that is not a valid basis for regulation. People under the age of 18 generally enjoy the same First Amendment rights as adults, and

---

[17] Keith N. Hampton & Inyoung Shin, *Disconnection More Problematic for Adolescent Self-Esteem Than Heavy Social Media Use: Evidence from Access Inequalities and Restrictive Media Parenting in Rural America*, 41 Soc. Sci. Comput. Rev. 626 (2023), https://perma.cc/YHH8-VQC7; Erica Chen et al., *Online Social Networking and Mental Health Among Older Adults: A Scoping Review*, 41 Canadian J. on Aging 26, 26–27 (2022), https://perma.cc/J7NL-3UKZ.

[18] *See* Claire Cain Miller, *For One Group of Teenagers, Social Media Seems a Clear Net Benefit*, N.Y. Times (May 24, 2023), https://perma.cc/A4TK-ED3R; Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed,'* BBC (Nov. 28, 2020), https://www.bbc.com/news/av/uk-55079954.

[19] *See* Rainier Harris, *How Young People Use Social Media to Engage Civically*, PBS (Nov. 5, 2020), https://perma.cc/C434-65F4; Jessica L. Hamilton et al., *Re-Examining Adolescent Social Media Use and Socioemotional Well-Being Through the Lens of the COVID-19 Pandemic*, 17 Persps. Psych. Sci. 662, 671 (2022), https://perma.cc/N8VQ-8A4N.

the Supreme Court has expressly held that the government cannot "create a wholly new category of content-based regulation that is permissible only for speech directed at children." *Brown*, 564 U.S. at 793–94 (rejecting government's argument that it can regulate violent speech communicated to minors just as it can sexual speech that is harmful to minors).

The Supreme Court's recent decision in *Paxton* is not to the contrary and cannot save the Act. There, the Supreme Court held that a law that aimed to block minors' access to content that is obscene as to minors was subject to intermediate scrutiny only because "[h]istory, tradition, and precedent recognize" that minors have no First Amendment right to access such sexually explicit speech. *Paxton*, 606 U.S. at 472.[20] The Court concluded that the law's age verification requirements were thus "an exercise of Texas's traditional power to prevent minors from accessing speech that is obscene from their perspective"—i.e., *unprotected* as to minors—and its "burden [on] adults' rights . . . ha[d] 'only an incidental effect on protected speech.'" *Id.* at 478 (citation omitted). The Court repeatedly disclaimed any application of its decision to regulations of "fully protected speech." *Id.* at 484, 485,

---

[20] The Supreme Court left open the question of precisely whose perspective matters when it comes to defining "harmful to minors" content, suggesting for example that, at a minimum, it would make no sense to assess obscenity from the perspective of a pre-adolescent, who would lack any "concept of sexuality." *Paxton*, 606 U.S. at 481 n.7.

12

493 n.12, 494 n.13.

Beyond that historic exception for sexual speech, the Court has been emphatic that minors' First Amendment rights are on par with adults: That a speaker or listener is young is no reason to diminish their rights, but calls instead "for scrupulous protection of [their] Constitutional freedoms . . . if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). For that reason, the Supreme Court has repeatedly struck down legislation imposing age limitations on new mediums notwithstanding societal fears about the impact on children, from violent video games, *see Brown*, 564 U.S. at 789, to non-obscene sexual expression online, *Reno*, 521 U.S. at 874, to drive-in movies, *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975). Even where the laws are "intended to regulate [only] expression accessible to minors," they are "overbroad" if they reach beyond speech that is obscene as to minors. *Id*. at 214.

