No. 26-30016

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

_____

NETCHOICE,
*Plaintiff-Appellee,*

v.

LIZ MURRILL, in her official capacity as Attorney General of Louisiana; MIKE DUPREE, in his official capacity as Director of the Public Protection Division, Louisiana Department of Justice, *Defendant-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF LOUISIANA CASE NO. 3:25-CV-231 HON. JOHN W. DEGRAVELLES

_____

# BRIEF OF AMICUS CURIAE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF PLAINTIFF-APPELLEE NETCHOICE

_____

*(counsel listed on next page)*

Robert E. Dunn
EIMER STAHL LLP
1999 S. Bascom Avenue
Suite 1025
Campbell, CA 95008
(408) 889-1690
rdunn@eimerstahl.com

Nathaniel K.S. Wackman
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
(312) 660-7635
nwackman@eimerstahl.com

Jonathan D. Urick
Mariel A. Brookins
U.S. Chamber Litigation Center
1615 H Street, N.W.
Washington, D.C. 20062
(202) 463-5337

*Counsel for Amicus Curiae*
*Chamber of Commerce of the*
*United States of America*

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2, the undersigned counsel of record certifies that the following persons have an interest in the outcome of this litigation:

***Amicus Curiae:***
Chamber of Commerce of the United States of America

**Counsel for Amicus:**
Robert E. Dunn
Nathaniel K.S. Wackman
EIMER STAHL LLP

Jonathan D. Urick
Mariel A. Brookins
U.S. CHAMBER LITIGATION CENTER

The Chamber of Commerce of the United States of America is a tax-exempt, not-for-profit organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

/s/ *Robert E. Dunn*
Robert E. Dunn
*Counsel for Amicus Curiae*

iii

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE.................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .................... 3

ARGUMENT........................................................................ 7

I.   ASSOCIATIONAL STANDING IS VITAL TO VINDICATING THE INTERESTS OF INDIVIDUALS AND BUSINESSES SUBJECTED TO UNLAWFUL GOVERNMENT ACTION ............................................. 7

    A.   Associational Standing Solves A Collective-Action Problem By Allowing Individuals And Businesses To Pool Their Resources And Expertise To Challenge Government Overreach .............................................. 10

    B.   Associational Standing Protects Individuals And Companies From Retaliation When Challenging Government Action ..................................................... 13

II.   ADOPTING LOUISIANA'S FLAWED VIEW OF ASSOCIATIONAL STANDING WOULD UNDERCUT THE DOCTRINE AND ERODE THE ABILITY OF ASSOCIATIONS TO REPRESENT THEIR MEMBERS..... 17

    C.   NetChoice Conclusively Demonstrated That Many of Its Members Would Have Standing To Assert Individual Claims.................................................................... 17

    D.   NetChoice's Members Were Not Necessary Participants In The Lawsuit ......................................................... 27

CONCLUSION ......................................................................... 30

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Ariz. Christian Sch. Tuition Org. v. Winn,*
563 U.S. 125 (2011) ................................................................ 7, 8

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................ 10

*Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.,*
627 F.3d 547 (5th Cir. 2010) ................................................. 10, 28

*Bd. of Cnty. Comm'rs v. Umbehr,*
518 U.S. 668 (1996) ................................................................ 14

*Center for Biological Diversity v. EPA,*
937 F.3d 533 (5th Cir. 2019) ................................................. 24, 25

*Chamber of Com. of U.S. of Am. v. Bonta,*
62 F.4th 473 (9th Cir. 2023) .................................................... 12

*Chamber of Com. of U.S. v. FTC,*
820 F. Supp. 3d 473 (E.D. Tex. 2026)..............................12, 23, 30

*Chamber of Com. of U.S. v. SEC,*
88 F.4th 1115 (5th Cir. 2023) .................................................. 12

*Chamber of Com. of U.S. v. U.S. Dep't of Labor,*
885 F.3d 360 (5th Cir. 2018) .................................................... 12

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ................................................................ 24

*Club Retro, LLC v. Hilton,*
568 F.3d 181 (5th Cir. 2009) .................................................... 14

*Ctr. For Individual Freedom v. Carmouche,*
449 F.3d 655 (5th Cir. 2006) .................................................... 20

*Deep South Center for Environmental Justice v. EPA*,
138 F.4th 310 (5th Cir. 2025) ...................................................... 24

*First Choice Women's Resource Ctrs., Inc. v. Davenport*,
146 S. Ct. 1114 (2026) ................................................................ 16

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l.*,
695 F.3d 330 (5th Cir. 2012) ........................................................ 8

*Golodner v. Berliner*,
770 F.3d 196 (2d Cir. 2014) ........................................................ 14