As the Seventh Circuit explained in striking down a ban on violent video games, "[minors] must be allowed the freedom to form their political views on the basis of uncensored speech *before* they turn eighteen, so that their minds are not a blank when they first exercise the franchise." *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001). Otherwise, they "are unlikely to become well-functioning, independent-minded adults and responsible citizens,"

13

because "[t]o shield children right up to the age of 18 from exposure to [troubling or potentially harmful ideas] would not only be quixotic, but deforming; it would leave them unequipped to cope with the world as we know it." *Id.*

## II.    THE ACT'S CONTENT-BASED RESTRICTIONS VIOLATE MINORS' AND ADULTS' FIRST AMENDMENT RIGHTS.

The Act is subject to strict scrutiny as a content-based regulation of speech— "that is, . . . it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (cleaned up). The Act regulates "social media platforms," which it defines to exclude more than twenty specific types of online services. La. Stat. Ann. § 51:1751(12)(b)(i)–(xx). And these exceptions are not content-neutral; they include platforms focused on social interaction, just as long as they discuss only state-approved topics: online shopping, gaming, photograph editing, career development, or "public safety." *Id.* Contrary to the state's argument, *see* Appellants' Br. at 46 ("Br."), these exceptions turn on subject matter, not function. *See NetChoice, LLC v. Bonta*, 170 F.4th 744, 758–59 (9th Cir. 2026) (recognizing that "gateway definition" can trigger strict scrutiny where "the central coverage

14

definition facially distinguishe[s] between types of speech" (footnote omitted)).[21]

Thus, the Act is subject to strict scrutiny and neither its parental consent requirement nor its age verification requirement survive it.

A. **The Act Impermissibly Prohibits Minors from Accessing and Engaging in Protected Speech on Certain Topics Without Parental Consent.**

Louisiana cannot avoid strict scrutiny by framing the parental consent requirement as a mere exercise of its "traditional power" to protect minors that is subject only to intermediate scrutiny. Br. at 56. This argument is misplaced, as *Brown* highlights. In that case, the Supreme Court struck down a law that prohibited selling or renting violent video games to minors—in effect, like the Act, allowing parents to choose what speech minors can access.

There, the state had "claim[ed] that the Act is justified in aid of parental

---

[21] The state's reliance on *Moody v. NetChoice* to suggest that a law's regulation of "social media" is not subject to strict scrutiny is also incorrect. Br. at 44–45. In determining scrutiny, the text of the statute, not a description of it as regulation of "social media" writ large is what matters. In *Moody*, the Court considered a facial challenge to a Florida law that did not include any content-based exceptions for interactive platforms, 603 U.S. 707, 720 n.1 (2024), and is consequently distinguishable from Louisiana's law. Although the Texas law at issue in *Moody* exempted services "that consist[ ] primarily of . . . information . . . that is not user generated," see Tex. Bus. & Com. Code Ann. § 120.001(1), the Court declined to decide "whether to apply strict or intermediate scrutiny" because "the interest Texas ha[d] asserted" to justify the law was so clearly "related to the suppression of free expression" that it could not satisfy any applicable test. *Moody*, 603 U.S. at 740. Here, NetChoice challenges a law that regulates only some interactive platforms, depending on what users discuss, in its applications to speech-carrying platforms.

15

authority." *Brown*, 564 U.S. at 802. While recognizing the "legitima[cy]" of this aim, the Court held that, to satisfy the First Amendment, the government's means "must be . . . neither seriously underinclusive nor seriously overinclusive"—and the statute failed on that front. *Id.* at 805. The law was underinclusive in part "because it permits a parental . . . veto" of the law's restrictions. *Id.* If the material is indeed "dangerous [and] mind-altering," the Court explained, it did not make sense to "leave [it] in the hands of children so long as one parent . . . says it's OK." *Id.* at 802. The law was also overinclusive because it "abridges the First Amendment rights of young people whose parents . . . think violent video games are a harmless pastime." *Id.* at 805. "While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought to* want." *Id*. at 804; *cf. Reno*, 521 U.S. at 878.

The Court thus rejected the idea "that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent,*" for "[s]uch laws do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3. The Court also expressed "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* at 802.