*Houston Chronicle v. City of League City*,
488 F.3d 613 (5th Cir. 2007) ...................................................... 20

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ...........................................................9, 17, 27

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of
Am. v. Brock*,
477 U.S. 274 (1986) .............................................................passim

*Joint Anti-Fascist Refugee Cmte. v. McGrath*,
341 U.S. 123 (1951) ...................................................................... 9

*Lemaster v. Lawrence County*,
65 F.4th 302 (6th Cir. 2023) ...................................................... 14

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ............................................................. 21, 22

*McNutt v. U.S. Dep't of Justice*,
173 F.4th 204 (5th Cir. 2026) ..................................................... 19

*Murthy v. Missouri*,
603 U.S. 43 (2024) ...................................................................... 21

*Muskrat v. United States*,
219 U.S. 346 (1911) ...................................................................... 7

*N.Y. State Pistol & Rifle Ass'n v. Bruen,*
  597 U.S. 1 (2022) ........................................................ 30

*NAACP v. Alabama ex rel. Patterson,*
  357 U.S. 449 (1958) ........................................4, 9, 13, 29

*Nat'l Mot. Freight Ass'n v. United States,*
  372 U.S. 246 (1963) ...................................................... 8

*Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco & Firearms,*
  700 F.3d 185 (5th Cir. 2012) ........................................ 30

*Nat'l Treasury Emps. Union v. U.S. Dep't of Treasury,*
  25 F.3d 237 (5th Cir. 1994) ........................................... 8

*NetChoice v. Murrill,*
  812 F. Supp. 3d 594 (M.D. La. 2025) ...................................passim

*NRA v. Vullo,*
  602 U.S. 175 (2024) ..................................................... 15

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
  592 U.S. 14 (2020) ...................................................... 20

*Sierra Club v. Glickman,*
  82 F.3d 106 (5th Cir. 1996) .......................................... 29

*Speech First, Inc. v. Fenves,*
  979 F.3d 319 (5th Cir. 2020) ..............................18, 20, 21

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ...................................................... 8

*Students for Fair Admissions, Inc. v. President & Fellows of
  Harvard College,*
  600 U.S. 181 (2023) .........................................7, 8, 24

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ..................................................... 19

*United Food & Com. Workers Local 751 v. Brown Grp., Inc.*,
    517 U.S. 544 (1996) ...................................................................... 8

*US Investor, Inc. v. Vidal*,
    2022 WL 4595001 (5th Cir. Sept. 30, 2022) ................................ 25

*Valley Forge Christian Coll. v. Ams. United for Separation of
    Church & State, Inc.*,
    454 U.S. 464 (1982) .................................................................... 26

*Virginia v. Am. Booksellers Ass'n, Inc.*,
    484 U.S. 383 (1988) ....................................................19, 20, 21, 29

*Warth v. Seldin*,
    422 U.S. 490 (1975) ........................................................9, 17, 26

*Zen Grp., Inc. v. Agency for Health Care Admin.*,
    80 F.4th 1319 (11th Cir. 2023) ................................................... 14

## Rules

Federal Rule of Appellate Procedure 29(a)(4)(e)............................. 1

## Other Authorities

*NetChoice Litigation Center*, NetChoice,
    https://netchoice.org/litigation/ (last accessed May 26, 2026) ..... 12

Note, *From Net to Sword: Organizational Representatives
    Litigating Their Members' Claims*,
    1974 U. Ill. L. Forum 663, 669) ................................................. 11

Treasury Inspector General for Tax Admin., U.S. Dep't of Treas.,
    Ref. No. 2013-10-053, *Inappropriate Criteria Were Used to
    Identify Tax-Exempt Applications for Review* 1 (May 14, 2013) . 15

## INTEREST OF AMICUS CURIAE[1]

The Chamber of Commerce of the United States of America (the "Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every economic sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files amicus curiae briefs in cases, like this one, that raise issues of concern to the Nation's business community.

The Chamber files here solely to respond to Defendants' attack on NetChoice's associational standing. As an association that regularly represents the interests of its members in litigation, the

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(e), *amicus curiae* state that no counsel for any party authored this brief in whole or in part and that no entity or person, aside from amicus curiae, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

1

Chamber submits this brief to defend the ability of associations generally to sue on behalf of their affected members and to obtain relief that benefits those members.

## INTRODUCTION AND SUMMARY OF ARGUMENT

**I.** Both the Supreme Court and this Court have consistently recognized that associational standing is a key feature of our legal system because it empowers individuals and businesses to hold government accountable. Associational standing has two primary advantages over individual lawsuits: it solves a collective-action problem by allowing businesses and individuals to "pool" their resources and develop the expertise required to successfully challenge government overreach, *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986) [hereinafter *Brock*], and it allows businesses and individuals to challenge such overreach without making them targets for governmental reprisal.