16

"Accepting that position would largely vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors].'" *Id.* (quoting *Erznoznik*, 422 U.S. at 212–13).

Each of those holdings governs here: To the extent the Act is an attempt to protect minors under 16 from harm, it is "seriously underinclusive . . . because it permits a parental . . . veto." *Id.* at 805. To the extent that the Act is an attempt to "assist[ ] concerned parents," it is "seriously overinclusive because it abridges the First Amendment rights of young people whose parents . . . think [social media use is] a harmless pastime." *Id*. And it also raises First Amendment concerns because it seeks to punish third parties "*just in case* their parents disapprove." *Id.* at 802.

**B.    The Act Also Burdens the First Amendment Rights of Adults and Minors by Imposing Age Verification.**

Even if the Act's parental consent requirement could survive strict scrutiny, the predicate requirement of age verification cannot.[22] The Act requires social media services to implement age verification via undefined "commercially reasonable efforts."   La. Stat. Ann. § 51:1752(A). Common methods include checking

---

[22] Because the remaining provisions of the Act—including those that limit how personal information from users can be collected and used—apply only to minors' accounts and so are similarly predicated on the age verification requirement, amici do not separately address whether they would be subject to, or survive, First Amendment scrutiny if required for all users. Should the Court affirm that the Act's age-verification provisions are unconstitutional, it would not need to address the remaining provisions' constitutionality, either.

government IDs, collecting biometric information to estimate users' ages, and querying commercial databases. And the requirement is imposed on every user—adult and minor alike. This violates the First Amendment by directly burdening the rights of all social media users. *See Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Paxton*, 606 U.S. at 483 (recognizing that "submitting to age verification is a burden on the exercise of [First Amendment] right[s]").

Louisiana relies on *Paxton* to argue that *any* age verification is subject to intermediate scrutiny at most and survives it. Br. at 55–56. For the reasons detailed above, neither *Paxton* nor intermediate scrutiny governs—but, even if intermediate scrutiny were appropriate here, age verification for social media use would fail it. Because the regulated content is protected for all ages, *see supra* Section I.B, it is unclear how age verification relates to any legitimate government interest, much less advances a significant one. And *Moody* made clear that Louisiana lacks *any* legitimate interest in burdening all internet users' access to protected expression that would survive even a "less stringent form of First Amendment review." 603 U.S. at 740.

### 1. Many verification requirements will either chill or entirely block access to lawful speech.

Should social media services implement verification via government-issued identification to comply with the Act, it will "serve as a complete block to adults who wish to access adult material [online] but do not" have the necessary form of

identification. *PSINet, Inc. v. Chapman*, 362 F.3d 227, 237 (4th Cir. 2004); *see also Reno*, 521 U.S. at 856; *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003) (invalidating age-assurance requirement that would make "adults who do not have [the necessary form of identification] . . . unable to access those sites"). The same will be true for any child under 16 of such an adult, who will struggle to prove their relationship to their parents or guardian.

About 15 million adult U.S. citizens do not have a driver's license, and about 2.6 million do not have any form of government-issued photo ID.[23] Estimates show another 28.6 million adult citizens use government IDs that lack their current names or addresses.[24]

Using biometric data, such as scanning users' faces, is no better. Biometric analysis to determine a user's age is inherently imprecise, as the technology

---

[23] Jillian Andres Rothschild et al., Univ. Md. Ctr. for Democracy & Civic Engagement, *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge* 2 (2024), https://perma.cc/DL9A-5T8L.