**I.A.** Associational standing solves a collective-action problem by allowing businesses and individuals—consistent with Article III—to "pool" their resources and energies behind shared "collective interests." *Id*. Many laws impose relatively small burdens on a broad cross-section of businesses or individuals, especially when measured against the cost and burden of litigation. Even large companies often lack the resources to challenge every instance of government

3

overreach, while individuals and small businesses are often hopelessly outmatched by government defendants. Associational standing allows businesses to join organizations that have the resources and expertise to challenge unlawful government action. The Chamber and NetChoice are both examples of such associations.

**I.B.** Individuals and businesses often fear that they will be singled out for reprisal if they initiate legal action against the government. These fears are well founded, as there are many well-documented instances of such government reprisals in recent years. Associational standing allows affected individuals and businesses to seek redress without becoming targets for government retaliation. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 458–59 (1958). The Chamber's and NetChoice's members rely on these associations' ability to bring claims on their behalf to protect their privacy and shield them from such potential government targeting.

Given the importance of associational standing in allowing individuals and businesses to vindicate their rights—especially those rights protected by the Constitution—this Court should be

4

particularly wary of adopting the narrow view of associational standing the state advances here.

**II.** The state contends that NetChoice failed to satisfy the first and third factors of the associational-standing test. But it misconstrues both factors, and its cramped view of associational standing, if adopted by this Court, would deprive America's business community of a crucial tool to protect itself from illegal government action.

**II.A.** NetChoice unequivocally satisfied the requirement that "any one" of its members have "standing to sue in their own right" by showing that several of its members were not only subject to the regulation but were also threatened with enforcement. *Brock*, 477 U.S. at 282 (citation omitted). As NetChoice demonstrated, the state sent "Notice of Violation" letters to 11 different NetChoice members notifying them that the state had "reviewed" their platforms, found that they "fail[ed] to comply with several requirements of the Act," and threatened them with imminent enforcement action. *NetChoice v. Murrill*, 812 F. Supp. 3d 594, 626–27 (M.D. La. 2025). Under the Supreme Court and this Court's precedent, this constitutes

5

"imminent injury" which is more than enough to "sustain" a pre-enforcement First Amendment challenge.

The state faults NetChoice for failing to provide declarations with sufficient detail to establish standing at summary judgment, but the declarations provided are in line with the level of detail other courts have found sufficient to establish standing. And requiring more evidence than this to demonstrate standing would be costly and time-consuming to those businesses and would likely discourage their participation in such associations or litigation.

**II.B.** The state fundamentally misunderstands the third factor in the associational-standing inquiry. Specifically, it fails to recognize that members can provide the requisite evidence to prove the asserted claims without full "participation" "in the lawsuit." *Brock*, 477 U.S. at 282 (citation omitted). That NetChoice asserted "as-applied" challenges on behalf of its affected members does not mean that those members were required to participate as parties in the litigation. Far from being unaligned, as the state contends, each of these members received notice from the state that they were violating the same provisions of the statute and faced imminent

6

enforcement. Given those common facts, the district court correctly held that NetChoice adequately proved its claims as to each of the targeted members without requiring those members' participation by the lawsuit.

For these reasons, this Court should affirm the district court's conclusion that NetChoice has associational standing.

## ARGUMENT

### I. ASSOCIATIONAL STANDING IS VITAL TO VINDICATING THE INTERESTS OF INDIVIDUALS AND BUSINESSES SUBJECTED TO UNLAWFUL GOVERNMENT ACTION

Article III of the Constitution "limits 'the judicial power of the United States' to 'cases' or 'controversies,' ensuring that federal courts act only "as a necessity in the determination of real, earnest and vital' disputes." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 199 (2023) [hereinafter *SFFA*] (brackets omitted) (quoting *Muskrat v. United States*, 219 U.S. 346, 351, 359 (1911)). "To state a case or controversy under Article III, a plaintiff must establish standing." *Id.* (internal quotation marks omitted) (quoting *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011)). A plaintiff demonstrates standing where

it has (1) "suffered an injury in fact," (2) that is "fairly traceable" to the defendant's conduct, and (3) that is "likely to be redressed by a favorable judicial decision." *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

It has "long been settled" that a plaintiff association can satisfy the standing requirement when acting "as the representative of its members." *Brock*, 477 U.S. at 281, 289 (citing *Nat'l Mot. Freight Ass'n v. United States*, 372 U.S. 246 (1963)); *Funeral Consumers All., Inc. v. Serv. Corp. Int'l.*, 695 F.3d 330, 343 (5th Cir. 2012) ("It is well-established law that an association has Article III standing to bring a suit on behalf of its members . . . ."). Both the Supreme Court and this Court have repeatedly described "associational standing" as consistent with Article III. *See SFFA*, 600 U.S. at 199; *United Food & Com. Workers Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 551–58 (1996); *Nat'l Treasury Emps. Union v. U.S. Dep't of Treasury*, 25 F.3d 237, 240–41 (5th Cir. 1994).