[24] *Id*. at 2, 5; *see also* Michael J. Hanmer & Samuel B. Novey, Univ. Md. Ctr. for Democracy & Civic Engagement, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies* 5 (2023), https://perma.cc/X7JS-J7R7 ("Over 1.3 million voting-age citizens in [Georgia, Indiana, Kansas, Mississippi, Tennessee, and Wisconsin] likely did not have the identification needed to vote in 2020.").

essentially guesses a user's age based on the information it has collected.[25] The imprecision means that the Act will block adults who are miscategorized as minors and allow minors to access social media because the system guesses that they are adults.[26] These systems are also more likely to misidentify ages for specific demographics, including people of color, people with disabilities, and people whose faces are not detected by the system, failing a wide range of internet users.[27]

### 2. Online age verification impermissibly burdens the right to speak and access information anonymously online.

Having to provide identifying information to services seeking to comply with the Act—whether for age verification or to check parental relationships and consent—would also impermissibly burden the First Amendment right to anonymity. *See Am. Booksellers Found.*, 342 F.3d at 99 (age verification "require[s] that website visitors forgo the anonymity otherwise available on the internet").

A reported 86 percent of internet users have taken steps online to minimize

---

[25] *See* Rindala Alajaji, *Age Verification, Estimation, Assurance, Oh My! A Guide to the Terminology*, EFF Deeplinks Blog (Oct. 30, 2025), https://perma.cc/G644-WKZZ.

[26] *See id*. (explaining how biometric systems usually group users into age ranges, such as between age 15 and 19).

[27] *See* Nick Evershed & Josh Nicholas, *Social Media Ban Trial Data Reveals Racial Bias in Age Checking Software: Just How Inaccurate Is It?*, The Guardian (Sept. 18, 2025), https://perma.cc/LX46-34S8; Matt Burgess, *When Face Recognition Doesn't Know Your Face Is a Face*, Wired (Oct. 15, 2025), https://perma.cc/9DEK-4HDW.

their digital footprints, and 55 percent have done so to "avoid observation by specific people, organizations, or the government."[28] Anonymity is a time-honored, historic tradition that is "protected by the First Amendment"—no matter whether its use is "motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42 (1995). "As with other forms of expression, the ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely[.]" *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011).

Without anonymity, "the stigma associated with the content of [certain] sites may deter adults from visiting them" at all. *PSINet, Inc.*, 362 F.3d at 236–37; *see also Reno*, 521 U.S. at 856. The same is true for minors who must obtain parental consent, and it may well cause parents to refuse permission to access certain social media simply because they fear that a record of such access might reflect poorly on their children or them. The absence of anonymity will chill users' ability to dissent, discuss "sensitive, personal, controversial, or stigmatized content," or seek medical

---

[28] Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Rsch. Ctr. (Sept. 5, 2013), https://perma.cc/5BUP-J96F.

or psychiatric help online.[29] *ACLU v. Gonzales*, 478 F. Supp. 2d 775, 806 (E.D. Pa. 2007); *see also State v. Weidner*, 611 N.W.2d 684, 690 (Wis. 2000) (age verification "constitutes an encroachment into the personal lives of those who use the internet precisely because it affords anonymity").

> **3.    Many age verification systems put internet users' sensitive data at risk.**

Even when users are comfortable foregoing anonymity, legitimate "concern[s] about security on the Internet and . . . [fears] of fraud and identity theft" may dissuade them from accessing social media. *Gonzales*, 478 F. Supp. 2d at 806; *see also ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008); *PSINet, Inc. v. Chapman*, 167 F. Supp. 2d 878, 889 (W.D. Va. 2001), *aff'd*, 362 F.3d 227 (4th Cir. 2004) ("Fear that cyber-criminals may access [identifying information] . . . . may chill the willingness of some adults to participate in the 'marketplace of ideas'" online).

The personal data that platforms may be required to collect is sensitive and often immutable. *See, e.g.*, Driver Priv. Prot. Act, 18 U.S.C. §§ 2721–25. Whereas usernames, passwords, and even credit card information can easily be changed, the types of information used in age screens or age verification such as date of birth,

---

[29] *See, e.g.*, Sarah Kendal et al., *How a Moderated Online Discussion Forum Facilitates Support for Young People with Eating Disorders*, 20 Health Expectations 98, 99 (Feb. 2017), https://perma.cc/B9Q4-RRNR.

name, biometrics, and home address are much more permanent.