"Associational standing" exists when the association can demonstrate that (1) "its members, or any one of them" "would otherwise have standing to sue in their own right," (2) "the interests it

8

seeks to protect are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Brock*, 477 U.S. at 282 (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975) and *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Associational standing possesses two features "advantageous both to the individuals represented and to the judicial system as a whole." *Id.* at 289. First, it solves a collective-action problem by allowing individuals and businesses to "pool" their resources and expertise to challenge government overreach. *Id.* Second, it empowers them to challenge such overreach without inviting targeted government reprisal. Both features "sharpen[]" and "undeniably enhance" the "presentation of issues" and the resolution of "difficult questions" before the federal courts. *Id.* at 289; *NAACP*, 357 U.S. at 460. Indeed, it is "often" "the only practical judicial policy" "to permit association[s]" to "vindicate the interests of all" "in a single case." *Id.* (quoting *Joint Anti-Fascist Refugee Cmte. v. McGrath*, 341 U.S. 123, 187 (1951) (Jackson, J., concurring)); *see also Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.*, 627 F.3d 547, 553 (5th Cir. 2010)

9

[hereinafter *AAPS*] (describing how associational standing "support[s] judicially efficient management").

### A. Associational Standing Solves A Collective-Action Problem By Allowing Individuals And Businesses To Pool Their Resources And Expertise To Challenge Government Overreach

Statutes, regulations, and other government actions often impose relatively small burdens on a broad cross-section of individuals and businesses, especially when measured against the cost and burden of litigation. *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009) (describing the "heavy costs in terms of efficiency and expenditure of valuable time and resources" of litigation). It also requires significant financial resources and organizational capacity to stay abreast of developments across the federal government, all 50 states, and countless municipalities. Even large companies often lack the resources to challenge burdensome government overreach. This is particularly true with respect to state or local regulation, where the burden on any given company may be too small to justify the cost of litigation. For individuals and small businesses, challenging any unlawful government action is often impossible due to the resources it

10

demands. But because any individual or business affected by unlawful government action would benefit from a successful legal challenge, there is a strong incentive to wait and hope that someone else will take the laboring oar.

Associational standing solves this collective-action problem. It allows businesses—and individuals—to "pool" their resources and energies behind shared "collective interests." *Brock*, 477 U.S. at 290. The resulting organizations develop "specialized expertise and research resources relating to the subject matter of the lawsuit" that individual plaintiffs or ad hoc groups cannot. *Id.* at 289 (*quoting* Note, *From Net to Sword: Organizational Representatives Litigating Their Members' Claims*, 1974 U. Ill. L. Forum 663, 669). Associations have thus become highly "effective vehicle[s] for vindicating" those rights in court." *Id.* at 290. Accordingly, even when an individual or company might be willing to shoulder the burdens of litigation, they often prefer to take advantage of an association's litigation expertise and ability to better explain the wide range of harms resulting from a government policy. *Brock*, 477 U.S. at 290.

The Chamber and NetChoice are two such associations with "specialized expertise and research resources," which they regularly employ in support of their members. These associations propose (or object to) draft legislation, comment on proposed regulations, and meet with governmental officials and agencies to discuss enforcement priorities. And when the government illegally restricts free enterprise and innovation, they both vigorously litigate on behalf of American businesses. The Chamber[2] and NetChoice[3] have both

---

[2] *See, e.g.*, *Chamber of Com. of U.S. v. SEC*, 88 F.4th 1115 (5th Cir. 2023) (vacating SEC's "Stock Buyback Rule"); *Chamber of Com. of U.S. v. U.S. Dep't of Labor*, 885 F.3d 360 (5th Cir. 2018) (vacating DOL's "Fiduciary Rule"); *Chamber of Com. of U.S. v. FTC*, 820 F. Supp. 3d 473 (E.D. Tex. 2026) (vacating FTC's 2024 Hart-Scott-Rodino Act Rule), *appeal docketed*, No. 26-40094 (5th Cir.); *see also Chamber of Com. of U.S. of Am. v. Bonta*, 62 F.4th 473 (9th Cir. 2023) (enjoining California law making it a criminal offense to require an employee or potential employee to arbitrate employment-related claims).