Although Louisiana ostensibly enacted the Act out of concern for minors' wellbeing, the law's online age verification regime will make minors and adults less safe given the realities of online advertising and data insecurity. Personal information collected online sells for astonishing profits.[30] Because all online data is transmitted through intermediaries, the information a user shares to verify identity or parental relationship can be transmitted beyond the site or its age verification providers.[31]

At a minimum, the data will present a potential target for data thieves. Age verification data is emerging as an attractive target for hackers. In October 2025, hackers stole the government IDs of 70,000 individuals used to verify their age for the social media applications Discord.[32] Similarly, the frontend of one age verification service was left exposed on a federal server,[33] and the French agency

---

[30] *See Digital Advertising in the United States – Statistics & Facts*, Statista (May 20, 2025), https://perma.cc/Y9P9-VZB7 (the U.S. digital advertising market boasted a revenue of $347 billion in 2024).

[31] *See* Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive into the Technology of Corporate Surveillance*, EFF Deeplinks Blog (Dec. 2, 2019), https://perma.cc/7B5F-S376.

[32] Dan Goodin, *Discord Says Hackers Stole Government IDs of 70,000 Users*, Ars Technica (Oct. 9, 2025), https://perma.cc/98KD-4YDX.

[33] Pieter Arntz, *Age Verification Vendor Persona Left Frontend Exposed, Researchers Say*, Malwarebytes Labs (Feb. 20, 2026), https://perma.cc/94A9-7C82.

responsible for handling age verification was hacked, resulting in the data of millions of affected French people being put up for sale.[34]

Compounding this concern, minors are attractive targets for identity theft due to their "uniquely valuable" unused Social Security numbers.[35] A 2021 study found that one in 50 U.S. children were victims of identity fraud, and one in 45 children had personal information exposed in a data breach.[36] The risk of data breach is likely to chill constitutionally protected expression.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's order and maintain the permanent injunction against the Act for violating the First Amendment rights of minors and adults.

---

[34] *France Opens Formal Probe Into Teenage Suspect in Massive ID Data Breach*, Reuters (Apr. 30, 2026), https://perma.cc/5DHR-A5F4.

[35] Richard Power, Carnegie Mellon CyLab, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers* 3 (2011), https://perma.cc/RR56-VE2H ("A child's identity is a blank slate, and the probability of discovery is low, as the child will not be using it for a long period of time.").

[36] Tracy Kitten, Javelin, *Child Identity Fraud: A Web of Deception and Loss* 5 (2021), https://perma.cc/Z9P4-2U4B.

Dated: June 2, 2026

Cody Venzke
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
915 15th St. NW
Washington, DC 20005
Email: cvenzke@aclu.org
Tel.: (202) 457-0800
*Licensed only in California.*
*Application pending in the District of*
    *Columbia.*

Nora Ahmed
ACLU FOUNDATION OF LOUISIANA
1340 Poydras St., Suite 2160
New Orleans, Louisiana 70112
Tel: (504) 522-0628

Respectfully submitted,

*/s/ Vera Eidelman*
Vera Eidelman
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 18 Fl.
New York, NY 10004
Email: veidelman@aclu.org
Tel.: (212) 549-2500

Aaron Mackey
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, California 94109
Email: amackey@eff.org
Tel.: (415) 436-9333

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

Pursuant to Fed. R. App. P. 32(g)(1), I certify as follows:

1.      This Brief of Amici Curiae in Support of Plaintiff-Appellee and Affirmance complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 5914 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: June 2, 2026                              */s/ Vera Eidelman*
                                                 Vera Eidelman

                                                 *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on June 2, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: June 2, 2026                       */s/ Vera Eidelman*
                                          Vera Eidelman

                                          *Counsel for Amici Curiae*