[3] The district court's opinion cataloged 8 challenges where NetChoice successfully obtained injunctive relief on behalf of its members. NetChoice served as the lead plaintiff in cases in Ohio, Arkansas, Mississippi, Utah, Georgia, California, Tennessee, and Colorado. *NetChoice v. Murrill*, 812 F. Supp. 3d 594, 609 (M.D. La. 2025). NetChoice's website catalogs many more. *See NetChoice Litigation Center*, NetChoice, https://netchoice.org/litigation/ (last accessed May 26, 2026).

successfully challenged a variety of overreaching laws, regulations, and government policies on behalf of their members. Many of these challenges to illegal government action would likely never have been brought—or would have been litigated less effectively—without associations like the Chamber and NetChoice.

## B. Associational Standing Protects Individuals and Companies from Retaliation When Challenging Government Action

Those challenging unlawful government action often fear being singled out for retaliation in the form of administrative harassment, prosecution, permitting delays, and other forms of governmental mischief. Associational standing shields individuals and businesses from such reprisals and thus facilitates legal challenges, especially by those who may hold minority or unpopular viewpoints. *See NAACP*, 357 U.S. at 458–59. As the Court explained in *NAACP*, the "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," and there is a "vital relationship between freedom to associate and privacy in one's associations." 357 U.S. at 460, 462. Preserving anonymity and thus avoiding retaliation was one of the original

13

justifications for associational standing, and it remains salient today as governments often take hostile action against those challenging government policy. *See, e.g.*, *Club Retro, LLC v. Hilton*, 568 F.3d 181, 191 (5th Cir. 2009) (denying qualified immunity, in part, to law-enforcement officers and other public officials who conducted a massive, violent police raid on a nightclub after the business "protested" being closed early by law enforcement on two prior occasions; *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 671–74 (1996) (business's government contract terminated for "outspoken critic[ism]" of County's "alleged mismanagement of taxpayer money" and other topics); *Zen Grp., Inc. v. Agency for Health Care Admin.*, 80 F.4th 1319, 1324 (11th Cir. 2023) (alleging retaliation by state agency for "administrative challenge" to agency action and "criticism of" agency in a "motion for sanctions"); *Lemaster v. Lawrence County*, 65 F.4th 302, 304–07 (6th Cir. 2023) (denying summary judgment to county official alleged to have retaliated against business for public criticism of a government personnel decision); *Golodner v. Berliner*, 770 F.3d 196, 199–201 (2d Cir. 2014) (alleging termination of government contract for having sued the City on unrelated matter).

Associations themselves often find themselves targeted by the government when they take unpopular positions. For example, in 2024 the Supreme Court found that the National Rifle Association (NRA) "plausibly alleged" that the superintendent of the New York Department of Financial Services pressured private businesses to cease doing business with the NRA or face enforcement actions. *NRA v. Vullo*, 602 U.S. 175, 187 (2024). And in 2010, the IRS targeted Tea Party organizations and other organizations dedicated to issues such as "government spending, government debt or taxes" for review of their application for tax-exempt status, leading to significant processing delays and unnecessary information requests. *See* Treasury Inspector General for Tax Admin., U.S. Dep't of Treas., Ref. No. 2013-10-053, *Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review* 1, 5–6 & fig.3, 12, 18 (May 14, 2013). However, associations are better able to withstand these attacks than individuals or specific businesses, whose livelihoods can be put at risk.

Invoking associational standing, the Chamber and NetChoice repeatedly stand in the breach by vindicating their members'

constitutional rights, protecting their privacy, and shielding them from potential government targeting. The Chamber also preserves its members' privacy (its membership list is not public), and the Supreme Court has recently reaffirmed that "privacy in association" plays a "critical role" "in shielding dissident expression from suppression." *First Choice Women's Resource Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1123 (2026) (citation modified). And while NetChoice's membership is public (at least to a certain extent), litigating as a group prevents the government from focusing its retaliatory efforts on any one member. Forcing individual members to litigate government challenges in their own name would "inevitably" have a "deterrent effect on the exercise of" legal rights. *Id.* (citation modified).

\* \* \*

In short, associational standing plays an important role in allowing businesses and individuals to vindicate their rights and challenge governmental overreach. This Court should thus be cautious about adopting the rigid standing requirements advocated by the state here, as those requirements would hinder the ability of

16

associations to represent their members in litigation against the government.

## II. ADOPTING LOUISIANA'S FLAWED VIEW OF ASSOCIATIONAL STANDING WOULD UNDERCUT THE DOCTRINE AND ERODE THE ABILITY OF ASSOCIATIONS TO REPRESENT THEIR MEMBERS

Louisiana contends that NetChoice failed to establish the first and third factors for associational standing. But Louisiana misconstrues both factors, and its cramped view of associational standing, if adopted by this Court, would deprive individuals and America's business community of a crucial tool they have used for more than half a century to protect themselves from illegal government action.

### C. NetChoice Conclusively Demonstrated That Many of Its Members Would Have Standing To Assert Individual Claims

The first factor for associational standing requires the association to show that "its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Hunt*, 432 U.S. at 342 (quoting *Warth*, 422 U.S. at 511). NetChoice unequivocally satisfied this requirement by showing that several of its members were not only subject to Act 456

17

but were also threatened with enforcement. As NetChoice demonstrated, the state sent a "Notice of Violation" to 11 different NetChoice members notifying them that the state had "reviewed" their platforms and found that they "fail[ed] to comply with several requirements of the Act." *NetChoice*, 812 F. Supp. 3d at 626 (internal quotation marks omitted). "Several" was apparently an understatement, because each letter described the targeted companies as violating *every* substantive provision of the Act. *Id.* The Notices threatened that the state would bring civil enforcement actions if the companies did not "cure" their violations within 45 days. *Id.* The state demanded "compliance and cure" for each identified violation and required the companies to execute a statement promising that "no further violations will occur." *Id.* Any company receiving that Notice would have had standing to assert a pre-enforcement First Amendment challenge to the Act. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 331, 335–36 (5th Cir. 2020)

The state ignores these notices in its brief, but these "pointed warning letter[s]," which were submitted as evidence in support of summary judgment, plainly satisfy the first element of associational

18

standing. *McNutt v. U.S. Dep't of Justice*, 173 F.4th 204, 214 (5th Cir. 2026) (determining that home-distillers association had standing where, *inter alia*, one of its members had received a letter from the federal government threatening prosecution). The state's apparent (if implied) position that associations lack standing to bring pre-enforcement challenges on behalf of their members *even when* their members have been explicitly threatened with prosecution is squarely at odds with binding precedent from the Supreme Court and this Court. *See, e.g., Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) ("[W]e have permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent."); *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (standing requirement of "threatened or actual injury" met where plaintiff booksellers' associations and booksellers "will have to take significant and costly compliance measures or risk criminal prosecution"); *McNutt*, 173 F.4th at 214.

To the extent that the state takes issue with the pre-enforcement nature of the challenge—because no members have yet been prosecuted—its argument again runs headlong into well-established

19

precedent. When private parties raise First Amendment challenges to statutes or regulations that threaten to chill protected speech, the Supreme Court is "not troubled by the pre-enforcement nature of th[e] suit." *Am. Booksellers Ass'n*, 484 U.S. at 393; *cf. Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (citation omitted). Accordingly, "[t]his court has repeatedly held, in the pre-enforcement context, that '[c]hilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Speech First*, 979 F.3d at 331 (quoting *Houston Chronicle v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007)); *see also Ctr. For Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006) ("The First Amendment challenge has unique standing issues because of the chilling effect, self-censorship, and in fact the very special nature of political speech itself.") (citation omitted). Put simply, "[i]t is not hard to sustain standing for a pre-enforcement challenge in the highly sensitive area of public regulations governing bedrock political speech." *Speech First*, 979 F.3d at 331.

20

The state faults NetChoice for "only" providing two declarations from member companies, which supposedly lack "specific facts" and merely contain "generalized assertions" about the Act's effects. La.Br. 33. But the state's Notice alone provided ample evidence of threatened enforcement. *See supra* at 17–19. And in all events, plaintiffs in a pre-enforcement challenge are unlikely to have specific evidence of compliance costs they have not yet incurred. All a plaintiff must show in such a case is an "actual and well-founded fear that the law will be enforced against them." *Am. Booksellers Ass'n*, 484 U.S. at 393.

To be sure, the evidence required to establish standing increases as a case moves from the pleadings to final judgment. A complaint need only plead "general factual allegations" to sustain standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), while at the preliminary injunction stage the plaintiff "must make a clear showing that [it] is likely to establish each element of standing," *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (internal quotation marks omitted), and at the summary judgment stage, "the plaintiff . . . must set forth by affidavit or other evidence specific facts"

21

establishing its standing, *Lujan*, 504 U.S. 555 at 561 (internal quotation marks omitted). But NetChoice did not rely on mere allegations to establish standing when seeking summary judgment; it provided *evidence* that its members were threatened with enforcement, *see supra* at 17–19, and declarations from two members explaining that compliance with the statute would entail significant changes to their platforms. D. Ct. Dkt. 57-4 Boyle Decl. & Kessel Decl.

The Snap declaration, for example, described how compliance with the Act would require "implement[ation]" of "age-verification," "parental-identification and verifiable parental consent processes" and "modif[ication]" of "Snap's advertising and targeted content model." D. Ct. Dkt. 57-4 Boyle Decl. ¶ 9. This would require "extensive modification to Snap code that would fundamentally alter the nature of those services" and "require a significant amount of budget, resources and staff investment." *Id.* And the Reddit declaration described compliance with the Act as "costly to implement and maintain" and stated that it "would threaten to destroy pseudonymity on [Reddit]"—which it described as "[c]entral to the free exchange of ideas on Reddit." D. Ct. Dkt. 57-4 Kessel Decl. ¶¶ 11, 27. The state

was free to contest the facts asserted in those declarations or to provide contrary evidence showing that NetChoice's members were not threatened with enforcement, but it failed to do so. *NetChoice*, 812 F. Supp. 3d at 624.

This unrebutted testimony is exactly the type of evidence that courts have accepted to establish associational standing in the pre-enforcement context. For example, in the Chamber's challenge to a 2024 rule promulgated by the FTC under the Hart-Scott-Rodino Act, the district court upheld standing for a local chamber of commerce where that chamber's affidavit averred that its members had engaged in activity covered by the Rules "th[at] year" and that they "regularly" did so. *Chamber of Com.*, 820 F. Supp. 3d at 483 (internal quotation marks omitted). Because the local chamber's members were "objects of the Final Rule," the court held that there was "little question" that they had standing. *Id.* Similarly, in *SFFA*, the district court found that the association had standing based on deposition testimony by two SFFA members attesting that they would apply to Harvard if it changed its race-conscious admissions policies. *Student for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,

23

346 F. Supp. 3d 174, 191–92 (D. Mass. 2018), *aff'd in relevant part*, 600 U.S. 181 (2023).

The state attempts to analogize this case to several cases in which associational standing was denied because the plaintiff associations offered only "conclusory assertions" regarding its member's alleged injuries. But in each of those cases the plaintiff attempted to establish standing based on a complex and "speculative chain of possibilities" that the Supreme Court has held insufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). For instance, in *Deep South Center for Environmental Justice v. EPA*, several environmental associations challenged a decision by the EPA to allow Louisiana to issue carbon sequestration well permits. 138 F.4th 310, 321–26 (5th Cir. 2025). The plaintiffs' theory of injury involved a "highly attenuated" multi-step "chain of possibilities" contingent on multiple events where each proposed injury would only occur at "some indefinite future time." *Id.* at 321, 327 (internal quotation marks omitted). Likewise, in *Center for Biological Diversity v. EPA*, this Court considered the standing of four plaintiffs to challenge permits granted by the EPA to discharge pollutants into the Gulf of Mexico. 937 F.3d

24

533, 535–36 (5th Cir. 2019). This Court found their affidavits lacking because they did not describe a "geographic nexus"—that they planned to visit the location where pollutants would be discharged— or a "temporal nexus"—that they would travel to a pollutant site when a discharge was occurring. *Id.* at 538, 540. And in *US Investor, Inc. v. Vidal,* this Court found that five events would have to occur before the plaintiff would suffer injury, including a third-party challenge and a discretionary act by the government in response to that lawsuit. 2022 WL 4595001, at *3–4 (5th Cir. Sept. 30, 2022) (per curiam). Because the "[n]on-occurrence of a single event in this series breaks the chain of causation between the alleged procedural failing and resulting harm," this Court held that the asserted injury was too "speculative" to support individual or associational standing *Id.*, at *4 & n.6.

Unlike the speculative or attenuated injury asserted in those cases, the injury here is demonstrably concrete and imminent. The state has warned NetChoice's members that they are out of compliance with the challenged Act and threatened them with enforcement actions within 45 days. And two of NetChoice's members submitted

25

declarations asserting that compliance with this soon-to-be-enforced law would require "extensive modifications" that would "fundamentally alter the nature" of their platforms and require "a significant amount of budget, resources and staff investment." D. Ct. Dkt. 57-4 Boyle Decl. ¶ 9.

Requiring additional evidence would transform the standing inquiry into a merits question. But an association need not prove its constitutional claim to show that it has standing to bring the claim in the first place. *See Warth*, 422 U.S at 500 ("[S]tanding in no way depends on the merits of plaintiff's contention . . . ."). The primary purpose of the standing doctrine is to weed out claims brought by uninterested parties and "concerned bystanders." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982) (internal quotation marks omitted). Such a concern is hardly present here, where NetChoice's members are the primary and direct targets of the challenged legislation.

### D. NetChoice's Members Were Not Necessary Participants In The Lawsuit

To satisfy the third element of associational standing, the association must show that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. Again, NetChoice amply established that no such participation was required here. *NetChoice*, 812 F. Supp. 3d at 629–31. The state's response again confuses standing with the merits.

The state contends that NetChoice failed to provide sufficient evidence to support its claims but "instead rel[ied] on websites" to establish injury. La.Br. 35. According to the state, this evidence was insufficient because some members may already have adopted platform changes that go beyond those required by the statute, thus obviating any burden allegedly imposed by the statute. *Id.* at 36. But the state can hardly argue with a straight face that NetChoice's members failed to prove that Act 456 imposes a burden when the state itself sent notices to each of the affected members asserting

that they are out of compliance and threatening enforcement.[4] And the state was free to take discovery and present evidence that Act 456 would not burden certain members, but it declined to do so. The state cannot now argue that NetChoice's members' participation was required to defeat a defense that the state never attempted to prove.

It is true that an as-applied challenge may require some degree of individualized evidence, but that does not mean that every member's "participation" is required. Associations often are required to "prove[]" their claims using "evidence from representative injured members," *AAPS*, 627 F.3d at 552, and the presentation of such evidence does not defeat associational standing. Here, NetChoice was able to prove the constitutional claims asserted and obtain the requested injunctive relief with limited information from its members, and the state has failed to demonstrate that more was required.

---

[4] It would be especially odd to impose heightened requirements for as-applied pre-enforcement challenges, given that such challenges seek *narrower* relief than facial challenges. *NetChoice*, 812 F. Supp. 3d at 664.

The state contends that NetChoice's members are not "aligned in the way NetChoice . . . assumes." La.Br. 36. But perfect litigation or policy alignment of all members has never been a requirement for associational standing. *See Am. Booksellers Ass'n*, 484 U.S. at 389 n.4 (describing the different types of booksellers that would need to comply with the law and how "[t]he ability of these diverse types of booksellers to utilize the differing methods of compliance varies"); *Sierra Club v. Glickman*, 82 F.3d 106, 110 (5th Cir. 1996) (per curiam) ("[W]e reject the district court's ruling that AFBF does not meet the requirements for associational standing. . . . That not all AFBF members support intervention is not dispositive. The AFBF has standing to sue if only a few members support it."). Indeed, the Chamber and its 300,000 members are rarely in perfect alignment, but that is not a barrier to its standing. Other organizations likely include members with even less "alignment," but courts have nevertheless allowed such organizations to litigate on behalf of their members. *See, e.g.*, *NAACP*, 357 U.S. at 458–59; *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco & Firearms*, 700 F.3d 185, 191–92 (5th Cir. 2012), *abrogated on other grounds, N.Y. State Pistol & Rifle*

29

*Ass'n v. Bruen*, 597 U.S. 1 (2022); *Chamber of Com.*, 820 F. Supp. 3d at 482–84. And in all events, the affected members *are* aligned in the one aspect that matters for standing: they have all been deemed non-compliant by the state and threatened with enforcement actions. That is more than sufficient for associational standing.

## CONCLUSION

For the reasons stated above and in NetChoice's brief, this Court should affirm the district court's conclusion that NetChoice has associational standing.

Dated: June 2, 2026              Respectfully submitted,

                                 */s/ Robert E. Dunn*
                                 Robert E. Dunn
                                 EIMER STAHL LLP
                                 1999 S. Bascom Avenue
                                 Suite 1025
                                 Campbell, CA 95008
                                 (408) 889-1690
                                 rdunn@eimerstahl.com

                                 Nathaniel K.S. Wackman
                                 EIMER STAHL LLP
                                 224 South Michigan Avenue,
                                 Suite 1100

Chicago, IL 60604
(312) 660-7635
nwackman@eimerstahl.com

Jonathan D. Urick
Mariel A. Brookins
U.S. Chamber Litigation Center
1615 H Street, N.W.
Washington, D.C. 20062
(202) 463-5337

*Counsel for Amicus Curiae
Chamber of Commerce of the
United States of America*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because the brief contains 5,272 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: June 2, 2026                Respectfully submitted,

                                   /s/ *Robert E. Dunn*
                                   Robert E. Dunn

                                   *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify that the foregoing brief of amicus curiae was filed via CM/ECF and served on all counsel of record.

Dated: June 2, 2026                    Respectfully submitted,

                                       /s/ *Robert E. Dunn*
                                       Robert E. Dunn

                                       *Counsel for Amicus Curiae*